1  EVAN C. BORGES, State Bar No. 128706
    *EBorges@GGTrialLaw.com*
2  HEEJIN H. HWANG, State Bar No. 349455
    *HHwang@GGTrialLaw.com*
3  GREENBERG GROSS LLP
   650 Town Center Drive, Suite 1700
4  Costa Mesa, California 92626
   Telephone: (949) 383-2800
5  Facsimile: (949) 383-2801

6  Attorneys for Defendants Erika Girardi,
   Laia Ribatallada, and Michael Minden

7

8

9                **UNITED STATES DISTRICT COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11

12  CHRISTOPHER PSAILA,                    | Case No. 2:23-cv-07120-MWF (SKx)

13              Plaintiff,                  | **NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO**
14       v.                                | **CALIFORNIA ANTI-SLAPP STATUTE (C.C.P. § 425.16, ET**
15  ERIKA GIRARDI aka ERIKA JAYNE,         | **SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA,**
    AMERICAN EXPRESS COMPANY,              | **AND MICHAEL MINDEN;**
16  ROBERT SAVAGE, KENNETH                 | **MEMORANDUM OF POINTS AND**
    HENDERSON, STEVE SCARINCE,             | **AUTHORITIES IN SUPPORT**
17  PETER GRIMM, LAIA                      | **THEREOF**
    RIBATALLADA, MICHAEL                   |
18  MINDEN, and DOES 1 TO 10,              | Filed Concurrently with Declarations of
    Inclusive,                             | Erika Girardi, Laia Ribatallada, Michael
19                                         | Minden, and Evan C. Borges and
              Defendants.                  | Request for Judicial Notice, and
20                                         | [Proposed] Order
21                                         |
22                                         | **Hearing:**
                                           | Date:      December 18, 2023
23                                         | Time:    10:00 a.m.
                                           | Crtrm.: 5A
24                                         |
25                                         | Complaint Filed:  August 29, 2023
                                           | Trial Date:  Not Assigned
26

27

28

SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE (C.C.P.
§ 425.16, ET SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA, AND MICHAEL MINDEN

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 18, 2023, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 5A of the above-captioned Court located at 350 West First Street, Los Angeles, California 90012, the Honorable Michael W. Fitzgerald presiding, defendants Erika Girardi ("Ms. Girardi"), Laia Ribatallada ("Ms. Ribatallada"), and Michael Minden ("Mr. Minden") (collectively the "EG Defendants") will, and hereby do, bring this special motion to strike the Complaint filed in this action by plaintiff Christopher Psaila ("Mr. Psaila" or "Plaintiff") pursuant to the California anti-SLAPP statute set forth in California Code of Civil Procedure Section 425.16 (the "Motion").

Specifically, by this Motion, the EG Defendants request that the Court strike the only two causes of action against them in the Complaint:  the second cause of action for malicious prosecution; and the fourth cause of action for conspiracy to commit malicious prosecution.  In addition, if the Court grants the Motion, the EG Defendants request attorneys' fees and costs as provided by California Code of Civil Procedure § 425.16(c).[1]

This Motion is brought following the conference of counsel pursuant to Local Rule 7-3, which took place on October 10, 2023.  Based on a recent Stipulation of the parties filed on October 16, 2023 (Document No. 22), the EG Defendants have set this Motion for hearing on December 18, 2023, to allow for a more extended briefing schedule agreed to by the parties in the Stipulation, as follows:

- The EG Defendants will file and serve the Motion on **October 20, 2023**;

---

[1] If a party's anti-SLAPP motion is granted, by statute, an award of attorneys' fees and costs is mandatory.  *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136 (9th Cir. 2022); Cal. Civ. P. Code § 425.16(c).  The statutory fee provision is "broadly construed."  *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1115 (C.D. Cal. 2004) (citing *Wilkerson v. Sullivan*, 99 Cal. App. 4th 443, 446 (2002)).

Case No. 2:23-cv-07120-MWF (SKx)

SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE (C.C.P. § 425.16, ET SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA, AND MICHAEL MINDEN

- Plaintiff's opposition brief and supporting papers are due on or before **November 20, 2023**;

- The EG Defendants' reply papers are due on or before **December 4, 2023**; and

- The hearing on the Motion is set at least 14 days after the reply papers are filed (that is, on **December 18, 2023**, the first available hearing date after December 14, 2023). *See* Stipulation, Etc. (Document No. 22).

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of Erika Girardi, Laia Ribatallada, Michael Minden, and Evan C. Borges filed concurrently herewith, the pleadings and records on file in this action, any and all matters of which the Court may take judicial notice, and such other and further argument and evidence as may be presented to and accepted by the Court prior to the Court's decision on the Motion.

DATED:  October 20, 2023          Respectfully submitted,

GREENBERG GROSS LLP

By: _____
        Evan C. Borges
        Heejin H. Hwang
        Attorneys for Defendants Erika Girardi,
        Laia Ribatallada, and Michael Minden

1

## **<u>TABLE OF CONTENTS</u>**

2

<span style="float:right">**Page**</span>

3

I.    LEGAL STANDARD AND SUMMARY OF ARGUMENT ........................ 8

4

II.   FACTUAL BACKGROUND ........................................................ 12

5

     A.    Ms. Girardi's Marriage to Thomas Girardi ("TG") in 2000;
          Control Over the Couple's Finances; Ms. Girardi's Use of

6

          American Express Cards; and Her Divorce Filing and Separation
          From TG in November 2020 ........................................... 12

7

8

     B.    2007-2016:  Ms. Girardi's Work as an Entertainer. ..................... 12

9

     C.    2014-2016:  Ms. Girardi's Business Relationship with Marco
          Morante, Mr. Psaila, and Their Business Marco Marco. ................. 13

10

     D.    2015-2016:  The Nature and Frequency of Ms. Girardi's

11

          Performance Shows and Useage of Costume Design,
          Manufacture, and Related Services of Marco Marco .................... 13

12

     E.    Summer 2016:  TG Complains to Erika About Increased,
          Excessive Charges on her Amex. .................................... 14

13

14

     F.    September 2016:  For the First Time, Erika Obtains Access to
          Her Amex Account Information and Charges, Notices an

15

          Unusual Charge From Marco Marco, But Gives Them the
          Benefit of the Doubt. ................................................ 15

16

     G.    November 30 and December 1, 2016:  Additional Suspicious,
          Unauthorized Charges from Marco Marco, Mr. Psaila's

17

          Admission of Unauthorized Charges, Mr. Psaila's Provision of
          Woefully Incomplete Invoices, and the EG Defendants' Further

18

          Investigation. ....................................................... 15

19

     H.    Early December 2016:  Erika Reports Her Concerns to Law
          Enforcement. ....................................................... 17

20

21

     I.    December 8, 2016:  Mr. Psaila's Email Admission to Erika
          Stating:  "I have been going through orders and credit card

22

          statements *over and over and am clearly seeing mistakes. . . . I*
          would like to go through and come up with a plan to get this

