EVAN C. BORGES, State Bar No. 128706
 *EBorges@GGTrialLaw.com*
HEEJIN H. HWANG, State Bar No. 349455
 *HHwang@GGTrialLaw.com*
GREENBERG GROSS LLP
650 Town Center Drive, Suite 1700
Costa Mesa, California 92626
Telephone: (949) 383-2800
Facsimile: (949) 383-2801

Attorneys for Defendants Erika Girardi,
Laia Ribatallada, and Michael Minden

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PSAILA,<br><br>              Plaintiff,<br><br>       v.<br><br>ERIKA GIRARDI aka ERIKA JAYNE, AMERICAN EXPRESS COMPANY, ROBERT SAVAGE,  KENNETH HENDERSON, STEVE  SCARINCE, PETER GRIMM, LAIA RIBATALLADA, MICHAEL MINDEN, and DOES 1 TO 10, Inclusive,<br><br>              Defendants. | Case No. 2:23-cv-07120-MWF (SKx)<br><br>**DECLARATION OF LAIA RIBATALLADA IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16**<br><br>Filed Concurrently with Defendants' Special Motion to Strike, Declarations of Erika Girardi, Michael Minden, Evan C. Borges and Request for Judicial Notice, and [Proposed] Order<br><br>**Hearing**:<br>Date:    December 18, 2023<br>Time:    10:00 a.m.<br>Crtrm.:  5A<br><br>Action Filed:  August 29, 2023<br>Trial Date:  Not Assigned |

DECLARATION OF LAIA RIBATALLADA IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

## DECLARATION OF LAIA RIBATALLADA

I, Laia Ribatallada, declare as follows:

1.      I am a party in the above-entitled action.  The facts stated herein are within my personal knowledge and if called upon to testify, I can truthfully and competently do so as to all matters herein.

### A.    Personal Background

2.      I am Erika Girardi's ("Erika") personal assistant.  I have been in this role for about eight years, since late 2015.

3.      I am originally from Spain, where I trained professionally as a dancer. I attended college for pharmacy, but did not complete my degree.

4.      In 2010, I moved from Spain to Los Angeles, California to attend EI School of Professional Makeup and received a certification from there.

5.      In 2013, Michael Minden ("Mikey"), Erika's choreographer and now-creative director, hired me as his personal assistant.  I was acquainted with Mikey because we had both worked with the same agency and agent.  I had also met him socially in 2009, when I was visiting Los Angeles from Spain for the summer.

6.      I met Erika while working for Mikey.

7.      I began to take on a larger role supporting Erika directly in 2015, when Erika started filming for *The Real Housewives of Beverly Hills*.  Erika eventually hired me as her personal assistant.

8.      As Erika's assistant, I help prepare Erika for her performances, shoots, media interviews, and other events and manage her day-to-day activities.  Part of my work includes planning Erika's performance outfits with Mikey and Erika and liaising with stylists and vendors to ensure the timely execution of all costumes.

### B.    2014-2016: Business Relationship with Marco Marco

9.      In 2014, I met Marco Morante, the designer of Marco Marco LLC ("Marco Marco"), through one of Erika's stylists and through Mikey, who was

1    friends with Marco.  Soon after, Erika and Mikey hired Marco Marco as Erika's

2    costume designer.

3         10.    Before then, we had ordered Erika's costumes from Sylvia's Costumes.

4    I am aware that even before I started working with Erika, Erika had her costumes

5    made by Sylvia's Costumes.

6         11.    I was aware that the decision to have Erika's costumes made by Marco

7    Marco instead of Sylvia's Costumes was a budgetary decision.

8         12.    To order a costume for Erika, Mikey or I would reach out to Marco

9    Marco to request a costume.  If the costume order was for a show, we usually did

10   not request the costume more than a few weeks before the show.

11        13.    We coordinated the costume orders with Mr. Morante or his business

12   partner, Plaintiff Christopher Psaila ("Mr. Psaila").  We were aware that although

13   Marco was the designer, Mr. Psaila managed the operations of the business.

14        14.    We requested costumes from Marco Marco for Erika to wear during

15   performances, as well as for music videos.  However, we did not order a costume for

16   every one of Erika's shows, and Erika often re-wore costumes.

17        15.    Although Erika performs with dancers, we usually did not order the

18   dancers' costumes from Marco Marco.  I would usually buy shirts and pants from

19   retail stores for $30 to $40 per shirt or pant and have them altered.  We only ordered

20   costumes for the dancers from Marco Marco on a few instances.  Occasionally, we

21   asked Marco Marco for minor alterations to the dancers' costumes.

