EVAN C. BORGES, State Bar No. 128706
  *EBorges@GGTrialLaw.com*
HEEJIN H. HWANG, State Bar No. 349455
  *HHwang@GGTrialLaw.com*
GREENBERG GROSS LLP
650 Town Center Drive, Suite 1700
Costa Mesa, California 92626
Telephone: (949) 383-2800
Facsimile: (949) 383-2801

Attorneys for Defendants Erika Girardi, Laia Ribatallada, and Michael Minden

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PSAILA,<br><br>  Plaintiff,<br><br>  v.<br><br>ERIKA GIRARDI aka ERIKA JAYNE, AMERICAN EXPRESS COMPANY, ROBERT SAVAGE, KENNETH HENDERSON, STEVE SCARINCE, PETER GRIMM, LAIA RIBATALLADA, MICHAEL MINDEN, and DOES 1 TO 10, Inclusive,<br><br>  Defendants. | Case No. 2:23-cv-07120-MWF (SKx)<br><br>**DECLARATION OF MICHAEL MINDEN IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 425.16**<br><br>Filed Concurrently with Defendants' Special Motion to Strike, Declarations of Erika Girardi, Laia Ribatallada, Evan C. Borges and Request for Judicial Notice, and [Proposed] Order<br><br>Date: December 18, 2023<br>Time: 10:00 a.m.<br>Crtrm.: 5A<br><br>Action Filed: August 29, 2023<br>Trial Date: Not Assigned |

# DECLARATION OF MICHAEL MINDEN

I, Michael Minden, declare as follows:

1. I am a party in the above-entitled action. The facts stated herein are within my personal knowledge and if called upon to testify, I can truthfully and competently do so as to all matters herein.

### A. Personal Background

2. I am Erika Girardi's ("Erika") Creative Director.

3. I am from Los Angeles, California.

4. I am a former child actor and started working in the entertainment industry at a young age.

5. I attended the Los Angeles County High School for the Arts but left mid-way to pursue my career in acting. I received my High School Equivalency ("HSE") certificate.

6. In 2009, Erika hired me as her choreographer. As we started working together, my role expanded. Eventually, I became Erika's Creative Director.

7. In 2013, I hired Laia Ribatallada ("Laia") as my personal assistant.

8. Laia met Erika while working for me.

9. In 2015, Erika's career began to take off in earnest when she appeared on *The Real Housewives of Beverly Hills*. Erika hired Laia as her personal assistant to help manage Erika's day-to-day activities.

### B. 2014-2016: Erika's Business Relationship with Marco Marco

10. In or around 2012, I met Marco Morante, the designer of Marco Marco LLC ("Marco Marco"), through Erika's publicist at the time.

11. In 2014, Erika and I discussed hiring Marco Marco to design Erika's costumes. Until then, we had ordered Erika's costumes from Sylvia's Costumes. However, Sylvia's Costumes was expensive, and we believed that Marco Marco would be a lower cost alternative.

12. Laia or I placed costume orders or alteration requests with Mr. Morante or Chris Psaila, Mr. Morante's business partner. Because Erika was the feature performer at her shows, we had some of her costumes made by Marco Marco. However, we did not request a costume from Marco Marco for every show or occasion. Erika often re-wore the same costume for multiple performances or music video recordings.

13. Erika typically performed with four, male back-up dancers, although she also performed with female back-up dancers. Erika's dancers generally wore costumes comprised of outfits purchased from retail stores that were altered. We rarely asked Marco Marco to make costumes for the back-up dancers.

### C. September 2016: Conversation with Mr. Psaila About an Unusual Charge From Marco Marco

14. I am aware that at some point in September 2016, Erika was able to gain access to her Amex credit card account.

15. On September 18, 2016, Erika had a performance in Dallas at the Dallas Pride Festival. Laia and I accompanied Erika on this trip.

16. On September 19, 2016, Erika, Laia, and I were getting in a car to leave Dallas when Erika told Laia and me that Marco Marco had recently charged her Amex card. Laia and I were not aware of any pending costume orders with Marco Marco. Erika asked me to call Mr. Psaila to ask about the charge.

17. I called Mr. Psaila as we rode to the airport. Mr. Psaila was apologetic and said that he would fix the issue. I relayed what Mr. Psaila had said to Erika and Laia.

18. I was surprised by the incident, but did not think more about it. I fully trusted Marco Marco and believed that Mr. Psaila had made an honest mistake.

**D.      November 30 and December 1, 2016: Mr. Psaila's Admission of Additional Unauthorized Charges**

19. On the morning of December 1, 2016, Erika informed that she had received two Amex alerts on her phone for pending charges to Marco Marco: (1) one charge on November 30, 2016, for $4,500, and (2) one charge on December 1, 2016 for $5,000.

