BARRETT S. LITT, SBN 45527
Email: blitt@mbllegal.com
DAVID S. McLANE, SBN 124952
Email: dmclane@mbllegal.com
MARILYN E. BEDNARSKI, SBN 105322
Email: mbednarski@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

STANLEY I. GREENBERG, SBN 53649
11845 W. Olympic Blvd., Ste. 1000
Los Angeles, CA 90064
Tel: (424) 248-6600
Fax: (424) 248-6601
Email: Stanmanlaw@aol.com

BRUCE BERNARD BEALKE
(pro hac vice)
(Illinois SBN 6200543)
77 West Wacker Drive, Ste. 45001
Chicago, IL 60601
Tel: (312) 216-7177
Fax: (312) 741-1010
Email: bealkelaw@protonmail.com

*Attorneys for Plaintiff* CHRISTOPHER PSAILA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTOPHER PSAILA,<br><br>Plaintiff,<br><br>v.<br><br>ERIKA GIRARDI aka ERIKA JAYNE, AMERICAN EXPRESS COMPANY, ROBERT SAVAGE, KENNETH HENDERSON, STEVE SCARINCE, PETER GRIMM, LAIA RIBATALLADA, MICHAEL MINDEN, and DOES 1 TO 10, Inclusive,<br><br>Defendants. | Case no.: 2:23-cv-07120-MWF (SKx)<br><br>**DECLARATION OF CHRISTOPHER PSAILA IN SUPPORT OF PLAINTIFF'S OPPOSITION TO SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE (C.C.P. § 425.16, ET SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA, AND MICHAEL MINDEN; EXHIBITS**<br><br>Hrg. Date: December 18, 2023<br>Time:10:00 a.m.<br>Crtrm:5A |

## DECLARATION OF CHRISTOPHER PSAILA

I, Christopher Psaila, hereby declare the following:

1.    I am the Plaintiff in this action. This declaration is submitted in support of Plaintiff's Opposition to Special Motion to Strike Complaint Pursuant to California Anti-SLAPP Statute (C.C.P. § 425.16, et seq.) by Defendants Erika Girardi, Laia Ribatallada, and Michael Minden. The facts set forth herein are within my personal knowledge or knowledge gained from my review of the pertinent business records referenced. If called upon, I could and would testify competently thereto.

**A.    Personal Background**

2.    I am the co-owner and managing member of Marcosquared LLC ("Marco Marco") a business incorporated in California with its principal place of business in Los Angeles, California. My business partner, Marco Morante, and I each own a 49% interest in Marco Marco. During all the years we did business with Erika Girardi, Marco Morante and I owned an equal percentage of our business.

3.    I met Marco Morante in 2000 during our time as college students at The California Institute for the Arts ("Cal Arts"). What began as us selling hand crafted t-shirts outside the campus cafeteria, evolved into Marco Marco, a company and brand Mr. Morante and I have spent our entire adult lives building. After our education at Cal Arts, Marco and I opened the business and aimed to create something significant.

4.    Marco Marco is a celebrity costume design brand catering to the entertainment industries. Mr. Morante and I founded Marco Marco in 2003 and have grown the company together over the past 20 years. Our work is frequently seen in the music industry, where we have designed iconic looks for numerous high-profile artists. Our designs have been featured in tours, award shows, and music videos, and have been worn by celebrities such as Jennifer Lopez, Nicki Minaj, Kesha and Shakira. We had worked with these celebrities before working with Ms. Girardi.  Marco Marco has also designed costumes for famous American institutions like the Ringling Bros. &

Barnum & Bailey Circus, the San Francisco Ballet, and the Houston Ballet. Some of the brand's most notable designs include Katy Perry's Cupcake bra, Britney Spears' Las Vegas Residency and two Super Bowl Halftime Shows. Each of these projects occurred prior to working with Ms. Girardi. Our business has earned a reputation for delivering high value costumes for entertainers and was awarded an Emmy Award for costume design in 2022.

5.      The Marco Marco brand has been a consistent advocate for LGBTQ+ rights in the fashion industry, using our platform to promote diversity and inclusion through the brand's runway shows, collaborations, and designs. Our commitment to these values is evident throughout Marco Marco's 20-year history.

6.      In addition to our costume design, Marco Marco began developing a men's underwear line in 2014. From humble beginnings, the underwear collection quickly gained recognition for its bold, innovative designs. Our use of vibrant colors, intricate patterns, and unconventional materials set our brand apart from traditional Men's underwear labels.

7.      As the managing partner, I handle all of the business aspects of Marco Marco. This includes creating invoices for client purchases, collecting payment authorizations, marketing, ecommerce management, wholesale distribution and handling logistics (i.e., organizing delivery of orders, scheduling fittings, purchasing materials, etc.). I maintain interactions with our clients, assistants, business managers, agents, tour managers etc. In 2009, we expanded our studio in Hollywood by acquiring two more retail storefronts on our block. At the same time, we increased the size of our team. By 2014, I was overseeing the operations of our studio, which included managing a staff of 22 full-time employees.

8.      Marco Morante focused on designing costumes and maintaining interactions with clients and their assistants including creative directors, stylists, choreographers etc.

### B.    Beginning of Custom Wardrobe Collaboration with Ms. Girardi

9.    Marco Marco received its first commissioned design for Erika Girardi for her music video, "Party People," which was released in 2011. Mr. Morante worked directly with Ms. Girardi's styling duo "The Kidz," who placed the order. The music video features a variety of Marco Marco costumes on Ms. Girardi and her dancers. Ms. Girardi began directly commissioning costumes from Marco Marco for all aspects of her singing career in 2014. When Ms. Girardi was added as a new character on The Real Housewives of Beverly Hills ("RHOBH") in 2015, Marco Marco began designing for appearances on that reality television show.

10.    Additionally, Ms. Girardi and Marco Marco shared a mutual publicist, Jack Ketsoyan, of formerly EMC Bowery Public Relations firm, who made the initial introduction of Ms. Girardi to Mr. Morante. Mr. Ketsoyan, a friend, had briefly told me about Ms. Girardi and her work as an entertainer, so I was vaguely familiar with her when she started ordering costumes from Marco Marco.