23

          sorted." ............................................................ 19

24

     J.    December 14, 2016:  At an In-Person Meeting with Erika, Laia,
          and Mikey, Mr. Psaila Undisputedly Admits to Approximately

25

          $100,000 in "Overcharges" (By Definition, Unauthorized
          Charges), and States that He and Marco Marco Want to Make

26

          Arrangements to Pay the Money Back Over Time. ..................... 20

27

     K.    Further Investigation and Work by Erika, Laia, and Mikey
          Provided Additional Probable Cause. ................................. 21

28

     L.    2017:  Events Leading Up to the Grand Jury Indictment of Mr.

Case No. 2:23-cv-07120-MWF (SKx)

SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE (C.C.P.
§ 425.16, ET SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA, AND MICHAEL MINDEN

Psaila on April 28, 2017................................................................21

M.   Events Leading Up to Dismissal Without Prejudice by DOJ in
September 2021, More Than Four Years After Indictment..................22

III.   ARGUMENT .........................................................................................23

A.   The Court Should Strike Mr. Psaila's Malicious Prosecution
Claim................................................................................................23

1.   Mr. Psaila's Claim Arises from the EG Defendants'
Protected Activity .........................................................23

2.   Mr. Psaila Cannot Meet His Burden of Showing a
Probability of Prevailing on His Malicious Prosecution
Claim..............................................................................24

(a)   Plaintiff Cannot Meet his Burden to Show Absence
of Probable Cause.............................................24

(i)   The Grand Jury Indictment of Mr. Psaila
Gave Rise to a Presumption of Probable
Cause. ..................................................25

(ii)   Mr. Psaila Admitted to the EG Defendants
That the Charges from Amex Alerts Were
Mistaken and Therefore Not Authorized. ..............25

(iii)   Mr. Psaila's Further Incriminating
Admissions on December 8, 2016. ........................26

(iv)   Mr. Psaila Admitted to $100,000 in
Overcharges During the December 14, 2016
Meeting, and Offered to Pay the Money
Back........................................................26

(v)   The EG Defendants Reviewed the Invoices
Provided by Mr. Psaila, Which Were
Woefully Incomplete...............................27

(vi)   The EG Defendants Reviewed Additional
Documents Prior to the Indictment. ......................27

(b)   Plaintiff Cannot Meet His Burden to Show a
Favorable Termination on the Merits..............................28

(c)   Plaintiff Cannot Meet His Burden to Show that the
EG Defendants Acted with Malice....................................28

B.   The Court Should Strike Plaintiff's Conspiracy Claim ........................29

IV.   CONCLUSION ....................................................................................29

-5-          Case No. 2:23-cv-07120-MWF (SKx)

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Choate v. County of Orange*,
   86 Cal. App. 4th 312 (2000)........................................................................29

*Comstock v. Aber*,
   212 Cal. App. 4th 931 (2012)......................................................................23

*Conrad v. United States*,
   447 F.3d 760 (9th Cir. 2006)........................................................................25

*CoreCivic, Inc. v. Candide Grp., LLC*,
   46 F.4th 1136 (9th Cir. 2022)........................................................................9

*Crowley v. Katleman*,
   8 Cal. 4th 666 (1994)...................................................................................24

*Dickens v. Provident Life & Accidents Ins. Co.*,
   117 Cal. App. 4th 705 (2004)......................................................................23

*Downey Venture v. LMI Ins. Co.*,
   66 Cal. App. 4th 478 (1998)........................................................................29

*Drummond v. Desmarais*,
   176 Cal. App. 4th 439 (2009)......................................................................28

*Ecker v. Raging Waters Grp., Inc.*,
   87 Cal. App. 4th 1320 (2001)......................................................................24

*Herring Networks, Inc. v. Maddow*,
   8 F. 4th 1148 (9th Cir. 2021).........................................................................9

*Jaffe v. Stone*,
   18 Cal. 2d 146 (1941)..................................................................................28

*Jarrow Formulas, Inc. v. LaMarche*,
   31 Cal. 4th 728 (2003)...........................................................................10, 24

*Kenne v. Stennis*,
   230 Cal. App. 4th 953 (2014)......................................................................29

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Lauter v. Anoufrieva*,
 642 F. Supp. 2d 1060 (C.D. Cal. 2009) .................................................. 24

*Northrup v. Baker*,
 202 Cal. App. 2d 347 (1962) .............................................................. 24

*Pasternack v. McCullough*,
 235 Cal. App. 4th 1347 (2015) ............................................................ 28

*Roberts v. McAfee, Inc.*,
 660 F.3d 1156 (9th Cir. 2011) ................................................... *passim*

*Sangster v. Paetku*,
 68 Cal. App. 4th 151 (1998) ................................................ 10, 24, 25

*Sheldon Appel Co. v. Albert & Oliker*,
 47 Cal. 3d 863 (1989) ......................................................... 10, 24

*Sierra Club Found. v. Graham*,
 72 Cal. App. 4th 1135 (1999) .............................................. 25, 26, 28

**Statutes**

Cal. Code Civ. Proc., § 425.16 ........................................................... 8

SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE (C.C.P.
§ 425.16, ET SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA, AND MICHAEL MINDEN

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.     LEGAL STANDARD AND SUMMARY OF ARGUMENT

3      By his Complaint, plaintiff Christopher Psaila ("Mr. Psaila" or "Plaintiff")

4   asserts claims against defendants Erika Girardi ("Ms. Girardi"), Laia Ribatallada

5   ("Ms. Ribatallada"), and Michael Minden ("Mr. Minden") (collectively the "EG

6   Defendants") for malicious prosecution and conspiracy to commit malicious

7   prosecution, based on their role as citizens in reporting suspected wrongdoing by

8   Mr. Psaila to federal law enforcement.  It is undisputed that in April 2017, an

9   independent Assistant United States Attorney, who is not alleged to have been

10   subject to improper influence, sought and obtained a criminal indictment from a

11   grand jury against Mr. Psaila, based on seven purportedly unauthorized American

12   Express charges on the credit card of Ms. Girardi, which totaled approximately

13   **$62,667**.  More than four years later, in September 2021, a different AUSA filed an

14   unopposed motion to dismiss the indictment without prejudice, which was granted.