22        16.    It was rare for Mikey or me to request duplicate costumes from Marco

23   Marco.

24   **C.    September 19, 2016: Erika Obtains Access to Her Amex Account**

25   **and Notices an Unusual Charge from Marco Marco**

26        17.    Sometime in 2016, I remember Erika sharing with Mikey and me that

27   her husband, Thomas Girardi, had complained to her about her Amex credit card

28   charges being too high.  Erika told us that she could not check the charges herself

-3-

1 because she did not have access to her Amex credit card account, even though she

2 had downloaded the Amex application on her cell phone.

3     18.    In September 2016, Erika called the Amex customer service line to

4 request access to her Amex credit card account.  I was with Erika when she made

5 the phone call and was provided with login credentials for the account.

6     19.    On September 19, 2016, Erika, Mikey, and I were leaving Dallas after

7 Erika's performance from the day before.  While we were in the car to the airport,

8 Erika told Mikey and me that Marco Marco had recently charged her Amex card.

9 Mikey and I were not aware of any pending costume orders with Marco Marco.

10 Erika asked Mikey to call Mr. Psaila to ask about the charge.

11     20.    Mikey called Mr. Psaila as we rode to the airport.  Mikey spoke with

12 Mr. Psaila then relayed to Erika and me that Mr. Psaila was apologetic and said he

13 would fix the issue.

14     21.    I was slightly concerned by the incident because I had not expected

15 Marco Marco to make this kind of mistake.  Nevertheless, Erika, Mikey, and I

16 believed it was an honest mistake because we trusted Marco Marco.  Erika did not

17 instruct Mikey or me to take any further action after this call, and none of us thought

18 more about this incident until December 1, 2016.

19     **D.**    **November 30 and December 1, 2016: Additional Unauthorized**

20             **Charges, Mr. Psaila's Admission of Unauthorized Charges, Mr.**

21             **Psaila's Provision of Woefully Incomplete Invoices**

22     22.    On December 1, 2016, I learned either from Erika or Mikey that Erika

23 had received two Amex alerts on her phone for pending charges to Marco Marco:

24 (1) one charge on November 30, 2016, for $4,500, and (2) one charge on December

25 1, 2016 for $5,000.

26     23.    I also learned from either Erika or Mikey that Mr. Psaila had texted

27 Mikey, stating that the charges were "very wrong," that they would both be

28 returned, that a similar issue had occurred with a different client, and that it was

-4-    Case No. 2:23-cv-07120-MWF (SKx)

DECLARATION OF LAIA RIBATALLADA IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

"[t]ime for a new bookkeeper."  (Declaration of Michael Minden In Support of Defendants' Special Motion to Strike Plaintiff's Complaint Pursuant to Code of Civil Procedure Section 425.16 ("Minden Declaration"), Ex. 1.)

24.     At some point on December 1, 2016, Erika and I were together discussing the two recent Marco Marco charges.  We discussed checking Erika's account to see whether the charges had actually been reversed like Mr. Psaila had represented to Mikey.  Erika gave me the login credentials to her Amex credit card account and then took a phone call.

25.     I logged in to Erika's account from my laptop.  I first searched for all transactions between December 1, 2014 to December 1, 2016 that included the term "marco marco."  This search showed 98 transactions by "Marco Marco 323-462-2304" or "Marco Marco – Hollywood, CA" between December 15, 2014 and August 29, 2016 totaling $635,903.15.  A true and correct copy of these search results is attached hereto as **Exhibit 1**.

26.     I immediately ran a second search using the term "marco" out of an abundance of caution.  This second search showed even more transactions.  I did not count all of the transactions at the time, but I saw that there were numerous charges to "SP * MARCOMARCOUNDERWE – HOLLYWOOD, CA" that had not shown up in my first search.  In addition, I saw that the total charges in 2015 was now $303,279.50, and the total charges in 2016 was $631,192.89, or more than double the amount in 2015.  The total amount of charges from both years was now $934,472.39.  A true and correct copy of the 2015 Marco Marco charges to Erika's Amex credit card is attached hereto as **Exhibit 2**.  A true and correct copy of the 2016 Marco Marco charges to Erika's Amex credit card is attached hereto as **Exhibit 3**.

27.     I was shocked by what I saw and believed that something was seriously wrong.  At the time, I could not remember how many costumes we had ordered from Marco Marco in the past two years.  However, I was generally aware of how

1   many performances Erika had in the past two years and knew that we had not
2   ordered a costume for each show.  I knew that we had ordered far less costumes than
3   the number of transactions on my search result.