20. We believed that these charges were unauthorized because Erika had not had any shows in November 2016, and she did not have any shows scheduled for December 2016.

21. Erika told me to contact Mr. Psaila about these charges.

22. I texted Mr. Psaila the images of the two Amex alerts that Erika had received and stated, "She just got a charge this morning for 5k." A true and correct copy of my text message exchange with Mr. Psaila is attached hereto as **Exhibit 1**.

23. Mr. Psaila responded, "Both of these?" (Ex. 1.) I replied, "And one yesterday for 4500." (*Id.*)

24. Mr. Psaila then stated, "***Ok that is very wrong.  Wtf is going on!? I'm sorry. I'm calling them now.***" (*Id.* (emphasis added).)

25. Mr. Psaila further texted, "They have both been returned and I have instructed them to delete the card they had. Going forward I will reach out to you when it's time to process and I will process myself. I'll have Marco reach out later today with the actual price of the garment ***as both of those seemed too high***." (*Id.* (emphasis added).)

26. Mr. Psaila also stated, "***I had this same issue with another client a week ago. My apologies. Time for a new bookkeeper***." (*Id.* (emphasis added).)

27. I replied to Mr. Psaila, "Thank you. Erika is going back through all other charges to make sure there has no [sic] been no other mistakes previously." (*Id.*)

28. Later that day, at 2:09 p.m., Mr. Psaila texted me again, stating, "I've spoken to her and we are getting it together." (*Id.*)

29. I relayed the contents of my text message exchange to Erika.

### E. December 7, 2016: Meeting with the Secret Service

30. On December 7, 2016, Erika, Laia, and I went to the downtown Los Angeles office of the United States Secret Service ("Secret Service"). Prior to this meeting, I have never had any contact with the Secret Service.

31. There were multiple Secret Service agents at this meeting, including Robert Savage, Special Agent in Charge of the Los Angeles Field Office.

32. During the meeting, Erika, Laia, and I explained the circumstances surrounding the unauthorized credit card charges by Marco Marco on Erika's Amex card, including Mr. Psaila's admissions during his September 19, 2016 phone call with me and over text message on December 1, 2016 that the charges were wrong.

33. The meeting was an informational meeting. We did not discuss taking further action. We did not discuss participating in a wire meeting with Mr. Psaila. At the end of the meeting, I did not expect to have any further contact or meetings with the Secret Service. I did not expect to have any further role investigating Erika's Amex credit card charges.

34. I did not have further contact with the Secret Service until December 14, 2016.

### F. December 14, 2016: In-Person Meeting with Mr. Psaila

35. At some point before December 14, 2016, Erika informed Laia and me that we would be meeting with Mr. Psaila at noon on December 14, 2016. I understood that the purpose of the meeting was to ask Mr. Psaila about the unauthorized charges on Erika's Amex credit card. I also understood that Erika would wear a wire during the meeting to record the conversation.

36. Mr. Psaila admitted to us that Marco Marco had overcharged us by about $100,000. He said that something similar had occurred with other clients of

his, and he seemed to place blame on his bookkeeper.  He did not give any other explanation for the Marco Marco transactions.  Mr. Psaila said that he wanted to correct the situation and would take out a loan and get on a payment plan in order to continue doing business with Erika.

37. I recall that Mr. Psaila handed us a stack of hard copy invoices during the meeting.

38. I was not confrontational during the meeting.  I did not blame Mr. Psaila or accuse him of defrauding Erika.  We tried to have a difficult, but sincere conversation about unauthorized charges with someone we thought was our friend.

39. I left the meeting feeling shocked and in disbelief.  I was friends with Mr. Morante and Mr. Psaila and had trusted them.  I did not expect that Mr. Psaila would take advantage of our friendship in this manner.

40. I am aware that later that day, Erika and Laia reviewed all of the invoices from Mr. Psaila and tried to determine which charges by Marco Marco on Erika's Amex card were authorized.  Erika and Laia called me multiple times during that process to ask for my recollection and to check my emails and text messages.

41. I do not recall what emails and text messages I reviewed or provided to Erika and Laia, but I would have searched whatever I had at the time.

42. I had no contact with the Secret Service after the December 14, 2016 meeting.  I never spoke with anyone from the United States Attorney's Office.

43. At no point during any of the aforementioned events did I hold any malice toward Mr. Psaila.  I worked with Erika and Laia to report the Marco Marco charges to the Secret Service because I genuinely believed they were unauthorized.  I would not have taken any of the actions I did if I did not hold that belief.

/ / /

/ / /

/ / /

/ / /

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 20, 2023.

DocuSigned by:

*[signature]*
—07706DD45A67436...

Michael Minden