11.    I understood from talking to Marco Morante, and from conversations directly with Ms. Girardi and her team, that she had been ordering costumes from a business named Sylvia's Costumes, a company I knew from my experience in the business in Los Angeles. I knew that Sylvia's largely, if not entirely, made costumes that were already designed, unlike Marco Marco which creates original designs for its clients, designed by Marco Morante. At that time, Mr. Morante and I were also using Sylvia's costumes to build garments for clients who did not have the budget to support an in-house costume build with Marco Marco.  Ms. Girardi told Marco Morante, who shared with me, that she loved the outfits that Marco Marco had made for her through her stylists "TheKidz."

12.    Our working relationship with Mikey Minden, Ms. Girardi's creative director, began in or around 2012 and developed over the years as we worked together for all of his clients. Mr. Minden brought many of his clients to Marco Marco for

custom performance clothing. Most notably, Carmen Electra, Robin Anton, Havana Brown, Amber Rose, G.R.L., and the PussyCat Dolls.  In April, 2014, Mr. Minden came to Marco Morante and I to talk to us about working directly with Ms. Girardi to design her full image. Mr. Minden expressed his vision that he and Mr. Morante would work together to create the "blonde bombshell" known as "Erika Jayne."  He explained that he and Ms. Girardi believed that there was no need for a stylist for her performances any longer since Mikey could handle accessories and day to day clothing, and that Erika's stage character "Erika Jayne" was only to wear custom one-of-a-kind designs from here on out whenever she was performing.

13.     Between 2015 and 2016, there were 132 transactions related to Ms. Girardi's orders of custom designed costumes for herself as well as other clothing items for herself and other members in her performance entourage. These costumes were worn for various stage performances, music videos, photo shoots, etc. some of which were featured on RHOBH, in which Ms. Girardi is a character.

14.     On April 30, 2014, Ms. Girardi arrived at Marco Marco for a fitting for the first set of costumes she directly commissioned from us, alterations on her personal clothing, and 2 "elastic bondage dresses with mesh." Both Marco Morante and I were at this fitting as well as Ms. Girardi and her usual entourage (her now assistant Laia Ribatallada, and her creative director Mikey Minden. At that fitting she told Ms. Ribatallada to pay for the outfit and Ms. Ribatellada handed Marco Morante the American Express credit card, which he in turn handed to me. As I handed her the paper invoice, in the presence of Mr. Minden and Ms. Ribatallada, she physically waved the invoice away from me and said it would not be necessary for her to receive the invoices. She said we were to keep the card on file for any future invoices for costumes and services.

15.    I know from reviewing records that this card she provided with her authorization to bill all future transactions to was American Express Account number xxx-xxxxxx-63516.

16.    It is my normal business practice to provide the invoice upon receipt of goods and services, and most customers ordinarily want invoices which contain an explanation of the charges before being charged. Costumes purchased from Marco Marco are most generally business expenses, so invoices and W-9 tax forms are required. For approximately three years, until the fall of 2016, neither Ms. Girardi nor her assistants ever asked to see an invoice, never expressed any unhappiness with the costumes provided, they never expressed any issue with pricing, nor did they dispute any charges made to Ms. Girardi's American Express card.

17.    I never knowingly made any unauthorized charges to Ms. Girardi's American Express card, nor did I ever charge Ms. Girardi's American Express card for goods and services not provided and received.

**C.    Marco Marco and Ms. Girardi's Business Relationship**

18.    Over the course of our business relationship, Ms. Girardi communicated her orders in a variety of ways. Often, Ms. Girardi or her staff, Michael Minden and Laia Ribatallada, or her stylist, Dani Michelle, would communicate orders via text message, email, or verbally on the phone or in person. It was routine for us to conduct business by text and email as well as verbal forms of communication, on the phone or in person. Our computers were also set up to keep a record of our texts and emails. There was no set method of communicating orders. Sometimes Ms. Girardi or her assistants would contact me, and other times they would speak with Mr. Morante, who would relay the order to me. In many instances, when Ms. Girardi and Mr. Minden were happy with a garment at a fitting, they would request additional sets of that look in multiple colorways.

19.     Orders would include custom costumes as well as alterations and repairs to Ms. Girardi's personal clothing, alterations and repairs to existing costumes and custom designs for Ms. Girardi and her dancers. In response to these orders, Marco Marco would design and illustrate the costumes for her and her team's approval. Once receiving approval, we would draft, pattern, sew, and embellish the costumes as needed and then hold fittings with Ms. Girardi at our Hollywood studio or on location. Ms. Girardi's team consistently asked for alterations to Ms. Girardi's personal clothing, repairs and maintenance on existing costumes, and materials kits for Ms. Girardi's tours.

20.     Between 2015 and 2016, Ms. Girardi purchased approximately $934,000 worth of goods and services over 132 separate transactions. When Ms. Girardi placed an order, she was initially billed a deposit amount, which was applied to her purchase. The deposit was used to purchase materials and other goods necessary to begin constructing the order. Once the order was complete, Ms. Girardi was billed the remaining cost of the outfit, which included any additional resources needed and for time and labor. Due to the nature of the industry and the chaotic ordering pattern in which Ms. Girardi and her team operated, Change Orders would occur. The change orders requested by Ms. Girardi and her team would modify the scope of work or adjust the amount of time needed to complete the work, or both. These changes, in turn, usually increased the price.

21.     All goods and services were invoiced and charged to Ms. Girardi's American Express card, pursuant to her express standing authorization given at her first fitting. The billing of the goods and services she ordered from Marco Marco to her American Express card remained consistent from the April 30, 2014 transaction through the last transaction in November 2016. Additionally, I had to obtain reauthorization for Ms. Girardi's American Express card on two occasions.

22.    First, Ms. Girardi's card had expired, and I required new card information to process a pending order. I received the updated American Express card information on behalf of Ms. Girardi by email from Shirleen Fujimoto who was Tom Girardi's executive assistant and notary at his law firm Girardi Keese. The second time we required reauthorization because Marco Marco had transitioned to new accounting software, which necessitated updating all credit card information. Ms. Ribatallada, on behalf of Ms. Girardi, provided the updated credit card information to me by text message.