15   As to the reasons for the dismissal, a recent Los Angeles Times article quotes an

16   official statement from the United States Attorney's Office as follows:  "We

17   ultimately determined that law enforcement evidence preservation issues

18   undermined our ability to prosecute the case and the interests of justice supported

19   dismissal."[2]

20      The EG Defendants bring this special motion to strike the Complaint under

21   the California anti-SLAPP statute, which is codified at California Code of Civil

22   Procedure Section 425.16 (the "Motion").  Federal courts recognize the validity of

23

24   _____

25      [2] Matt Hamilton & Harriet Ryan, *The Girardis, the Secret Service and wire fraud claims that nearly ruined a Hollywood designer*, L.A. TIMES  (Feb. 9, 2023)

26   https://www.latimes.com/california/story/2023-02-09/tom-erika-girardi-secret-service-hollywood-designer-wire-fraud-

27   claims#:~:text=The%20Girardis%2C%20the%20Secret%20Service,business%20and

28   %20devastated%20him%20personally.

anti-SLAPP motions. *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F. 4th 1136, 1140 (9th Cir. 2022). In deciding anti-SLAPP motions, both federal and state courts are required to conduct a "two-step inquiry." *Herring Networks, Inc. v. Maddow*, 8 F. 4th 1148, 1155 (9th Cir. 2021). First, defendant bears the initial burden to establish that plaintiff's complaint arises out of defendant's "petitioning activity." *Roberts v. McAfee, Inc.*, 660 F. 3d 1156, 1163 (9th Cir. 2011). Second, if defendant meets this initial burden, the burden shifts to plaintiff to establish, based on evidence, a probability of prevailing on the merits of the challenged claims. *Id.*

In this case, Plaintiff's claims against the EG Defendants are for malicious prosecution and conspiracy to commit malicious prosecution.[3]

Regarding the first prong of anti-SLAPP analysis, it is undisputed, based on the allegations of Plaintiff's Complaint and applicable law, that: (1) Plaintiff's malicious prosecution claim arises out of the EG Defendants' communications with federal law enforcement about suspected wrongdoing and a criminal investigation of Plaintiff; and (2) such communications were and are "petitioning activity" as a matter of law under the anti-SLAPP statute. Therefore, the EG Defendants have met their burden under the first prong of anti-SLAPP analysis, which means the parties must address the second prong.

Under the second prong of anti-SLAPP analysis, Plaintiff bears the burden to establish, by evidence, that Plaintiff is likely entitled to judgment on the merits of his claim for malicious prosecution. In California, malicious prosecution claims are disfavored, due to the chilling effect of malicious prosecution lawsuits on the willingness of citizens to petition the courts for resolution of grievances, or to petition the executive branch by communicating and reporting suspected

---

[3] As discussed in section III.B below, if Plaintiff's malicious prosecution claim against the EG Defendants is dismissed, then Plaintiff's derivative claim of conspiracy to commit malicious prosecution also must be dismissed. This Motion thus focuses on Plaintiff's malicious prosecution claim.

wrongdoing to law enforcement.  As a result, "courts have placed strict limitations on the elements of the tort of malicious prosecution." *Sangster v. Paetku*, 68 Cal. App. 4th 151, 164 (1998).  A plaintiff must demonstrate "that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice." *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 872 (1989) (internal alterations omitted).  In the anti-SLAPP context, a plaintiff must demonstrate a "probability of prevailing" on each element.  *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th 728, 741 (2003).

Regarding the relevant inquiry on an anti-SLAPP motion brought in response to a malicious prosecution complaint, after conclusion of a prior federal criminal matter where defendant had reported plaintiff to federal authorities, the Ninth Circuit decision in *Roberts v. McAfee, Inc.*, *supra*, 660 F. 3d 1156 is on all fours with this case, and compels granting the Motion.

In *Roberts*, the Ninth Circuit emphasized that in analyzing an anti-SLAPP motion filed in response to a malicious prosecution claim, the issue is not whether there was or is conflicting evidence regarding plaintiff's prior alleged wrongdoing. Rather, the Court focused on the fact that defendant had **some evidence** supporting probable cause (including, as is present in the instant case, incriminating prior admissions by plaintiff, which plaintiff later retracted and argued had been misconstrued).  The Court held that such evidence supporting probable cause required granting defendant's anti-SLAPP motion, even if plaintiff's accusations were true that in the underlying matter, defendant had falsified or exaggerated other evidence to make plaintiff's guilt seem more clear.  *See Roberts,* 660 F.3d at 1164-66.

Thus, in a context where, as in the present case, defendant had some evidence to support probable cause in the form of prior incriminating admissions by plaintiff, the Ninth Circuit ruled that plaintiff, to meet his burden of establishing the *absence*

-10-

of probable cause, must show that defendant "fabricated the **entire** predicate of its claim." *Roberts,* 660 F. 3d at 1164 (emphasis added). The Court stated that this meant plaintiff would need to establish that defendant knew of "***no*** facts that could provide reason to suspect the plaintiff of wrongdoing." *Id*. (emphasis in original).

In light of the Ninth Circuit's ruling in *Roberts*, the repeated absolute, extreme, and unyielding allegations of the Complaint, which allege a total and complete lack of any evidence whatsoever to support any suspicion whatsoever or any report to law enforcement about Mr. Psaila, can be understood as not only rhetorical flourishes, but rather acknowledgments of the burden that Plaintiff must meet in response to this Motion. In this regard, as was present in the facts giving rise to the *Roberts* decision, no matter how many contrary statements Plaintiff now tries to make, the fact remains that the evidence in the possession of the EG Defendants at the time, including undisputed incriminating admissions by Plaintiff himself, supported an objectively reasonable basis to have suspected Plaintiff of wrongdoing.

In sum, based on the evidence in this case, including the undisputed and incriminating admissions by Mr. Psaila discussed below, and applying the legal standard required by the Ninth Circuit in *Roberts*, the Court should grant the present Motion and find as a matter of law that: (1) the EG Defendants possessed evidence sufficient to support probable cause; and (2) Plaintiff has not met and cannot meet his burden to show the absence of probable cause. In addition, Plaintiff cannot meet his burden on the element of a prior favorable termination on the merits. The only available evidence shows that the Government's dismissal without prejudice of the indictment against Mr. Psaila, more than four years after it was filed, was not due to his innocence or a determination on the merits, but rather, "law enforcement evidence preservation issues." Finally, Plaintiff cannot meet his burden to show "actual malice" on the part of the EG Defendants, a point that is particularly obvious as to Mr. Minden given the lack of even legally sufficient allegations

1  against him.

2  **II.     FACTUAL BACKGROUND**

3      **A. <u>Ms. Girardi's Marriage to Thomas Girardi ("TG") in 2000; Control**

4      **Over the Couple's Finances; Ms. Girardi's Use of American Express**

5      **Cards; and Her Divorce Filing and Separation From TG in November**

6      **2020.</u>**

7      In 2000, defendant Erika Girardi ("Ms. Girardi" or "Erika"), an entertainer

8  with a high school education, married attorney Thomas Girardi ("TG"), who was 61

9  years old at the time and more than 30 years her senior.  At the time, TG was a well-

10  known attorney who showed exterior hallmarks of wealth and financial success.  At

11  all times during the marriage, TG exercised complete and exclusive control over the

12  couple's finances, which were managed out of his law firm Girardi Keese ("GK"),

13  and into which Erika was not provided with any visibility.  (*See* Declaration of Erika

14  Girardi ("EG Decl.") at ¶¶ 2–4.)

15      During the marriage, TG provided Erika the use of an American Express card,

16  including for purposes of re-starting her singing and performing career in 2007.

17  Until the events giving rise to this litigation in 2016, Erika never saw nor was she

18  provided a password or access to the statements or transaction records on her Amex

19  card, which were sent to and paid out of GK.  (*Id.* at ¶¶ 6–8.)