4       28.    I also did not understand how Marco Marco could have charged nearly
5   one million dollars, when Mr. Psaila's recent text to Mikey had represented that the
6   recent $4,500 and $5,000 charges were "too high."  (Minden Decl., Ex. 1.)

7       29.    Furthermore, I saw from this list of transactions that Marco Marco had
8   not reversed the transaction from November 30, 2016, even though Chris had told
9   Mikey via text message that "both" charges from November 30, 2016 and December
10   1, 2016 had been "returned."  (*Id.*)

11       30.    I showed Erika the list of transactions and explained the searches I had
12   run.  I explained how the second search had uncovered a longer list of transactions
13   totaling almost one million dollars between 2015 and 2016.

14       **E.**    **December 2, 2016: Review of Mr. Psaila's First Set of Invoices**

15       31.    On December 2, 2016, Erika forwarded to me two emails from Mr.
16   Psaila that he had sent her the previous day.  Mr. Psaila's first email was sent at 3:50
17   p.m. Pacific Standard Time ("PST") on December 1, 2016 under the subject line
18   "2015 invoices."  This email had nineteen PDF documents attached and contained
19   no other text.  A true and correct copy of this first email communication from Mr.
20   Psaila is attached hereto as **Exhibit 4**.

21       32.    Chris's second email was sent at 4:33 p.m. PST on December 1, 2016
22   under the subject line "recent 2016."  This email included one attachment.  Chris's
23   email stated that this document was the "sales I have downloaded from our credit
24   card processor while I wait on invoices."   A true and correct copy of this second
25   email communication from Mr. Psaila is attached hereto as **Exhibit 5**.

26       33.    I reviewed the nineteen documents that were attached to Mr. Psaila's
27   first December 1, 2016 email.  They appeared to be individual invoices for various

28

DECLARATION OF LAIA RIBATALLADA IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

costumes and alterations.  The invoices amounted to a total of $70,310.  A true and correct copy of these invoices is attached hereto as **Exhibit 6**.

34.     I also reviewed the attachment to Mr. Psaila's second email.  This document showed the details for four orders.  The total amount of the four orders was $103,960.50.  A true and correct copy of this document is attached hereto as **Exhibit 7**.

35.     I did not conduct a detailed analysis of these invoices at that time.  However, I saw that there were not nearly enough invoices to justify the over one hundred transactions by Marco Marco on Erika's Amex statements.  I shared this information with Erika.

**F.      December 7, 2016: Meeting with the Secret Service**

36.     On December 7, 2016, Erika, Mikey, and I went to the downtown Los Angeles office of the United States Secret Service ("Secret Service").  I understood that I was attending as Erika's assistant to help explain her Amex credit card situation.  I did not attend this meeting with any other purpose or understanding.

37.     Prior to this meeting, I never had any contact with the Secret Service.

38.     I recall sitting in a conference room with multiple Secret Service agents, but I cannot remember everyone's names.  I do recall that one of the agents at the meeting was Robert Savage.

39.     During the meeting, Erika, Mikey, and I explained that Erika had received multiple Amex alerts regarding pending transactions by Marco Marco and that Mr. Psaila had told us that the charges were wrong.  We told the agents about my searches of Erika's Amex statements and how we believed there were far more charges than actual costumes ordered.  We also told the agents that Mr. Psaila had sent over some invoices but that they did not cover all of the transactions.

40.     The meeting was an informational meeting.  We did not discuss taking further action.  We did not discuss participating in a wire meeting with Mr. Psaila.  At the end of the meeting, I did not expect to have any further contact or meetings

with the Secret Service.  I did not expect to have any further role investigating Erika's Amex credit card charges.

41.     I did not have further contact with the Secret Service until December 14, 2016.

**G.     December 9, 2016: Review of Additional AMEX Statements**

42.     On December 9, 2016, Steve Scarince, Assistant to the Special Agent in Charge of the Secret Service, sent Erika her 2013 and 2014 AMEX statements and asked her to review for any other suspicious credit card charges.  Erika sent the statements to me, and I conducted a search for Marco Marco-related transactions.  I did not see any suspicious charges in these two statements, and I relayed this information to Erika.

**H.     December 14, 2016: In-Person Meeting with Mr. Psaila, Mr. Psaila's Admission of Unauthorized Charges**

43.     At some point prior to December 14, 2016, Erika informed Mikey and me that we would be meeting with Mr. Psaila at noon on December 14, 2016.  I understood that the purpose of the meeting was to ask Mr. Psaila about the charges on Erika's AMEX credit card.  I also understood that Erika would wear a wire during the meeting to record the conversation.