23.    I, as well as my business partner Mr. Morante, tracked and coordinated all orders, fittings, and deadlines, and communicated all logistics for goods and services produced for Ms. Girardi, through one or more of her assistants including Laia Ribatallada and Mikey Minden, and on occasion, stylist Dani Michelle, via text message, email, and proof of delivery text messages. There was never a time that Marco Marco did not provide timely costumes and services Ms. Girardi requested, and neither Ms. Girardi nor her assistants complained that they did not receive the goods and services transacted for.

24.    Ms. Girardi, Ms. Ribatallada and Mr. Minden communicated throughout the 2015 and 2016 transactions with me, Marco Morante and our employees by text messages, emails, and sketches of the costumes sent to their emails and to their devices, and in phone calls and meetings, and in coordinating pickups and deliveries of the costumes,

25.    Marco Marco provided Ms. Girardi extraordinary custom services not just in designing stunning costumes, but doing so on very short notice, with last minute changes, and on numerous occasions traveling out of Los Angeles to wherever she was doing a show to conduct fittings and modify costumes. On six such occasions in 2015 & 2016 Marco Morante traveled to the venues for Ms. Girardi's shows for these

purposes. In September 2015, I personally traveled to Las Vegas to conduct a fitting with Ms. Girardi for her performance that evening.

26.    Until September 2016, neither Ms. Girardi nor her assistants complained about any charges applied to Ms. Girardi's American Express card, nor did they complain about the cost of any particular order. Her team communicated the opposite to us, that the outfits needed to be "spectacular and over the top" with premium crystals. As documented by text messages with Ms. Ribatallada and Mr. Minden, their sole request to "make it look RICH," as that was part of Ms. Girardi's persona on stage and in the TV show RHOBH.

**D.    Ms. Girardi Begins Questioning Costs in Late 2016**

27.    Marco Marco's business relationship with Ms. Girardi was well established and ran smoothly for approximately three years without any major issues until September 19, 2016, when I received a call from Mr. Minden. During the call, Mr. Minden began questioning me about a recent transaction charged to Ms. Girardi's American Express card for a balance payment on two Swarovski embellished leotards. The custom leotards created for Ms. Girardi in transaction 131 referenced in the summary chart I created (See attached Exhibit 1B) on September 15, 2016, were performance doubles (duplicates) of the leotards detailed in transaction 123. I also personally observed her wearing the blue crystal leotards on the broadcast of RHOBH Season 7, Episode 7, titled "It's Expensive to Be Me" when Ms. Girardi performed in Mykonos, Greece. I also personally observed and recognized these costumes on a Bravo.com digital feature titled "Erika Jayne Shows Off Her New Costume." I was present when this video was filmed on location at the Marco Marco Studio on August 10, 2016, and saw it online after it aired in September 2016.

28.    During Mr. Minden's phone call to me on September 19, 2016, he said Ms. Girardi was "surprised by the charge" and that she thought the price was too high for the remake of the leotards. I did not agree with Mr. Minden, but I told him that if

Ms. Girardi was unhappy, we would discuss it with Marco at her upcoming fitting. I expressed that if Ms. Girardi had any issue we would certainly resolve or issue a refund. The issue of price raised on the phone call was not brought up again by any of them. I decided to refund the transaction for the balance on the outfit until Ms. Girardi and I could have a conversation with Mr. Morante about the leotards. I did this to ensure there was no misunderstanding regarding the price and in an attempt to keep Ms. Girardi happy. Mr. Minden and Ms. Ribatallada both, by text message delayed scheduling fittings for the garments. Mr. Minden, Ms. Ribatallada and Ms. Girardi never made any effort to fit or pick up the costumes which are still in possession of Marco Marco.

29.    A couple of months passed and in late November 2016, Mr. Minden began discussions by text message with Mr. Morante requesting new design illustrations for a Black bodysuit Ms. Girardi requested. On November 30, 2016, Ms. Ribatallada sent me a text message asking me to remind Marco to send illustrations of the Black Bodysuit that Mr. Minden requested. I responded to Ms. Ribatallada by text message informing her I had seen Marco working on the illustrations the day prior and would follow up with Mr. Morante. I have reviewed a text from November 30, 2016, Mr. Morante sent Mr. Minden the requested illustrations and Mr. Minden responded by saying he was sending them to Ms. Girardi. Mr. Morante told me later that day that he had spoken to Mr. Minden on the phone who informed him of Ms. Girardi's approval of the illustrations, so I wrote up Invoice #1093, detailing a Black Crystal bodysuit and processed a deposit of $4500.00 to Ms. Girardi's American Express card.

30.    To begin the order Marco would create a materials list and I would arrange for our staff Materials Sourcer (shopper) to go buy them. We used the deposit funds as they were intended, to purchase the materials and crystal embellishments costing over $3000. Mr. Morante and staff moved quickly at creating this garment as we had intended on completing and having it available for pickup by Ms. Ribatallada

on December 5, 2016. On December 1, 2016, Mr. Morante sent Mr. Minden by text an image of the bodysuit displayed on a dress form so Mr. Minden could approve the shape of the garment. Mr. Minden responds by saying he's going to show Ms. Girardi. Shortly after, Mr. Minden called Mr. Morante and let him know Ms. Girardi approved of the shape of the bodysuit.

31.    With Ms. Girardi's approval of the sample photo, the completion due date planned for December 5, 2016, and the need to purchase additional embellishment materials; I processed the balance payment on Ms. Girardi's American Express credit card in the amount of $5000.

32.    Again, I received a surprise call from Mr. Minden on December 1, 2016. He again raised the question about the price of the garment that we had discussed months before in September. Mr. Minden also questioned me about the November 30 order and acted confused by the charges for that order. I did my best to try and understand how this could possibly be misunderstood. I knew that Marco Morante had just spoken to him about the cut of the black bodysuit order he had placed. Mr. Minden said to me in that phone call that Ms. Girardi felt she had been "wrongfully charged." Once again, in order to ensure there was no misunderstanding about the garment or any dissatisfaction with our goods and services, I told Mr. Minden that I would refund the transaction and we could discuss the price with Marco together when Ms. Girardi came to the studio for a fitting. Having not yet resolved Ms. Girardi's issue with the September 19, 2016 transaction, I processed the refund for transaction order 15-1026 December 1, 2016, in the amount of $5,000.00.