20      In early November 2020, many years after the events relevant to the

21  Complaint and this Motion, Erika filed for divorce and separated from TG.  Since

22  that time, Erika has been living in a rental and trying to support herself.  (*Id.* at ¶ 5.)

23      **B. <u>2007-2016:  Ms. Girardi's Work as an Entertainer.</u>**

24      Beginning in approximately 2007 and continuing through 2016 and thereafter,

25  a significant aspect of Erika's entertainment career involved stage shows featuring

26  performance of her dance-oriented songs and dancing, sometimes with between two

27  to four male backup dancers, typically in LGBTQ nightclubs.  (EG Decl., ¶ 6).

28      In 2009, Erika met defendant Michael Minden ("Mr. Minden" or "Mikey"),

Case No. 2:23-cv-07120-MWF (SKx)

SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE (C.C.P.
§ 425.16, ET SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA, AND MICHAEL MINDEN

an accomplished choreographer and dancer, and she hired him to choreograph and assist with production of her shows.  Defendant Laia Ribitallada ("Ms. Ribitallada" or "Laia") is a former professional dancer, who already had been working with Mikey and who assisted Mikey and Erika in production of her performance shows. (*See* Declarations of Laia Ribatallada ("LR Decl."), ¶¶ 2–8, Michael Minden ("MM Decl.), ¶¶ 6–9).

Between approximately 2013 and the present (with minor exceptions), Mikey and Laia have worked consistently to assist Erika with her shows.  In addition, since 2015, Laia has worked as Ms. Girardi's full-time assistant, both for performances and in connection with Erika's role as a cast member of the Bravo reality television series "Real Housewives of Beverly Hills" (which commenced in August 2015). (LR Decl., ¶ 7; MM Decl., ¶ 9).

**C.  <u>2014-2016:  Ms. Girardi's Business Relationship with Marco Morante, Mr. Psaila, and Their Business Marco Marco.</u>**

In 2014, Erika and Laia were introduced to Marco Morante, a costume designer and maker, who already knew Mikey.  At the time, Erika had been using a costume boutique known as Sylvia's, which was expensive.  Erika sought out a lower cost alternative; she was impressed with Mr. Morante; and they began to work together, along with Mr. Morante's business partner, Mr. Psaila.  Erika, Laia and Mikey became very good friends with Mr. Morante and Mr. Psaila, and had full trust in them.  (LR Decl., ¶¶ 9-16; MM Decl., ¶¶ 10-13; EG Decl., ¶¶ 14–21).

**D.  <u>2015-2016:  The Nature and Frequency of Ms. Girardi's Performance Shows and Useage of Costume Design, Manufacture, and Related Services of Marco Marco</u>**

It is important to understand the nature and frequency of Erika's performance shows, and in particular, the use of costume design, manufacture, and related services, in 2015 and 2016, the years at issue in the underlying credit card charge dispute.  Erika was the feature performer at her shows; she often wore the same

Case No. 2:23-cv-07120-MWF (SKx)

1  costume on multiple occasions; and she did not obtain, require, or request a new

2  costume for each show.  Erika's back-up dancers generally wore costumes

3  comprised of department store-purchased outfits.  Only on rare occasions would

4  Erika, Mikey, or Laia ask Marco Marco for costumes for the back-up dancers.  (LR

5  Decl., ¶¶ 9-16; MM Decl., ¶¶ 10-13; EG Decl., ¶¶ 14–21).

6       In 2015, Erika performed at a total of 21 shows.  In 2016, Erika performed at

7  about 11 or 12 shows, close to half the number of shows in 2015, for a total number

8  of shows during the two-year period of 32 to 33.  (EG Decl., ¶ 49).

9       While the price of Erika's costumes varied, as noted, she often re-wore

10  costumes and did not request or obtain a new costume for every show.  Erika,

11  Mikey, and Laia have estimated a maximum average charge per show for costumes

12  and related services from Marco Marco of $5,000.  This figure, multiplied by 32 to

13  33 shows, would result in a total expected approximate charge for the two-year

14  period of between $160,000 and $165,000.[4]  This amount is high, however,

15  considering that Erika did not request or receive new costumes for each show.  (LR

16  Decl., ¶¶ 25-28; EG Decl., ¶ 50).

17       **E.    Summer 2016:  TG Complains to Erika About Increased, Excessive**

18            **Charges on her Amex.**

19       In the summer of 2016, Erika thought that her husband was extremely

20  wealthy and earning significant sums of money from his law practice.  Also, TG had

21  not otherwise complained about financial problems, nor had he mentioned or had

22  Erika heard that TG or GK had needed to take on debt or that they were behind on

23  any outstanding debt obligations.  (EG Decl., ¶¶ 22-24).

24

25       [4] While Erika did not learn these facts until December 2016, in fact, the total

26  Marco Marco charges to Erika's Amex were $303,279 in 2015 (for 21 shows) and

27  more than double that amount or $631,240 (for 11-12 shows) in 2016, resulting in a
    grand total for the two-year period of $934,519, a difference of approximately

28  $769,519 as compared to the high-end usage rough estimate of $165,000.

-14-

In about the summer of 2016, TG complained to Erika about increased and allegedly excessive charges on her Amex card.  Erika had no visibility or access to her Amex statements or charges at that time, and she responded by asking TG what charges he was referring to.  All TG did was mention high dollar amounts with no specifics.  About a month after the first complaint, TG again complained to Erika about supposedly high and excessive Amex charges.  Again, Erika asked for specifics but received none.  (*Id*. at ¶ 25).

**F. September 2016:  For the First Time, Erika Obtains Access to Her Amex Account Information and Charges, Notices an Unusual Charge From Marco Marco, But Gives Them the Benefit of the Doubt.**

In September 2016, based on TG's complaints, Erika contacted Amex on her own to get specifics, but Erika could not get access to her credit card statements or charge history because she did not have authorization or a required passcode.  An Amex telephone service representative, however, recognized Erika's voice from the Housewives show, and provided her access, which led to Erika being able to set up mobile alerts from the Amex application for charges .  (EG Decl., ¶¶ 26-28).

On Monday September 19, 2016, Erika, Mikey, and Laia recall vividly that when they were in the car on the way to the airport to return from a show in Dallas that weekend, Erika received an alert on her phone about a charge from Marco Marco that none of them recognized as legitimate.  At Erika's request, Mikey called Mr. Psaila, who said that the charge was a mistake and he would fix it.  Erika, Mikey, and Laia at the time gave Mr. Psaila the benefit of the doubt.  (LR Decl., ¶¶ 17-21; MM Decl., ¶¶ 29-35; EG Decl., ¶¶ 29-35).