44.     Before the meeting with Mr. Psaila, I printed out the list of Marco Marco transactions from Erika's AMEX statements.

45.     On December 14, 2016, Erika, Mikey, and I met with Secret Service agents before our 12 p.m. PDT meeting with Mr. Psaila.  We met near Marco Marco's office in Hollywood, California.  I recall that we met with two Secret Service agents, and they equipped Erika with a wire.

46.     Afterwards, Erika, Mikey, and I went to Marco Marco's office at 1641 North Las Palmas Avenue in Hollywood, California and met with Mr. Psaila.

47.    We showed Mr. Psaila the printouts of the Marco Marco AMEX transactions and told him that something was not right.  We asked that he provide invoices for all charges so that we could determine what we had been charged.

48.    I was not confrontational during the meeting.  I did not blame Mr. Psaila or accuse him of defrauding Erika.

49.    Mr. Psaila admitted to us that Marco Marco had overcharged us by about $100,000.  He said that something similar had occurred with other clients of his, and he seemed to place blame on his bookkeeper.  He did not give any other explanation for the Marco Marco transactions.  Mr. Psaila said that he wanted to correct the situation and would take out a loan and get on a payment plan in order to continue doing business with Erika.

50.    During the meeting, Mr. Psaila also handed us a stack of hard copy invoices.  He told us that those were not all of the invoices and that he had to get the other invoices.  He did not show us any accounting books or spreadsheets.  Erika, Mikey, and I did not look at the invoices during our meeting with Mr. Psaila.

51.    Since being served in this lawsuit, I have searched for the invoices that Mr. Psaila gave us on December 14, 2016, but I have not been able to find them.

**I.     December 14, 2016: Investigation of All Invoices**

52.    After the meeting with Mr. Psaila, Erika and I spent many hours that afternoon and evening reviewing all invoices that we had received from Mr. Psaila on December 1, 2016 and on December 14, 2016.

53.    Mikey was not with Erika and me, but we called him throughout the day to ask him to review his text messages or emails, to cross-check what Erika and I remembered, and to ask if Mikey recalled facts that Erika and I could not.

54.    I calculated the total charges from the invoices to be around $287,239.50.  This amount was still less than the total charges to Marco Marco on Erika's Amex credit card in 2015 and 2016.

55.     Based on the date, amount, and description (if any) on the invoices, Erika and I tried to match the invoices with charges on Erika's Amex statements. I then tried to determine "legitimate" and "nonlegitimate" charges. Legitimate charges would have been any transaction for which we had received a costume.

56.     Some of the invoices from Mr. Psailahad detailed descriptions of the product or service provided, while others had no such details. This made it difficult to figure out what invoices corresponded with what costume.

57.     Erika and I also looked at the costumes from Marco Marco in Erika's closet and reviewed text messages, Erika's performance schedule, emails with our travel agent, and the dates of Erika's costume fittings with Marco Marco. True and correct copies of Erika's performance schedule and promotional engagements are attached hereto as **Exhibit 8** and **Exhibit 9**.

58.     Additionally, I reviewed Erika's social media posts. As Erika's assistant, I knew that if Erika had received a costume from Marco Marco, she would generally have worn it for a performance, and then posted a picture of herself in the costume on her Instagram account.

59.     Based on all of this information, I created two documents representing my analysis of the legitimate charges in 2015 and 2016. True and correct copies of these documents are attached hereto as **Exhibit 10** (2015) and **Exhibit 11** (2016).

60.     I identified to my best ability: (1) the costume ordered, (2) the date of the performance for which the costume was ordered, (3) a picture of the costume or of Erika wearing the costume during the performance, and (4) what I believed was the corresponding invoice number from the invoices Chris Psaila had provided. (Exs. 10 & 11.)

61.     Based on this review, I could only account for around $130,000 of legitimate charges in 2015 and 2016 combined.

62.     Erika and I could not find a corresponding invoice for many of the charges by Marco Marco on Erika's Amex credit card account.

63.     Many such charges without invoices occurred during periods when Erika only had one show or did not have any performances.  For example, in July 2016, Erika had one performance in Denver, Colorado on July 30, 2016.  (Ex. 11.)  Yet, Marco Marco had charged Erika's Amex card eight times between July 2, 2016 and July 29, 2016, including multiple charges on the same day or consecutively.  (Ex. 4.)  There were two charges on July 15, 2016 of $9,600 and $9,250, respectively; two charges on July 19, 2016 of $4,800 and $4,750, respectively; and a charge of $9,480 on July 25, 2016 and a charge of $9,240 on July 26, 2016.  (*Id.*)  Mr. Psailadid not provide any invoices for these charges.