33.    I continued to text with Mr. Minden about the issue. I told him something was "wrong" with the intent of keeping his employer and our customer Ms. Girardi happy. I never said that there was any intentional or any actual billing error. I knew of no such thing. I simply used words like "mistake," or "wrong," to keep the situation from escalating and have time to resolve it without losing the customer. I also

communicated to Mr. Minden that we had a client a few weeks prior that had an issue with pricing and that we had adjusted the price to meet that client's budget as an assurance that we were willing to negotiate the price if Ms. Girardi had a particular budget in mind. Mr. Minden appeared satisfied with these responses and we mutually agreed we wanted to keep our business relationship intact.

34.    Shortly after the phone call with Mr. Minden, I received a call from Ms. Girardi. Ms. Girardi said she was going through previous Marco Marco transactions to make sure there were no other mistakes. I assured her there were none. At this point in the call, Ms. Girardi's tone became more aggressive and threatening. She told me she had spoken to her lawyers and wanted me to send every invoice and transaction immediately because her lawyers were asking for them. The mention of a legal threat sent me into a panic. I had never faced a legal issue with a client in my 13 years of business at that time. I agreed to gather and send all related invoices to Ms. Girardi for her review.

35.    Very much still alarmed by my conversation with Ms. Girardi, I began the task of retrieving Ms. Girardi's invoices and transaction documents. I also tasked Mr. Morante's assistant with gathering images of illustrations and fitting photos. With the looming threat of Ms. Girardi's lawyers, I wanted to have everything to show. I was aware of who Ms. Girardi's husband was, having met him at one of Ms. Girardi's events and because she had told me that her husband was powerful and well connected.

36.    The gathering of invoices proved to be more difficult than I anticipated since there was not a uniform mechanism for Ms. Girardi to communicate orders. I had a difficult time going between devices when searching for initial order placements. IN an effort to streamline our business operations, we had recently changed bookkeepers, changed our bookkeeping software, and payment processing systems, making it more difficult to search for previous transactions. It's my recollection that as part of our

transition from Desktop to Online, our bookkeeper was manually transferring the data, a prolonged task that was not yet complete.

37.    I gathered documents I could easily access and emailed them to Ms. Girardi in a series of three (3) emails on December 1, 2016. I sent the first email to Ms. Girardi at 3:21 p.m. with the subject line "2016 Invoices" and wrote in the body of the email "Dec 2015 through March 2016." This email contained eight PDF invoice attachments. The second email was sent at 3:50 p.m. and contained seventeen individual PDF files of invoices from 2015. Not yet a complete transaction history, I was still working as fast as I could to gather the documents.

38.    At 4:33 p.m., I sent Ms. Girardi a third email with additional transaction details. This email contained a subject line "Recent 2016" and contained Order Invoice details from four recent transactions within one PDF attachment. I was able to access these transactions on our newly set up Shopify platform, where we processed credit cards on the Stripe payment processing system, a process still new to me and my staff at the time. In the body of the email I told Ms. Girardi, "Attached are sales I have downloaded from our credit card processor while I wait on invoices." At that moment, I felt it was best to send what I had immediately, as Ms. Girardi and her "lawyers" demanded, and to continue sending as I compiled the full history dating back three years.

39.    I never received a response from Ms. Girardi, Ms. Ribatallada, or Mr. Minden to any of my emails. I continued to conduct my "audit" by matching invoices with transactions and then identifying the custom garments associated with said invoice. Several days later I gained access to the original desktop version of our Quickbooks bookkeeping software and was able to download the timestamped invoices in their entirety.

40.    Rather than send the remaining invoices to Ms. Girardi by email as I had done prior, and considering it was over a hundred pages and Erika had not even

responded to my initial emails, I wanted an opportunity to review these invoices with Ms. Girardi in person. I was confident I could explain the invoices and information thoroughly with Ms. Girardi and we could all move past this brief dispute. We had all been friends for years, I was certain my "friends" would give me the benefit of the doubt and at least hear me out.

**E.    Meeting with Ms. Girardi and her Assistants on December 14, 2016**

41.    I scheduled a meeting with Ms. Girardi and her assistants on December 14, 2016, so we could go through and review the transactions in their totality. I had pulled all of the invoices related to Ms. Girardi's orders that I could find by that meeting and thought we could use this meeting to go over the invoices so I could explain to her what she was being charged for. I believed we could resolve this business dispute amicably and move on.

42.    I was preparing for this to be an informational exchange meeting so that we could figure out together what I believed was her misunderstanding or confusion over the billing. Marco Morante was not at this meeting.

43.    Ms. Girardi arrived with an affluent disdain demeanor, commenting on the interior of my studio with "this is nice." I smiled kindly and reminded her that it looked the same as when she had filmed with Bravo there a few months prior on August 10, 2016. In the meeting Ms. Girardi and Mr. Minden bombarded me with accusations of wrongdoing. Ms. Girardi and Mr. Minden accused me of making serious accounting errors. I attempted to hand her the stack of invoices I had gathered, so we could review them together, but she refused to look at them. Instead, she kept insisting that errors had been made. She made comments placing absolute blame on me before ever making any effort to consider she was wrong with comments like "How dare you do this to Mr. Girardi, he's done nothing but support us."

44.    In an effort to appease her, I stated there might have been some mistakes, referring to the haphazard ordering that confused me at the time. Because Ms. Girardi

---

DECLARATION OF CHRISTOPHER PSAILA ISO OPPOSITION TO ANTI-SLAPP MOTION
13

was very angry, saying, "where the F*** is my money" and shouting, "where is my card!? Is my card here?" I told her I would do whatever it took to make things right, even if that meant taking out a loan to pay for any mistakes that may have been made. I wanted to make sure Ms. Girardi knew I was taking the situation seriously because I wanted to preserve our business relationship.

45.    As the meeting continued, I was shocked to hear Ms. Girardi's claims that I overcharged her $800,000-$900,000 dollars. I responded to her saying "that's not even possible." She reiterated that almost a million dollars of her husband's money was gone and demanded to know where the money was. She refused to look at any of the documents I had provided.