**G. November 30 and December 1, 2016:  Additional Suspicious, Unauthorized Charges from Marco Marco, Mr. Psaila's Admission of Unauthorized Charges, Mr. Psaila's Provision of Woefully Incomplete Invoices, and the EG Defendants' Further Investigation.**

On November 30 and/or December 1, 2016, Ms. Girardi received an Amex

alert for two different Marco Marco charges totaling $9,500, which Erika, Mikey, and Laia knew they had not authorized because Erika had not done any shows in November and did not have any shows scheduled for December 2016.  These unauthorized charges concerned Erika, Laia, and Mikey, and caused them to take further action.  (LR Decl., ¶ 22; MM Decl., ¶¶ 14-18; EG Decl., ¶¶ 36-45.).

*First*, on December 1, Mikey sent a text to Mr. Psaila, including a picture of the notice of the two pending charges, asking for an explanation.  In response, on December 1, 2016, Mr. Psaila by reply text made the following undisputed admission of unauthorized charges:

> **Ok that is very wrong.  Wtf is going on!?  I'm sorry.  I'm calling them [Amex] now**. . . . I had this same issue with another client a week ago.  My apologies.  Time for a new bookkeeper.  (emphasis added).

(MM Decl., Ex. 1)

In the same text exchange, after being told by Mikey that, "Erika is going back through all other Marco charges to make sure there has been no other mistakes previously[,]" Mr. Psaila replied:  "I've spoken with her and we are getting it [evidence to support prior charges] together."  (*Id.*)

*Second*, presumably in response to his discussion with Erika that Mr. Psaila referred to in his above text, later on December 1, 2016, Mr. Psaila sent an email to Erika with attachments consisting of invoices and order forms from 2015 and 2016.  Laia proceeded that same day to analyze these documents, but on their face, at best, the documents supported only approximately $174,270.50 of charges for the two-year period of 2015 and 2016 – leaving approximately $760,000 in charges from Marco Marco for the same time period without any invoice or order to support them. (EG Decl., ¶¶ 54-56; LR Decl., ¶¶ 31-35).

*Third*, on December 1, 2016, at Erika's request, Laia also searched for all charges made by Marco Marco to Erika's Amex card during the two-year period

SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE (C.C.P. § 425.16, ET SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA, AND MICHAEL MINDEN

2015 and 2016.  At that time, Laia discovered, for the first time, that the total Marco Marco charges to Erika's Amex in 2015 and 2016 amounted to $303,279 and $631,240, respectively, with a grand total of $934,519.  These charges exceeded by several hundred thousand dollars the total amounts that, based on her significant involvement and knowledge of Erika's shows and use of Marco Marco's services, Laia expected to find.  Also, as noted above, the 2016 total charge of $631,240 (based on 11-12 shows) was more than double the amount of the 2015 total charge (based on 21 shows).  Further, as noted, Mr. Psaila had provided invoices and orders allegedly supporting, at most, $174,270.50 of charges, which left a remaining approximately $760,000 in charges with no invoice or proof of authorization.  (LR Decl., ¶¶ 24-30; EG Decl., ¶¶ 47-53).

That same day (December 1, 2016), Laia relayed to Erika the results of her analysis.  Both Laia and Erika at that point were deeply concerned that Erika may have been the victim of several hundred thousand dollars in unauthorized charges by Marco Marco.  (LR Decl., ¶¶ 24-30; EG Decl., ¶¶ 47-53).

## H. Early December 2016:  Erika Reports Her Concerns to Law Enforcement.

Greatly concerned by the above events, Ms. Girardi thought that she should report her concerns to law enforcement.  Contrary to the allegations of Plaintiff's Complaint, however, Ms. Girardi went to law enforcement on her own without discussing the matter with TG.  (EG Decl., ¶¶ 57-61).

Due to a prior experience in 2009, which had nothing to do with TG, Ms. Girardi had learned that the Secret Service had jurisdiction over credit card fraud. Specifically, in 2009, the Secret Service had contacted and interviewed Ms. Girardi because, along with Hollywood celebrities, Ms. Girardi had been the victim of fraudulent charges on her Amex by a Hollywood aesthetician, who was later charged criminally.  Based on this experience, Ms. Girardi understood that the Secret Service was the right agency to contact.  (*Id*. at ¶¶ 12-13, 58).

1    Ms. Girardi was aware that a social acquaintance of TG, a gentleman named

2    Mr. Savage, was a Secret Service agent.  Contrary to the allegations of the

3    Complaint, however, Ms. Girardi:  (1) did not discuss with TG that she was going to

4    reach out to the Secret Service or Mr. Savage; and (2) she had no idea at the time

5    (and did not learn until being so advised by the LA Times shortly before they ran the

6    above-quoted story in February 2023) that TG had any actual or potential attorney-

7    client relationship or other transactions with Mr. Savage in connection with a

8    Volkswagen case or otherwise.  Ms. Girardi simply reached out to the Secret

9    Service because that is what she had learned in 2009, and she reached out to Mr.

10   Savage because his was a name she recognized.  (*Id*. at ¶¶ 12-13, 58-61).

11   Based on a telephone call with Mr. Savage in early December 2016, Erika

12   was able to schedule a meeting with the Secret Service on December 7, 2016.  At

13   the meeting, which Erika, Laia, and Mikey attended, Mr. Savage introduced them to

14   two Secret Service agents who would handle the investigation:  Mr. Scarince and

15   Mr. Henderson.  After the December 7 meeting, Erika had no further

16   communications of any kind with Mr. Savage.  All her communications from that

17   point forward were with Mr. Scarince and principally with Mr. Henderson.  (EG

18   Decl., ¶¶ 63-67; LR Decl., ¶¶ 36-41; MM Decl., ¶¶ 30-34).

19   Also, as a matter of follow-up diligence, on December 9, 2023, Mr. Scarince

20   sent Erika electronic copies of her Amex statements from 2013 and 2014, which she

21   had been unable to obtain through the Amex system.  Notably, late in the day on

22   December 9, 2016, after reviewing the 2013 and 2014 Amex statements with Laia,

23   Erika sent an email to Mr. Scarince stating:  "We have reviewed both years and have

24   found nothing that doesn't make sense.  All the crazy charges begin April 2015 till

25   now."  (EG Decl., Ex. 3).[5]

26

27   _____

28   [5]  Contrary to the allegations of the Complaint, Ms. Girardi's email evidences
     a person trying to be careful about allegations, who was willing to acknowledge the
     absence of suspected wrongdoing along with identifying specific areas of concern.

**I.**   **December 8, 2016:  Mr. Psaila's Email Admission to Erika Stating:  "I have been going through orders and credit card statements *over and over and over and am clearly seeing mistakes. . . . I would like to go through and come up with a plan to get this sorted."***

By December 8, 2016, Mr. Psaila had known for at least a week, since December 1, that Ms. Girardi had received notice of charges that were unauthorized.

Also by December 8, 2016, Mr. Psaila had known for at least a week, since December 1, that Ms. Girardi was reviewing Marco Marco's prior charges, to which he had responded by sending her invoices and orders.  But those invoices and orders, as noted, were woefully incomplete and at best supported only $174,270 out of total charges of $934,519 for 2015 and 2016.

On December 8, 2016, with the above background and knowing the importance of the issue, Mr. Psaila sent an email to Ms. Girardi with the following admission:

> **I have been going through orders and credit card statements *over and over and am clearly seeing mistakes*.**[6]  I know your schedule is very busy but if you have time coming up I would like to go through and come up with a plan to get this sorted.