64.     Certain aspects of the invoices themselves led me to suspect that there might be nonlegitimate charges to Erika's Amex card.  For example, some of the invoice descriptions seemed to reference the same costume, as if Marco Marco had charged Erika multiple times for the same outfit.

65.     The hard copy invoices that Mr. Psaila had given to us on December 14, 2016 also looked very informal, compared to the invoices he had emailed Erika on December 1, 2016.  The invoices from December 14, 2016 looked like someone had quickly typed up information in a Word document.

66.     I shared my understanding of legitimate and nonlegitimate charges with the Secret Service.

67.     Agent Henderson created a spreadsheet based on the information I had provided.  I do not recall when I received it and whether Agent Henderson shared it directly with me or if Erika had sent it to me.  The spreadsheet listed the Marco Marco charges on Erika's AMmex credit card, the amount of each charge, any invoice number that Erika and I had identified as corresponding to a charge, and a brief summary of the costume description from the invoice.  A true and correct copy of this spreadsheet is attached hereto as **Exhibit 12**.

**J.     April 26, 2017 Analysis**

68.     On April 26, 2017, I received a list of seven transactions that I learned were the transactions with which the United States Attorney's Office planned to prosecute Chris Psaila.  These transactions were as follows:

- October 21, 2015 - $7,500
- December 28, 2015 - $8,500
- March 29, 2015 - $7,600
- April 14, 2016 - $9,156
- May 23, 2016 - $9,256.37
- June 8, 2016 - $10,300.50
- August 10, 2016 - $10,355

69.     I do not know how the United States Attorney's Office ("USAO") decided on these seven transactions.  I had not previously contacted the USAO about which of the Marco Marco transactions on Erika's Amex credit card were legitimate or not legitimate.

70.     I did not receive any documents from the United States Attorney's Office.

71.     Erika and I reviewed these transactions and again reviewed any invoices we had, as well as emails or text messages, to determine whether the charges matched any costumes or services we had received.

72.     Erika and I could not find support for the seven transactions for the following reasons:

        **(i)**       **<u>Transaction 1 of 7 (October 21, 2015 Charge)</u>**

                **(a)**    **April 26, 2017 Review**

73.     I did not find an invoice from Mr. Psaila that was dated October 21, 2015.

74.     I reviewed Erika's performance schedule in 2015, and she did not have any performances in October 2015.  (Exs. 8 & 9.)

Case No. 2:23-cv-07120-MWF (SKx)

DECLARATION OF LAIA RIBATALLADA IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

75.     Although Erika had performed twice in September 2015—in San Diego, California and Las Vegas, Nevada, respectively—I knew that we would have ordered costumes for those shows before the show dates, not a month after the performances.  (*Id.*)  In addition, there were other invoices that I thought were a better match for the costumes that Erika had worn during these shows.

76.     Erika did have a performance on November 8, 2015 in Palm Springs, California, and we had ordered a costume from Marco Marco for that show.  (*Id.*; Ex. 8.)  However, I determined that we had an existing invoice, Invoice No. 2334, for that order.

**(b)     Review of Exhibit 1**

77.     I have reviewed the purported evidence submitted by Mr. Psaila in support of the October 21, 2015 charge in Exhibit 1 of the Complaint.

78.     Exhibit 1 does not provide an invoice number for the October 21, 2015 charge.  (Compl., Ex 1-1.)

79.     The four images of Erika performing on page 1 of Exhibit 1 are from the same performance—the November 8, 2015 performance in Palm Springs—and show Erika wearing the same costume.  (*Id.*)  They are not four different costumes worn on four different occasions.

80.     The text messages on pages 1 and 2 are from August 2015 to November 2015 and appear to discuss different orders.  (*Id.*, Ex. 1-1–Ex. 1-2.)  Mikey or I did not request costumes months in advance.  We usually placed an order not more than a few weeks ahead of the show.  If there are text messages discussing orders over many months, they would have been for separate orders with different charges to Erika's AMEX card, not one transaction.

81.     Exhibit 1 states that Erika performed at an event called "Miami Perf Rock the Troops" on October 31, 2015.  (*Id.*, Ex. 1-1.)  This is not true.  Erika did not have any performances on that date.  (Exs. 9 & 10.)