46.    I could not fathom how it would be possible for us to overcharge Ms. Girardi by that amount. Based on my cursory review of the invoices and knowledge of Ms. Girardi's previous orders, this amount seemed to represent the value of all goods and services Marco Marco had provided to Ms. Girardi during the entire course of our business relationship. I was confused and did not understand how she could ignore all the costumes, designs, alterations, and services provided by Marco Marco over the past 3 years, or that she and her dancers had worn the costumes in performances and on TV.

47.    I realized that we were not going to be able to resolve this issue in this meeting, so I provided Ms. Girardi the stack of invoices I had prepared along with a full statement history of transactions that included Invoice numbers and dates from 2014-2016. The statement history reflected that every transaction was documented and accounted for. Ms. Girardi stood up, picked up the stack of invoices and the statement off the table and walked out with Mr. Minden and Ms. Ribatallada. After that day, I continued to gather documents and expected to hear from her after her review of what I had given her and to continue talking to clear things up. We never spoke again. I have never spoken to Ms. Girardi since that day.

**F.      The Secret Service Execute a Search Warrant on Marco Marco in January 2017**

48.      In early January, 2017, around 7:00 a.m. the Secret Service, including Agent Henderson, came to Marco Marco and served a search warrant. The agents arrived in full swat gear with guns drawn. They shouted for everyone to exit the building, terrifying my employees. I had no idea what was happening or why. One of my sewing ladies started crying. Agent Henderson, without speaking to me, told all of my employees to go home for the rest of the day. Agent Henderson took me outside and stood with me while they tore apart the studio. Sitting on the curb outside my studio with Agent Henderson, I repeatedly asked what was happening with no answer while at least 10 agents destroyed the studio, tossing files and boxes and pouring out craft organizers, spilling beads and rhinestone crystals on the floor.

49.      Mr. Morante arrived at the studio just after 8:00 a.m.. He approached Agent Henderson and I and asked Agent Henderson what was going on. Agent Henderson said, "A claim has been made that Mr. Psaila charged $600k in unauthorized AMEX charges." Mr. Morante and I expressed the ridiculousness of that and Agent Henderson replied with an in the dark look to say, "I'm not even sure why we're here." He stated, "It's not like you're driving around in a Ferrari."

50.      During the search Agents Henderson and Scarince interviewed me. I personally logged them into and gave them passwords to my computer and Quickbooks accounting software. I wanted them to see the business records to verify that no crime or fraud had occurred.

51.      No one interviewed me before the service of the search warrant to ask about the Girardi costumes or transactions.

52.      I am unaware even to this date of the Secret Service interviewing any other customers of Marco Marco besides Ms. Girardi. I am also aware that they never interviewed my business partner Marco Morante

53.    I was at the business when the warrant was served. The agents were there for hours. The Secret Service took paper business records as well as all of the electronics from our studio which included computers, monitors, tablets, cellular phones and hard drives. We shut down Marco Marco for over a month to grasp what had just happened and because we had nothing to conduct business with. Mr. Morante didn't have access to his illustrations or the ability to illustrate or access our client files.

54.    The seized devices and records included Marco Marco's business records in electronic and/or paper form of: (1) communications by text messages and/or emails to and from Ms. Girardi, Ms. Ribatallada, and /or Mr. Minden; (2) ordering forms and/or invoices; (3) designs and sketches of costumes and clothing ordered and provided to Ms. Girardi and her assistants and even communications with Agent Henderson.

55.    After the search I communicated by email with Agt. Henderson approximately six times about when we could get our business computers back so we could continue Marco Marco's operations and business. I told him about the dire situation we were in without our electronics. I have reviewed my business email records which contain the communications with Agent Henderson on 1/18/17,  2/1/17, 2/9/17, 3/15/17, 3/23/17 and 4/19/17. I figured that they could quickly determine there was no fraud and minimize the chaos that the seizure of our computers, devices and records was causing in our business operations.

56.    On January 18, 2017, a week after the search, I left a voicemail about and wrote an email to Agt. Henderson concerning a chargeback on the Marco Marco account that day from American Express for a $4,500 charge on 11/30/16 from Marco Marco to Ms. Girardi. I advised Agent Henderson in those communications that I planned to dispute the chargeback with American Express immediately, and I briefly

summarized for him the work done for that order, and expressed that I needed the records from our business computers to prepare to dispute the chargeback.

### G. Summary Charts Exhibits 1A and 1B

57.     Attached hereto as Exhibits 1A and Exhibit 1B to this declaration are true and correct copies of multipage charts describing evidence related to the transactions Ms. Girardi engaged in with Marco Marco between 2015 and 2016. I am familiar with the contents of both Exhibit 1A and 1B as I created them and have reviewed them thoroughly. Exhibit 1A accurately summarizes evidence related to the seven transactions named in the indictment filed against me. Exhibit 1B accurately summarizes evidence related to the 132 transactions between Ms. Girardi and the business Marco Marco between 2015 and 2016. That evidence includes specific references to Marco Marco business records in electronic and/or paper form of: (1) communications by text messages and/or emails to and from Ms. Girardi, Ms. Ribatallada, and /or Mr. Minden; (2) ordering forms and/or invoices; and (3) designs and sketches of costumes and clothing ordered. The evidence supporting Exhibit 1A and Exhibit 1B also includes a reference to a video which I observed filmed by Bravo TV at our studio, and which I watched after it aired, and which I located on social media showing her showing the specific Marco Marco costume designed, made and provided to her and charged to her American Express 8/10/2016 (the transaction alleged in count 8 of the indictment). Our business invoices as shown in our business records contain time stamps verifying their date. The evidence also includes references to photographs, posts, or material I located on social media showing Erika Girardi and her dancers wearing (or holding) Marco Marco costumes and clothing that was transacted for and provided.

58.     Exhibit 1A to this declaration is the same document that was attached as Exhibit 1 to the Complaint my attorneys prepared in this case.

59.    Both of my charts, Exhibit 1A (the seven transactions) and Exhibit 1B (the 132 transactions) reflect a summary of evidence and not necessarily all of the evidence that may exist of these transactions.