(EG Decl., Ex. 2 (emphasis added)).

Erika, Laia, and Mikey – based on (1) Mr. Psaila's above-quoted statement, (2) his prior statement on December 1 of "**[o]k that is very wrong.  Wtf is going on!?  I'm sorry[,]**" (3) his provision of invoices and back-up documents supporting only $174,240 out of a total of $934,510 in total charges, leaving about $760,000 in charges without back-up, and (4) the similar gross discrepancy between Erika, Laia, and Mikey's expectations, based on their direct involvement, of usage of Marco Marco services as compared to the actual number and total amount of the charges –

---

[6] This admission is nowhere mentioned in Plaintiff's Complaint.

1  had an objectively reasonable basis and, as a matter of law, probable cause to

2  suspect that Erika was a victim of significant unauthorized charges, and therefore,

3  potentially intentional wrongdoing.  But there is more.

4        **J.**  **December 14, 2016:  At an In-Person Meeting with Erika, Laia, and**

5             **Mikey, Mr. Psaila Undisputedly Admits to Approximately $100,000 in**

6             **"Overcharges" (By Definition, Unauthorized Charges), and States**

7             **that He and Marco Marco Want to Make Arrangements to Pay the**

8             **Money Back Over Time.**

9        By December 14, 2016, Mr. Psaila had the benefit of almost two weeks to

10  think about (1) the issue of unauthorized charges and review of past charges raised

11  on December 1, (2) his December 1 admissions of "ok that is very wrong.  Wtf is

12  going on!?  I'm sorry[,]" (3) his December 1 provision of grossly incomplete back-

13  up documentation, and (4) his December 8 admission of "I have been going through

14  orders and credit card statements over and over and am clearly seeing mistakes."

15        With the above background, on December 14, 2016, Mr. Psaila met in person

16  with Erika, Laia, and Mikey.  At this meeting, at the request of the Secret Service,

17  Erika wore a wire.  Erika, Laia, and Mikey all recall that at the meeting, Mr. Psaila

18  admitted to approximately **$100,000** in "overcharges" (which by definition are

19  unauthorized charges), Mr. Psaila again blamed his bookkeeper, and he said that

20  Marco Marco would pay the money back.  (EG Decl., ¶¶ 78-81; LR Decl., ¶¶ 46-51;

21  MM Decl., ¶¶ 35-39).

22        The fact that Mr. Psaila admitted to approximately $100,000 in unauthorized

23  charges and offered to pay the money back constitutes an admission of taking

24  money that did not belong to him.  This additional, undisputed evidence provided

25  Erika, Laia, and Mikey a further objective reasonable basis or probable cause, as a

26  matter of law, to suspect Mr. Psaila of unauthorized credit charges and potential

27  wrongdoing.

28

## K. Further Investigation and Work by Erika, Laia, and Mikey Provided Additional Probable Cause.

After the December 14 meeting, Erika and Laia underwent a detailed analysis of information available to them, including new invoices that Mr. Psaila had provided at the December 14 meeting.  The new invoices from December 14, combined with the prior invoices received on December 1, only supported, at most, a total of approximately $461,000 in charges for the two year period – still a far cry from the $934,519 in total charges.  Further, Laia (working with Erika) analyzed multiple sources of information and, for the two-year period, was only able to identify approximately $133,500 in verifiable legitimate charges.  Laia provided her feedback to Agent Henderson, who eventually created a spread sheet analyzing the charges, including identification of charges supported by purported invoices.  (EG Decl., ¶¶ 82-90; LR Decl., ¶¶ 52-67).

## L. 2017:  Events Leading Up to the Grand Jury Indictment of Mr. Psaila on April 28, 2017.

While the EG Defendants heard about the Secret Service's search warrant carried out at Marco Marco in early 2017, the EG Defendants had no role in the process.  (EG Decl., ¶¶ 96-98).

In late April 2017, the AUSA assigned to the matter reached out to Erika and provided to her and Laia a sub-set of seven transactions totaling approximately $63,000 on which the Government was focused.  The EG Defendants had no role or involvement in how the seven transactions were selected.  It appears, however, from the spread sheet created with information from, among other sources, Laia and the invoices provided by Mr. Psaila on December 1 and December 14, that the seven transactions were a subset of a larger number of transactions on the spread sheet showing charges from Marco Marco with no apparent supporting invoice.  (EG Decl., ¶¶ 99-104; LR Decl., ¶¶  68-128.)

On April 26, 2017, Erika sent an email to the AUSA stating:  "we reviewed

these charges and we have no invoices, no emails, and no texts that can support these transactions.  I would like to speak to you again to make SURE we are not missing anything."  (EG Decl., Ex. 4.)  If anything, this email from Erika evidences a desire to be accurate, not make inaccurate assertions, and therefore, act in good faith as opposed to maliciously.

On or about April 27, 2017, during a conference call with the AUSA and Agent Henderson, Erika and Laia again stated that they had not been able to locate any invoices, emails, or other support for the seven transactions previously identified by the AUSA.  (EG Decl., ¶ 107.)

On April 28, 2023, the AUSA sought and obtained a grand jury indictment against Mr. Psaila, based on the seven transactions.  (Declaration of Evan C. Borges ("ECB Decl."), Ex. 1.)  Nowhere in Plaintiff's Complaint is there any allegation that the AUSA did not act independently, or that any improper influence of any kind affected the AUSA's decision to seek and obtain the indictment.

## M. Events Leading Up to Dismissal Without Prejudice by DOJ in September 2021, More Than Four Years After Indictment

After the indictment, Erika had only limited communications with federal law enforcement.  Erika recalls speaking with a female AUSA about trial.  At all times, Erika expressed her willingness to testify.  At no time did anyone advise Erika that there was any problem with the Government's case.  (EG Decl., ¶¶ 111-112.)

In late September 2021, Erika learned from social media that the indictment had been dismissed.  She immediately reached out to Agent Henderson, and they spoke by telephone.  Agent Henderson stated to Erika that he was likewise upset by the dismissal, and suggested that he was new at the time of the Psaila investigation and words to the effect of it being his first case.  (*Id*. at ¶¶ 114-116.)

In February 2023, the LA Times published the above-quoted article, including an official statement from the U.S. Attorney's Office about the dismissal, which said:  "We ultimately determined that **law enforcement evidence preservation**

1   **issues undermined our ability to prosecute the case** and the interests of justice

2   supported dismissal." *See* n. 2, *supra* (emphasis added).

3   **III.   ARGUMENT**

4        **A.   The Court Should Strike Mr. Psaila's Malicious Prosecution Claim**

5        The Court should grant the Motion and strike Mr. Psaila's malicious

6   prosecution claim, given that:  (1) the claim is based upon the EG Defendants'

7   participation in "petitioning activity"; and (2) Mr. Psaila cannot meet his burden to

8   establish a probability of prevailing on the elements of the claim.