82.     Exhibit 1 states that Erika performed at the Bellagio in Las Vegas, Nevada on September 19, 2015.  (Compl., Ex. 1-1.)  This is also not true.  Erika performed at the Share Nightclub in Las Vegas on September 18, 2015, but she did not perform at the Bellagio.  (Ex. 8.)

**(ii)     Transaction 2 of 7 (December 28, 2015 Charge)**

**(a)     April 26, 2017 Review**

83.     I did not find an invoice from Mr. Psaila that was dated December 28, 2015.

84.     The performance closest in date to that transaction would have been Erika's performance in Denver, Colorado for New Year's Eve on December 31, 2015.  (Ex. 8.)  Mikey or I had ordered a costume for Erika from Marco Marco.  (Ex. 11 at 2.)  However, I identified a different invoice, Invoice No. 2360, as the corresponding order for that costume and identified the AMEX charge from that invoice date as the legitimate charge for that costume.  (*Id.*; Ex. 12.)

85.     I identified Invoice No. 2360 as a match based on its description of a "gold and black fringe" costume.  Erika had worn a gold and black costume with fringe during the Denver show.  (Ex. 11 at 2.)

86.     We had not ordered costumes for Erika's dancers for the Denver performance, so I believed that there would not be other invoices for that show.

**(b)     Review of Exhibit 1**

87.     I have reviewed the purported evidence submitted by Mr. Psaila in support of the December 28, 2015 charge in Exhibit 1 of the Complaint.

88.     On Exhibit 1, page 4, a comment bubble states, "Dec 22, 2015 Marco delivers refurbished 'black flame' catsuit w whitecrystal for Chicago Christmas show." (Compl., Ex. 1-4.)  This timing does not make sense.  Erika performed in Chicago on December 12, 2015.  (Ex. 8 at 10.)  She did not have any other performances in Chicago that month.  (*Id.*)

89.   In addition, there should not have been a charge in December 2015 for Erika's Chicago show because she re-wore a costume that Marco Marco had made. Marco Marco had previously made this costume for Erika's September 18, 2015 show in Las Vegas.  (Ex. 10 at 9.)

**(iii)   Transaction 3 of 7 (March 29, 2016 Charge)**

**(a)   Review on April 26, 2017**

90.   I did not find an invoice from Mr. Psaila that was dated March 29, 2016.

91.   The performances closest in date to that transaction would have been Erika's shows in Dallas, Texas on March 31, 2016 and in Palm Springs, California on April 11, 2016.  (Ex. 11 at 4.)  Mikey or I had ordered costumes for these shows. (*Id.*)  However, a different invoice, Invoice No. 2386, seemed to correspond to those orders based on the invoice descriptions and the costumes that Erika wore.  (*Id.*) That invoice was dated March 11, 2016, so I believed that the AMEX charges from that date were the legitimate charges for these costumes.  (Ex. 12.)

92.   I did not think that there would be another invoice for these costumes.

**(b)   Review of Exhibit 1**

93.   I have reviewed the purported evidence submitted by Mr. Psaila in support of the March 29, 2016 charge in Exhibit 1 of the Complaint.

94.   Exhibit 1, page 6 shows an invoice with the receipt number 5-1201. (Compl., Ex. 1-6.)  I have not seen this invoice before, and I do not think Mr. Psaila provided this invoice to Erika or me before filing the Complaint.

95.   The invoice is nondescriptive.  It states that the order is for "Erika girardi wholesale."  I cannot determine what this invoice was for from this generic description.

**(iv)   Transaction 4 of 7 (April 14, 2016 Charge)**

**(a)   Review on April 26, 2017**

96.   I did not find an invoice from Mr. Psaila that was dated April 14, 2016.

97.     Erika did not have any performances in April 2016, aside from the Palm Springs show on April 11, 2016.  (Ex. 9.)  As discussed above, I had already accounted for the costume for that show with a different invoice.  (Ex. 11 at 4.)

98.     Erika had a performance in Miami, Florida on May 14, 2016, and we ordered a costume from Marco Marco for that show.  (Ex. 9.; Ex. 11 at 6.)  However, we would not have requested the costume a month before the show.  I believed that a different invoice, Invoice No. 6-1039, was a match for that costume and identified the AMEX charges from that invoice date as a legitimate charge.  (Ex. 12 at 6.)

99.     I did not think that there would be other invoices for the same costumes.

**(b)     Review of Exhibit 1**

100.   I have reviewed the purported evidence submitted by Mr. Psaila in support of the April 14, 2016 charge in Exhibit 1 of the Complaint.