60.    I used the same procedure to create Exhibit 1A (chart of seven indicted transactions) and Exhibit 1B, (chart of all 132 transactions in 2015 to 2016) which charts accompany this declaration. For brevity in this declaration, I refer to the individual transactions as T-1, T-2, etc. Exhibits 1A and 1B accurately summarized the business records that I have reviewed and imbedded in the charts. All of the business records referenced therein: invoices, order forms, texts and emails were maintained in our electronic and/or paper records in the ordinary course of our business at Marco Marco. All existed at the time of the event referred to in the records and were created and maintained in the ordinary course of business of Marco Marco. The documents imbedded in the two charts are true and correct records pertaining to the goods and services the Girardi Defendants ordered from Marco Marco between 2015 and 2016. When I reference Instagram posts, or photos from social media, I personally observed those in social media online and imbedded true and correct copies of those posts or photos in the chart.

61.    She and her dancers posted images related to their performances, including her August 7, 2015 post on Instagram which I reviewed showing herself and her dancers traveling on "the Gulfstream [private] jet" specifically stating "not a charter" (T-27 p. 85, T-56 p. 171), similarly on December 30, 2015; T-56 p. 171 (Erika and dancers photo in front of jet); same on 6/6/16 p. 314 (photo of Erika's dancers posting in front of her jet). I watched numerous episodes of Erika performing on Real Housewives of Beverly Hills and her image was of a very rich, money is no object housewife of an incredibly successful and powerful attorney in Los Angeles. I also watched her "It's Expensive To Be Me" music video filmed in the summer of 2016. In the video she and her dancers are throwing wads of money into the air. (Exh. 1B p.

356). She and her assistant Laia and creative director Mikey presented that same rich, money is no object, image to Marco Morante and me.

62.    I have not falsified any business records, posts, photographs or any other information I rely upon in my charts.

63.    I wrote the summary text within the two charts of transactions for the purpose of explaining the  transactions and related records. That summary text is incorporated into this declaration by reference as true and correct to the best of my knowledge and as if it were stated again in this declaration under penalty of perjury.

64.    I start the chart of 132 transactions, Exhibit 1B, by explaining the custom design process our business used in 2015 to 2016, during the period of these transactions. See Exh. 1B, pp. 3-9. Our process for Erika Girardi often involved multiple pages of designs with approximately 20 designs per page. Her team would choose a design and often asked for variations. Generally, we would bill the initial deposit on a project to commence work and issue an invoice for the balance on the date of delivery. We would also charge for repairs and alterations to prior outfits, design or alter outfits and accessories for her dancers, for change orders, for rush fee, and on several occasions to travel to fittings at her hotel and/or performance venues.

65.    Our garment price for Erika's costumes began as $4,500 in 2014 but grew over time to more than $8,500 over the course of 2015 to 2016. The Girardi Defendants' estimate of cost of $5,000 for the custom designed costumes is inaccurate.

66.    Ms. Girardi often demanded crystal embellishments on leotards and catsuit costumes. The materials alone for a leotard were between $1,200 and $2,800 (Exh. 1B p. 5) and for a catsuit $2,375 to $5,700 (Exh. 1B p. 5). Moreover she and her team demanded the best crystals, made by Swarovski, an Austrian company with a long history of creating high quality exceptionally brilliant crystals cut from leaded glass. (Ex 1B, p. 9) Her costumes starting in 2015 and through 2016 were much more

expensive than the Girardi Defendants' claim. See, e.g. Transactions including and not limited to:

•T-7 & T-8 dated 4/1 & 4/2/2015 Exh. 1B pp. 28-31(combined cost of $10,400 for long sleeve black catsuit with Swarovski crystals);

•T-75 dated 3/16/2016 Exh. 1B p. 233 (crystalized bodysuit with reveal cost $8,500 portion of bill);

•T-77 dated 3/28/2016 Exh. 1B p. 241-242 (crystal stoning on previous outfit and new outfit cost $9,483);

•T-78 dated 3/28/2016 Exh. 1B pp. 244-246 ($8,500 Blk/Wht. crystal leotard alternate white party design);

•T-79 dated 3/29/2016 (Exh. 1B pp. 247- 249 (the duplicate costume made with Swarovski crystal AB Chevron gradient leotard on white spandex stretch velvet base cost $7,600);

•T-81 & T-82 dated 4/2/2016 & 4/4/2016 Exh. 1B pp. 254-261 (deposit of $8,400 and balance of $8,400 on Erika performance outfits (Wht/Blk leotard with peplum skirt & crystal pink/wht. & blk. leotard with reveal, plus change order);

•T-84 dated 4/12/2016, first of three invoices for two new Erika performance outfits and new dancer looks, Exh. 1B. pp. 263- 267 (black mesh bodysuit with hematite crystals $8,200), second invoice T-85 dated 4/14/2016 Exh. 1B pp. 268- 272 (second outfit, variation of black mesh bodysuit with hematite crystals $9,156) and third invoice T-92 dated 5/9/2016 & 5/12/2016 Exh. 1B pp. 291-296 (balance of Erika outfits and dancers for Miami event, $9,210.50 each);

•T-88 dated 4/26/2016 Exh. 1B pp. 281-283 (deposit $8,938 on stretch denim hooded romper with old Crystals)

•T-89 dated 4/28/2016 Exh. 1B pp. 284-287 (deposit $5,940 on black scuba neoprene and high waisted short with crystals, and blk stretch long sleeve crop top, about which Erika later changed her mind before finished/balance not billed);

•T-95 dated 5/18/2016 Exh. 1B pp. 305-306 (long sleeve red sportivo embellished with Swarovski hematite crystal $8,753.27);

•T-96 dated 5/20/2016 Exh. 1B pp. 307 (blk fishnet halter top leotard with clear crystals in chevron patter $9,256);

•T-99 dated 5/25/2016 Exh. 1B p. 313 ($11,719.68 invoice for custom garments ordered for June Pride Engagements "meet and greet looks");

•T-101 dated 6/6/2016 Exh. 1B p. 315-318 (overnight rush order $8,765 custom long sleeved with glove "money print" leotard with crystals);