9             **1.   Mr. Psaila's Claim Arises from the EG Defendants'**

10                 **Protected Activity**

11        In California, "a defendant's alleged participation in procuring a criminal

12   prosecution against a plaintiff falls within the ambit of the anti-SLAPP statute."

13   *Dickens v. Provident Life & Accidents Ins. Co.*, 117 Cal. App. 4th 705, 716 (2004);

14   *Comstock v. Aber*, 212 Cal. App. 4th 931, 941 (2012) ("The law is that

15   communications to the police are within SLAPP.").

16        Here, the Complaint arises out of the EG Defendants' communications with

17   law enforcement and participation in a criminal investigation of Plaintiff, which led

18   to a grand jury indictment.  Plaintiff alleges that the EG Defendants:  (1) "reported

19   to the Secret Service … that charges and transactions made to the AMEX card by

20   Plaintiff Psaila and Marco Marco were not authorized and were fraudulent"

21   (Compl., ¶ 39; *see also id.* at ¶ 57); and (2) spoke to the U.S. Attorney's Office as

22   the government prepared to charge Plaintiff and present its case to a grand jury.  (*Id.*

23   at ¶¶ 80–84.)  These activities by EG Defendants, as a matter of law, constituted

24   protected petitioning activity.  *See Dickens*, 117 Cal. App. 4th at 714 (contacting

25   "the executive branch of government and its investigators about a potential violation

26   of law," which "was preparatory to commencing … a criminal prosecution for mail

27   fraud" was a protected activity).  Therefore, the EG Defendants have met their

28   burden on the first prong of the anti-SLAPP analysis.

1          **2.**     **Mr. Psaila Cannot Meet His Burden of Showing a**

2                    **Probability of Prevailing on His Malicious Prosecution Claim**

3       "[M]alicious prosecution is a 'disfavored cause of action' because of its

4 potentially chilling effect on the public's willingness to [engage in petitioning

5 activity]." *Crowley v. Katleman*, 8 Cal. 4th 666, 680 (1994). As a result, "courts

6 have placed strict limitations on the elements of the tort of malicious prosecution."

7 *Sangster v. Paetku*, 68 Cal. App. 4th 151, 164 (1998). A plaintiff must demonstrate

8 "that the prior action (1) was commenced by or at the direction of the defendant and

9 was pursued to a legal termination in his, plaintiff's favor; (2) was brought without

10 probable cause; and (3) was initiated with malice." *Sheldon Appel Co. v. Albert &*

11 *Oliker*, 47 Cal. 3d 863, 872 (1989) (internal alterations omitted). In the anti-SLAPP

12 context, a plaintiff must demonstrate a "probability of prevailing" on each element.

13 *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th 728, 741 (2003).

14         **(a)**     **Plaintiff Cannot Meet his Burden to Show Absence of**

15                    **Probable Cause**

16       "[T]he probable cause element calls on the trial court to make an objective

17 determination of the 'reasonableness' of the defendant's conduct, i.e., to determine

18 whether, on the basis of the facts known to the defendant, the institution of the prior

19 action was legally tenable." *Sheldon Appel Co.*, 47 Cal. 3d 863, 878 (1989); *see*

20 *also Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1093 (C.D. Cal. 2009). For the

21 malicious prosecution of a criminal action, "the question of probable cause is

22 whether it was objectively reasonable for the defendant [ ] to suspect the plaintiff [ ]

23 had committed a crime." *Ecker v. Raging Waters Grp., Inc.*, 87 Cal. App. 4th 1320,

24 1330 (2001). Courts apply "the common standard of human judgment and

25 conduct." *Northrup v. Baker*, 202 Cal. App. 2d 347, 354 (1962). Probable cause

26 exists if a reasonable person would "honestly believe the charge is true." *Id.* A

27 litigant lacks probable cause only "if he relies upon facts which he has no reasonable

28 cause to believe to be true, or if he seeks recovery upon a legal theory which is

untenable under the facts known to him." *Sangster*, 68 Cal. App. 4th at 164–65.

On an anti-SLAPP motion, Mr. Psaila must show that the EG Defendants were not aware of any facts "that, on their own, provided objectively reasonable suspicion that [he] had committed a crime." *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1165 (9th Cir. 2011); *see id.* at 1164 (malicious prosecution defendant "would lack probable cause had it *fabricated the entire predicate for its claim*") (emphasis added). Here, Mr. Psaila will be unable to demonstrate that the EG Defendants knew of "no facts" to support reasonable suspicion that he had engaged in unauthorized charges of Erika's credit card, and therefore, potential wrongdoing.

### (i)   The Grand Jury Indictment of Mr. Psaila Gave Rise to a Presumption of Probable Cause.

As an initial matter, Mr. Psaila was indicted by a grand jury. This indictment "creates a presumption in favor of the malicious-prosecution defendant that probable cause existed for the underlying prosecution." *Conrad v. United States*, 447 F.3d 760, 768 (9th Cir. 2006) (citing *Williams v. Hartford Ins. Co.*, 147 Cal. App. 3d 893 (1983)). At this stage, the Court must grant the Motion unless Mr. Psaila proffers evidence sufficient to show that "probable cause is **nonexistent**." *Sierra Club Found. v. Graham*, 72 Cal. App. 4th 1135, 1153 (1999) (emphasis added). Mr. Psaila cannot meet this burden due to, among other reasons, his own repeated and undisputed admissions of unauthorized charges.

### (ii)   Mr. Psaila Admitted to the EG Defendants That the Charges from Amex Alerts Were Mistaken and Therefore Not Authorized.

First, in September 2016, and then again on December 1, 2016, Mr. Psaila admitted that at least three different charges by Marco Marco to Erika's Amex card were unauthorized. On September 19, 2016, Mr. Psaila told Mikey on a phone call that the recent September charge was in error. On December 1, 2016, when Mikey texted Mr. Psaila about the two Amex alerts Erika had received, Mr. Psaila

responded by stating: "Ok that is very wrong.  Wtf is going on!?  I'm sorry.  I'm calling them now."  Mr. Psaila further stated, "I had this same issue with another client a week ago.  My apologies.  Time for a new bookkeeper."  Mr. Psaila made each of these admissions <u>before</u> the EG Defendants ever contacted federal law enforcement.  Further demonstrating the EG Defendants' reasonableness, they did not approach law enforcement until after Mr. Psaila's second admission on December 1, which was combined with Mr. Psaila providing purported receipts of past charges that, as noted above, left approximately $760,000 of charges without any invoice support.  In addition, the EG Defendants at that time discovered the total magnitude and number of Marco Marco charges for the period 2015 and 2015, which far exceeded even high rough estimates of charges based on useage of Marco Marco's services.

### (iii)    Mr. Psaila's Further Incriminating Admissions on December 8, 2016.

Second, on December 8, 2016, with full knowledge of the gravity of the issue, Mr. Psaila sent an email to Erika stating:  "**I have been going through orders and credit card statements** *over and over* **and am** *clearly seeing mistakes*.  . . . I would like to go through and come up with a plan to get this sorted." (*Id.* (emphasis added).)  This was Mr. Psaila's third admission of unauthorized charges on Ms. Girardi's Amex card.