101.   Exhibit 1, page 10 shows an invoice with the receipt number 5-1208.  (Compl., Ex. 1-10.)  I have not seen this invoice before, and I do not think Mr. Psaila provided this invoice to Erika or me before filing the Complaint.

102.   Exhibit 1, page 9 shows pictures of the costume that Erika wore in Miami on May 14, 2016.  (Compl., Ex. 1-9.)  As noted above, however, I identified a different invoice as a match for that costume.

103.   Exhibit 1, page 11 includes an April 4, 2016 text message from me to Mr. Psaila about picking up a costume.  (Compl., Ex. 1-11.)  A comment next to the text message states that the costume was worn on "Apr. 11, 2016." (*Id.*)  Erika only had one performance on April 11, 2016, the White Party in Palm Springs.  (Ex. 12 at 4.)  Yet, Exhibit 1 previously alleged that the transaction from March 29, 2016 was for Erika's costume for the White Party.  (Compl., Ex. 1-7.)

**(v)     Transaction 5 of 7 (May 23, 2016 Charge)**

**(a)     Review on April 26, 2017**

104.   I did not find an invoice from Mr. Psaila that was dated May 23, 2016.

105.   Although Erika had a performance on May 14, 2016 in Miami, Florida, I had found an invoice with a different date that I determined was the costume order for that show.  (Ex. 11 at 6.)

106.   I reviewed Erika's social media account and was reminded that she had performed in Orlando, Florida on June 3, 2016.  We had ordered a costume from Marco Marco for that show.  (Ex. 11 at 7.)  Based on my review of the invoices from Chris Psaila and the information I had at the time, I believed that an invoice, Invoice No. 6-1040, matched the costume order for the Orlando show.  (*Id.*)

107.   I saw from Erika's tour schedule that she had also performed in El Paso, Texas on June 4, 2016.  (Ex. 9.)  When I searched Erika's Instagram account, I found a picture of Erika wearing a Marco Marco costume.  However, I recognized this costume as one she had previously worn in February 2016 and May 2016.  (Ex. 11 at 3.)  As such, I believed that there would not be a transaction on May 23, 2016 for this costume.

108.   There were no other shows on Erika's schedule that matched the timing of a May 23, 2016 charge.  (Ex. 10.)

**(b)    Review of Exhibit 1**

109.   I have reviewed the purported evidence submitted by Mr. Psaila in support of the May 23, 2016 charge in Exhibit 1 of the Complaint.

110.   Exhibit 1 does not include an invoice for the May 23, 2016 charge. (Compl., Ex. 1-14.)

111.   Exhibit 1 includes pictures of the costume that Erika wore during the Orlando show on June 3, 2016.  (*Id.*)  As discussed above, in my review of the documents on April 26, 2017, I had matched Erika's costume from this show to a different invoice.

112.   I have not seen the sketches on page 15 of Exhibit 1.  (*Id.* at Ex. 1-15.)
The sketches look different from the costume that Erika wore on June 4, 2016 and
are not costumes that we ordered.

### (vi)   <u>Transaction 6 of 7 (June 8, 2016 Charge)</u>

### (a)   Review on April 26, 2017

113.   I do not recall whether I saw an invoice from Mr. Psaila that was dated
June 8, 2016.

114.   Erika had three performances close to the time of this transaction date:
the Orlando and El Paso shows in early June 2016 and a show at Los Angeles Pride
on June 10, 2016.  However, as discussed above, I had already identified a different
transaction and invoice from June 2016 for the costume we ordered for the Orlando
show, and I determined that there should not be a June 2016 transaction for the
costume Erika wore in El Paso.

115.   At Los Angeles Pride, Erika wore a costume with a money print.  This
was not a new costume.  We had originally ordered this costume from Marco Marco
for the shooting of a music video on December 9, 2015.  (Ex. 10 at 11.)  Therefore, I
knew that the June 8, 2016 charge could not be for the costume that Erika wore to
Los Angeles Pride on June 10, 2016.

116.   Erika had taped a performance for The Bravos, an annual award show
for Bravo TV, on June 29, 2016.  (Ex. 11 at 8.)  We had ordered a costume for Erika
from Marco Marco for that performance.  (*Id.*)  Based on my review of the invoices
and the information I had at the time, I believed that an invoice dated June 21, 2016,
Invoice No. 6-1050, corresponded to this costume.  (*Id.*)  I determined that the
Marco Marco charge from June 21, 2016 on Erika's AMEX card was a legitimate
charge.  (Exs. 3 & 12.)