•T-102 Exh. 1B pp. 319-323 (invoice $10,300 for multiple Erika outfits Blk crystal on back diamond leotard, money print leotards, with and without skirt, re-stone and alter prior leotard with hematite crystal);

•T-103 & T-104 dated 6/14/2016 & 6/16/2016 Exh. 1B pp. 324-326 (initial and second invoices for $9,200 and $9,543 for Erika's blue silk robe with blue Marabou feathers and lingerie and dancer outfits for Erika's music video shoot, which scene was aired on the Real Housewives of Beverly Hills show January 18, 2017 called "It's Expensive to be Me."). I saw the video and the TV show and recognized our costumes;

•T-106 dated 6/21/2016 Exh. 1B p. 329 (invoice for $7,085, order for Black spandex bodysuit with clear Crystal embellishment);

•T-106 dated 6/21/2016 Exh. 1B p. 330 (order for alternate money print look embellished with Swarovski crystals $7,085);

•T-108 dated 6/28/2016 Exh. 1B p. 332 (invoice for $9,500 order for diamond mesh cutout in black scuba, long sleeved leotard);

•T-109 dated 6/29/2016 Exh. 1B p. 333 (invoice for $9,200 crystal rainbow gradient leotard);

•T-111 dated 7/2/2016 Exh. 1B p. 335 (invoice for $9,483.00 for long sleeve bodysuit and gloves for Erika video shoot);

•T-112 dated 7/15/2016 Exh. 1B p. 336 (invoice for $9,600 for deposit on black crystal catsuit);

•T-112 & T-114 dated 7/15/2016 & 7/19/2016 Exh. 1B pp. 336-349 ($9,600 deposit and $4,800 balance on crystals catsuits ordered for Bravo Awards Performance);

•T-116 dated 7/26/2016 Exh. 1B p. 353 (invoice $9,240 in part for new outfit with tear away peplum for Erika, and cheetah print swim and coverup for Mykonos Greece filming);

•T-118 dated 7/29/2016 Exh. 1B p. 354 (invoice for $9,350 for Erika outfit black and pink diamond shaped crystal gradient with beaded tear away peplum);

•T-120 dated 8/3/2016 Exh. 1B p. 358-360 (invoice for $9,476 for a silver Swarovski crystal leotard and silver Swarovski crystal which she wore in her video);

•T-122 dated 8/9/2016 Exh. 1B p. 362 ($9,627 deposit invoice for pink metallic leotard embellished with Swarovski crystal, later changed to a blue option);

•T-123 & T-126 dated 8/10/2016 & 8/16/2016 Exh. 1B pp. 368-375, 381-387 ($9,627 deposit and $6,758 balance payment for baby blue metallic and pink leotard both with Swarovski crystal);

•T-127 dated 8/18/2016 Exh. 1B p. 388 ($9,014.30 invoice red Swarovski Siam Crystal Leotard, long sleeve with tear away peplum);

•T-128 dated 8/29/2016 Exh. 1B p. 389 ($9,500 invoice for nude fishnet mesh with neon crystal gradient pink and yellow);

•T-129 dated 8/29/2016 Exh. 1B p. 390 (invoice $10,355 for multi color spandex and scuba based leotard embellished with rainbow crystal gradient);

•T-131 dated 9/15/2016 Exh. 1B pp. 393-396 ($9,019.76 reorder of prior designed Magenta pink leotard with crystals and Baby Blue leotard with crystals);

•T-132 dated 11/30/2016 Exh. 1B p. 397 ($4,500 deposit on black crystal bodysuit).

67.    In addition, given the vigorous dance routines, her outfits with crystals would routinely need restoration and upkeep, requiring reattaching crystals to maintain

the visual beauty of the costumes. She ordered these services and we billed for them. This happened several times and two examples are T-5 dated 1/27/2015 Exh, 1B p. 23 (invoice $2,300 , and T-130 dated 9/8/2016 Exh. 1B pp. 391-392 ($9,200 invoice for repair of bodysuit needing repair and replacement of crystals).

68.    These embellishments were labor intensive as they extensively covered costumes and each crystal was hand placed and often done at a rush rate.  (Exh. 1B, p. 5) On different occasions in 2015 and 2016 Ms. Girardi's assistant Laia and creative director Mikey would orally comment to me and Marco Morante about how Erika wanted her outfits to look expensive or rich.  I saw a similar reference Laia made to me in a 3/7/2016 text that is saved in our business records (our computer at work was set up to get our text messages). See Exh. 1B p. 248 (relating to a Swarovski Aurora Borealis crystal embellished outfit for Erika "to make it insane").

69.    Some invoices included multiple "looks" (meaning outfits) and others just one; there is not one invoice per one article of clothing or one service provided. In addition as the charts summarize, there is also not only one invoice per costume, rather it is common for there to be several invoices related to a particular costume or dancer outfit as an invoice is created for many events related to services, such as the beginning of an order, a change order, at the time of delivery, and for a fitting at hotel or venue of the performance.

70.    As we supplied her costumes, fittings and alterations, Marco Morante and I were in frequent communication with her assistant Laia and creative director Mikey and therefore knew that Erika wore multiple garments in each performance and had extra garments created by Marco Marco as backup for such performances. Erika would also wear multiple costumes at times during performances, and video shoots. Erika, Laia and Mikey were involved in all the 2015 and 2016 orders, fittings and alterations and therefore knew that counting the number of performances would not be an

accurate measure of how many costumes were designed, made and altered for her over the course of 2015 and 2016.

71.     In addition the chart contains numerous invoices for alteration service transactions for costumes. Erika, Laia and Mikey were involved in all the 2015 and 2016 orders, including substantial alterations and repairs therefore knew that counting the number of "costumes" in her closet would not be any accurate measure of the goods and services she ordered and authorized billing for. These were not simple alterations, they were fundamental revisions. Examples of substantial alterations include: T-105 dated 6/18/2016 Exh. 1B pp. 327-8 (invoice $9,500 reconstruct and replace the sheer panel on the Black Onesie bodysuit and embellish it with crystals); T-121 dated 8/6/2016 Exh. 1B pp. 360-361 ($8,647 invoice for alterations on multiple Erika costume items); T-125 dated 8/15/2016 Exh. 1B pp. 379-380 (invoice for $9,600 incl. replace crystals on Erika Leotard with silver hematite crystal coverage and dancer shirts).