### (iv)    Mr. Psaila Admitted to $100,000 in Overcharges During the December 14, 2016 Meeting, and Offered to Pay the Money Back.

Third, at the meeting with the EG Defendants on December 14, 2016, Mr. Psaila admitted to approximately $100,000 in "overcharges" (by definition, unauthorized charges), and offered to pay the money back.  Mr. Psaila's admissions demonstrated full awareness of having taken a substantial sum of money, $100,000, to which he and Marco Marco were not authorized.  In short, Mr. Psaila

incriminated himself. His undisputed admission to having taken money, without authorization, that did not belong to him, provided independent evidence of probable cause as a matter of law, which on virtually identical facts, the Ninth Circuit in *Roberts v. McAfee, Inc*., *supra*, 660 F. 3d at 1164, held required the district court to grant defendant's anti-SLAPP motion.

### (v) The EG Defendants Reviewed the Invoices Provided by Mr. Psaila, Which Were Woefully Incomplete.

Fourth, as discussed above, after the December 14 meeting, Erika and Laia underwent a detailed analysis of information available to them, including new invoices that Mr. Psaila had provided at the December 14 meeting. The new invoices from December 14, combined with the prior invoices received on December 1, only supported, at most, a total of approximately $461,000 in charges for the two year period – still a far cry from the $934,519 in total charges. Further, Laia (working with Erika) analyzed multiple sources of information and, for the two-year period, was only able to identify approximately $133,500 in verifiable legitimate charges. At no time in the process did anyone present contrary information to the EG Defendants.

### (vi) The EG Defendants Reviewed Additional Documents Prior to the Indictment.

Finally, in April 2017, the EG Defendants again reviewed the information in their possession to determine whether seven transactions identified by the U.S. Attorney's Office were supported by invoices, emails, or text messages. The EG Defendants did their best, and in fact, Erika requested an opportunity to speak with the AUSA again "to make SURE we're not missing anything."

In sum, similar to the facts before the Ninth Circuit in *Roberts*, the EG Defendants had objective and undisputed evidence, including in the form of repeated incriminating admissions from Mr. Psaila of only increasing amounts of admitted unauthorized charges, which constituted probable cause to suspect

potential wrongdoing and to report the matter to law enforcement.  Under *Roberts*, Plaintiff cannot meet his burden of showing an absence of probable cause.

Accordingly, Psaila cannot demonstrate a probability of prevailing on the element of demonstrating an absence of probable cause.

### (b)  Plaintiff Cannot Meet His Burden to Show a Favorable Termination on the Merits

"Favorable termination is an essential element of the tort of malicious prosecution, and it is strictly enforced." *Pasternack v. McCullough*, 235 Cal. App. 4th 1347, 1355 (2015).  Merely showing the dismissal of the underlying proceedings "is not enough." *Jaffe v. Stone*, 18 Cal. 2d 146, 150 (1941).  Instead, the dismissal must "reflect on the merits." *Drummond v. Desmarais*, 176 Cal. App. 4th 439, 450 (2009).  A dismissal of an indictment is a favorable termination if it "tended to indicate [the accused's] innocence of or lack of responsibility for the alleged misconduct." *Id.* "If, however, the dismissal is on technical grounds, for procedural reasons, or for any other reason not inconsistent with his guilt, it does not constitute a favorable termination." *Jaffe*, 18 Cal. 2d at 150.

In the present case, more than four years after the indictment of Mr. Psaila, the Government moved to dismiss the indictment "without prejudice."  Thus, the dismissal was not on the merits.  Moreover, the U.S. Attorney's Office issued an official statement on the reasons for the dismissal, saying that it was due to "law enforcement evidence preservation issues."  A failure by law enforcement to preserve evidence is a procedural ground for dismissal and is not probative of the innocence or lack of responsibility of Mr. Psaila.  Accordingly, Mr. Psaila cannot establish that the criminal indictment was terminated in his favor on the merits.

### (c)  Plaintiff Cannot Meet His Burden to Show that the EG Defendants Acted with Malice

"The malice element of the malicious prosecution tort goes to the defendant's subjective intent in initiating the prior action." *Sierra Club Found.*, 72 Cal. App.

4th at 1156.  "The motive of the defendant must have been something other than that of bringing a perceived guilty person to justice."  *Downey Venture v. LMI Ins. Co.*, 66 Cal. App. 4th 478, 494 (1998).  There is no evidence of malice on the part of the EG Defendants, who trusted Mr. Psaila and Mr. Morante and took care only to express concerns where justified, including based on Mr. Psaila's own admissions.

In sum, because Plaintiff cannot establish, by evidence, a probability of prevailing on key elements of his malicious prosecution claim where Plaintiff bears the burden of proof, the Motion should be granted as to the second cause of action.

## B.    The Court Should Strike Plaintiff's Conspiracy Claim

"Because civil conspiracy is so easy to allege, plaintiffs have a weighty burden to prove it."  *Contreras*, 5 Cal. App. 5th at 416 (quoting *Choate v. County of Orange*, 86 Cal. App. 4th 312, 333 (2000)).  To prove a civil conspiracy, Psaila must establish: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct."  *Id.* (quoting *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995)).  A conspiracy, however, "does not result in tort liability unless an actual tort is committed."  *Kenne v. Stennis*, 230 Cal. App. 4th 953, 968 (2014).

As demonstrated above, Mr. Psaila cannot show a probability of prevailing on his malicious prosecution claim.  Absent that tort, there is no wrongful conduct to support a conspiracy.  Accordingly, Mr. Psaila's conspiracy claim also fails.  *Kenne*, 230 Cal. App. 4th at 969 ("[Plaintiff's] failure to show a probability of success on any of the underlying tort claims therefore bars her conspiracy claim as a matter of law.").

## IV.    CONCLUSION

The EG Defendants have met their burden under the first prong of the anti-SLAPP statute, given that Mr. Psaila's claims for malicious prosecution and conspiracy arise out of the EG Defendants' petitioning activity in reporting suspected wrongdoing to federal law enforcement.  Mr. Psaila, however, cannot

-29-

1   meet his burden under the second prong of the anti-SLAPP statute, to show by

2   evidence that he likely will prevail on the merits of the elements of his malicious

3   prosecution claim.  As the Ninth Circuit held on virtually identical facts in *Roberts*

4   *v. McAfee, Inc*., 660 F. 3d 1156 (2011), the instant Motion should and must be

5   granted.

6   DATED:  October 20, 2023                    Respectfully submitted,

7                                               GREENBERG GROSS LLP

8

9

10                                             By: _____

11                                             Evan C. Borges
                                               Heejin H. Hwang
12                                             Attorneys for Defendants Erika Girardi,
                                               Laia Ribatallada, and Michael Minden
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:23-cv-07120-MWF (SKx)
SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE (C.C.P.
§ 425.16, ET SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA, AND MICHAEL MINDEN