### (b)   Review of Exhibit 1

117.   I have reviewed the purported evidence submitted by Mr. Psaila in
support of the June 8, 2016 charge in Exhibit 1 of the Complaint.

Case No. 2:23-cv-07120-MWF (SKx)
DECLARATION OF LAIA RIBATALLADA IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

118.    Exhibit 1 attaches Invoice No. 6-1040, which is dated June 8, 2016. (Compl., 1-17.)  I recall seeing an invoice with the invoice number 6-1040, but I do not recall whether I had seen a June 8, 2016 date on this invoice when I conducted my April 26, 2017 review.

119.    Mr. Psaila may have previously provided Invoice No. 6-1040 to Erika or me in December 2016.  I was reviewing countless invoices and doing my best to make sense of the documents.  I did not intentionally omit any information.

120.    Exhibit 1, page 18 alleges that Erika's Amex credit card was "[r]un for Multiple upcoming shows" and that the costumes provided included "a black crystal on black Diamond Cut out Leo, Money Print Set for EJ and Dancers, and restoning and altering original black diamond cutout leo with hematite crystal."  (Compl., Ex. 1-18.)  None of that information is included in Invoice No. 6-1040.

121.    Erika did wear a black costume with a diamond cutout from Marco Marco to The Bravos show on June 29, 2016.  (Ex. 11 at 8.)  However, as discussed above, I had matched a different invoice for this costume order during my review on April 26, 2017.  (*Id.*)

122.    Erika also wore a costume with a money print for The Bravos show. However, as discussed above, this was not a new costume.  Erika first wore this costume for a music video recording on December 9, 2015.  (Ex. 10 at 11.)  She re-wore this costume when she performed at Los Angeles Pride on June 10, 2016 and then again for The Bravos performance on June 29, 2016.

123.    Exhibit 1 alleges that Erika also ordered a "Money Print Set" for Erika's dancers.  (Compl., Ex. 1-18.)  When Erika recorded her performance for The Bravos on June 29, 2016, her backup dancers did wear matching money-print costumes from Marco Marco.  However, we had previously ordered two of these costumes when we had ordered Erika's money-print costume for the December 9, 2015 music video.  (Ex. 11 at 11.)

124.   We ordered two additional, money-print costumes when we ordered Erika's costume for the White Party in Palm Springs on April 11, 2016 because she had two additional dancers performing for that show.  We ordered these two additional, money-print costumes around the same time that we had requested Erika's costume for the White Party.  (Ex. 11 at 5.)  We did not order any more money-print costumes on or around June 8, 2016.

**(vii)**   **Transaction 7 of 7 (August 10, 2016 Charge)**

**(a)**   **Review on April 26, 2017**

125.   I did not find an invoice from Mr. Psaila that was dated August 10, 2016.

**(b)**   **Review of Exhibit 1**

126.   I have reviewed the purported evidence submitted by Mr. Psaila in support of the August 10, 2016 charge in Exhibit 1 of the Complaint.

127.   Exhibit 1, page 22 shows an invoice with the receipt number 12-1018. (Compl., Ex. 1-22.)  I have not seen this invoice before, and I do not think Mr. Psaila provided this invoice to Erika or me before filing the Complaint.

128.   Mikey and I did request a costume from Marco Marco for Erika to wear in Mykonos, Greece, while filming for *The Real Housewives of Beverly Hills*. However, I do not recall when we requested the costume.

**K.**   **Events Leading Up to Grand Jury Indictment**

129.   I do not recall the phone call between myself, Assistant United States Attorney George Pence, and Agent Henderson or what was discussed.

130.   I did not have any further contact with the Secret Service or the United States Attorney's Office.

131.   At no point during any of the aforementioned events did I hold any malice toward Mr. Psaila.  I worked with Erika and Mikey to report Mr. Psaila to the Secret Service because I genuinely believed that on many occasions he had charged

1  Erika's credit card without authorization.  I would not have taken any of the actions

2  I did if I did not hold that belief.

3    132. At no point during any of the aforementioned events did I conspire with

4  the Secret Service or with Amex.  I was doing my job as Erika's assistant to review

5  the transactions by Marco Marco and to resolve any vendor issues.

6  / / /

7  / / /

8  / / /

9  / / /

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

DECLARATION OF LAIA RIBATALLADA IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16

1    I declare under penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct.

3    Executed on October 20, 2023.

4

5

         Laia Ribatallada

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF LAIA RIBATALLADA IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16