72.     There were also occasions where we invoiced for Marcos travel fittings to San Diego and Palm Springs, and we would bill for offsite fittings at her rehearsal studio if we needed to send a Marco Marco staff member. That happened on multiple occasions. See e.g., T-36 dated 9/1/2016 Exh. 1B p. 107 ($5,400 invoice in part for travel fitting); T-100 dated 6/6/2016 Exh. 1B p. 314 (invoice in part for Marco Morante travel fitting); T-47 dated 11/9/2015 p. 137-138 ($2,200 for Morante on site fitting); T-93 dated 5/10/2016 Exh. 1B p. 297-(travel fitting Morante in Miami); T-100 dated 6/6/2016 (travel fitting Morante in Orlando).

73.     In addition to the performance costumes for Erika, she also hired and paid Marco Marco to perform services for her dancers. At times we created actual outfits for them and other times her team would bring us "store bought" clothes for the dancers but hire us to modify them to a "Leotard" including a tear away crotch with cut sleeves, create other tear away accessories such as ties, jackets, shirt sleeves, to add

leather and vinyl embellishments, and to repair damaged shirts and pants. The dancers would frequently throw their clothing, or parts of them, into the audience during performances, requiring new ones for the next performance. I would estimate approximately 24 transactions for dancer orders of which 15 include alteration services between 2015 and 2016 amounting to well over $100,000 just for dancer related services and goods. See these examples:

•T-1 dated 1/8/2015 Exh. 1B pp. 10-12 (invoice $480);

•T-2, dated 1/15/2015 Exh. 1B pp. 13-16 (invoice $690);

•T-3 dated 1/22/2015 Exh. 1B pp. 17-19 (invoice $360);

•T-6, dated 3/23/2015 Exh. 1B pp. 26-27 (invoice $450),

•T-9 dated 4/3/2015 Exh. 1B pp. 32 -33 (invoice combines dancer alterations $3,680 w/ catsuit another $3,600)

•T-10 dated 4/6/2015 Exh. 1B pp. 34-35 (invoice $440);

•T-14 dated 4/16/2015 Exh. 1B pp. 43-46 (invoice $1,900);

•T-15 dated 4/17/2015 Exh. 1B pp. 47-48 (invoice $760);

•T-16 dated 4/21/2015 Exh. 1B pp. 49-51 (invoice combines dancer alterations $720 w/ new bodysuit another $3,400

•T-17 dated 4/22/2015 Exh. 1B pp. 52-54 (invoice $480);

•T-75 & T-76, Exh. 1B pp. 233-240 (invoice combines $2,200 for dancer "Money look" outfits with crystallized bodysuit another $8,500);

•T-80 dated 4/1/2016 Exh. 1B pp. 252-253 ($7,500 order for four new dancer outfits with "Money" print fabric cost);

•T-86 & T-87 dated 4/18/2016 & 4/19/2016 Exh. 1B pp. 273-280 (first of two related invoices for the 12 male and 4 female dancer outfits $8,938 for deposit on dancer 2nd look and $8,938 balance of dancer 2nd look);

•Three related transactions which include services ordered and rendered for dancers in Erika's upcoming performances, see specifically T-93 dated 5/10/2016 Exh. 1B pp.

297-302 (invoice for deposit on rush order on Erika custom outfits and harness looks for dancers $9,210); T-94 dated 5/12/2016 Exh. 1B pp. 303-304 ($9,210.50 invoices for dancer costumes with crotch pants, embellishes and vinyl harnesses);

•T-107 dated 6/22/2016 Exh. 1B p. 331 ($5,123 invoice for order of 4 dancer bodysuits and male dancer harness and alterations to button down shirts);

•T-110 dated 6/30/2016 Exh. 1B pp. 334 ($8,393 dancers outfits);

•T-113 dated 7/15/2016 Exh. 1B p. 336, 340-344 ($9,250 invoice for 8 dancers outfits);

•T-115 dated 7/19/2016 & 7/25/2016 Exh. 1B p. 350-351 (first and second invoices $4,750 and $9,480 combined invoices for revised "Money" print dancer outfits, and 2 piece Erika money print outfit);

•T-116 dated 7/26/2016 Exh. 1B p. 353 (invoice $9,240 in part for revised money print looks for female dancers, updated looks for male dancers with leather and vinyl details), new outfit with tear away peplum for Erika, and cheetah print swim and coverup for Mykonos Greece filming);

•T-119 dated 8/1/2016 Exh. 1B pp. 355-357 (invoice for $9,700 for dancer and Erika outfits);

•T-124 dated 8/12/2016 Exh. 1B p. 376 -378 ($9,453 invoice for alterations of 16 items—four items each for four male dancers);

•T-125 dated 8/15/2016 Exh. 1B p. 379 (invoice for $9,600 incl. repair Erika outfit and dancer shirts).

74.    All of the 132 transactions Marco Marco engaged in with Ms. Girardi she authorized in advance to be billed to the American Express card account she provided Marco Marco. All of the goods and services she transacted for were provided. There was no false or fraudulent billing to her account. There was no unauthorized billing to her account. All of this evidence existed both in Marco Marco records and in Ms.

Girardi's and her assistants' records. Their statements to the authorities that there was no documentation to support their legitimacy are entirely false.

75.     Our business Marco Marco had a merchant business account with American Express and in my role as managing partner I am familiar with our history of transactions with American Express. Not only did we have an excellent and legitimate track record with American Express, American Express did not terminate our merchant privileges despite Ms. Girardi's false claims of fraud in the amount of $787,118.88. American Express did not charge back our merchant account $787,118.88 despite "refunding" Ms. Girardi that amount. In addition American Express never called Marco Morante nor I to discuss her claims, and never gave us or our business a chance to respond or produce records to establish the legitimacy of the transactions.

I declare under penalty of perjury that the foregoing is true and correct. Executed this November 20, 2023, at Hollywood, California.

_____
Christopher Psaila