BARRETT S. LITT, SBN 45527
Email: blitt@mbllegal.com
DAVID S. McLANE, SBN 124952
Email: dmclane@mbllegal.com
MARILYN E. BEDNARSKI, SBN 105322
Email: mbednarski@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

STANLEY I. GREENBERG, SBN 53649
11845 W. Olympic Blvd., Ste. 1000
Los Angeles, CA 90064
Tel: (424) 248-6600
Fax: (424) 248-6601
Email: Stanmanlaw@aol.com

BRUCE BERNARD BEALKE
(pro hac vice)
(Illinois SBN 6200543)
77 West Wacker Drive, Ste. 45001
Chicago, IL 60601
Tel: (312) 216-7177
Fax: (312) 741-1010
Email: bealkelaw@protonmail.com

*Attorneys for Plaintiff* CHRISTOPHER PSAILA

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PSAILA,<br><br>Plaintiff,<br><br>v.<br><br>ERIKA GIRARDI aka ERIKA JAYNE, AMERICAN EXPRESS COMPANY, ROBERT SAVAGE, KENNETH HENDERSON, STEVE SCARINCE, PETER GRIMM, LAIA RIBATALLADA, MICHAEL MINDEN, and DOES 1 TO 10, Inclusive,<br><br>Defendants. | Case no.: 2:23-cv-07120-MWF (SKx)<br><br>**DECLARATION OF MARCO MORANTE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO SPECIAL MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE (C.C.P. § 425.16, ET SEQ.) BY DEFENDANTS ERIKA GIRARDI, LAIA RIBATALLADA, AND MICHAEL MINDEN**<br><br>Hrg. Date: December 18, 2023<br>Time:10:00 a.m.<br>Crtrm:5A |

## DECLARATION OF MARCO MORANTE

I, Marco Morante, hereby declare the following:

1.     I am one of the founding partners and lead designer for Marcosquared LLC. This declaration is submitted in support of Plaintiff's Opposition to Special Motion to Strike Complaint Pursuant to California Anti-SLAPP Statute (C.C.P. § 425.16, et seq.) by Defendants Erika Girardi, Laia Ribatallada, and Michael Minden. The facts set forth herein are within my personal knowledge or knowledge gained from review of the pertinent documents. If called upon, I could and would testify competently thereto.

**A.     Personal Background**

2.     I am the co-owner and managing member of Marcosquared LLC ("Marco Marco") a business incorporated in California with its principal place of business in Los Angeles, California. My business partner, Christopher Psaila, and I each own a 49% interest in Marco Marco. During all the years we did business with Erika Girardi, Christopher Psaila and I owned an equal percentage of our business.

3.     I met Christopher Psaila in 2000 during our time as college students at The California Institute for the Arts ("Cal Arts"). After our education at Cal Arts, Christopher and I opened Marco Marco together in 2003.

4.     We have grown the company together over the past 20 years. Our work is frequently seen in the music industry, where we have designed iconic looks for numerous high-profile artists. Our designs have been featured in tours, award shows, and music videos, and have been worn by celebrities such as Jennifer Lopez, Nicki Minaj, Kesha and Shakira. We had worked with these celebrities before working with Ms. Girardi. Marco Marco has also designed costumes for famous American institutions like the Ringling Bros. & Barnum & Bailey Circus, the San Francisco Ballet, and the Houston Ballet.  Some of the brand's most

notable designs include Katy Perry's Cupcake bra, Britney Spears' Las Vegas Residency and two Super Bowl Halftime Shows. Each of these projects occurred prior to working with Ms. Girardi. Our business has earned a reputation for delivering high value costumes for entertainers and was awarded an Emmy Award for costume design in 2022 for our work designing for HBO's series, "We're Here."

5.    The Marco Marco brand has been a consistent advocate for LGBTQ+ rights in the fashion industry. We have used our platform to promote diversity and inclusion through the brand's runway shows, collaborations, and designs. Our commitment to these values is evident throughout Marco Marco's 20-year history. We have worked hard to develop our brand and reputation in the fashion industry.

6.    In 2009, we expanded our studio in Hollywood by acquiring two more retail storefronts on our block. At the same time, we increased the size of our team. By 2014, we had a staff of 22 full-time employees.

7.    Christopher and I worked together in the studio. My focus was on designing costumes and interacting with clients and their assistants, creative directors, stylists, and choreographers on the look they were trying to achieve, and the costumes and wardrobe needed for the clients. I also conducted fittings with clients and helped coordinate delivery and scheduling as needed. Christopher handled the business side of the company, which involved creating and sending invoices for orders, processing payments and billing for customer orders, and helping to coordinate logistical matters, such as delivery of goods and scheduling fittings. Chris also ran the underwear production and website nearly entirely on his own, from sourcing to manufacturing, e-commerce and wholesale distribution

**B.    Ms. Girardi Learns of Marco Marco's Services**

8.    I was first approached by Jack Ketsoyan, Marco Marco's publicist, about doing work for another one of his clients, Ms. Girardi. Jack told me Ms.

DECLARATION OF MARCO MORANTE ISO OPPOSITION TO ANTI-SLAPP MOTION
2

Girardi was a bored housewife who needed help with her look. I was initially uninterested in taking up the work, thinking that it would be more trouble than it was worth.

9.    After months of asking, we agreed to make a few last-minute pieces for Ms. Girardi's music video, "Party People," which was released in 2011. I worked directly with Ms. Girardi's styling duo "The Kidz," who placed the order. The music video features a variety of Marco Marco costumes on Ms. Girardi and her dancers. This was the first time I met Ms. Girardi, as I arrived on the set of the music video to conduct a quick fitting. My initial impression was that she was down to earth, which made me more open to the idea of moving forward with creating pieces for her.

10.    Ms. Girardi began directly commissioning costumes from Marco Marco for all aspects of her singing career in 2014. When Ms. Girardi was added as a new character on The Real Housewives of Beverly Hills ("RHOBH") in 2015, I began designing for her appearances on that reality television show.

11.    I understood from talking to Ms. Girardi's creative director Mikey Minden, who I had known for years, and from conversations directly with Ms. Girardi, that she had been ordering costumes from a business named Sylvia's costumes, a company I knew from my experience in the fashion business in Los Angeles. I knew that Sylvia's largely if not entirely made costumes that were already designed, unlike Marco Marco which creates original designs for our clients, that I design. At that time, Christopehr Psaila and I were also using Sylvia's costumes to build garments for clients who did not have the budget to support an in-house costume build with our company. Ms. Girardi told me that she loved the outfits that Marco Marco had made for her through her stylists "TheKidz." I shared that information with Christopher Psaila while we were discussing the possibility of working with Ms. Girardi in the future.

12.    Our working relationship with Mikey Minden, Ms. Girardi's creative director, began in or around 2011 and developed over the years as we worked together for his clients. Mr. Minden brought many of his clients to Marco Marco for custom performance clothing. Most notably, Mikey commissioned outfits for Carmen Electra, Robin Anton, Havana Brown, Amber Rose, G.R.L., and the PussyCat Dolls.  In April 2014, Mr. Minden came to Christopher Psaila and me to talk about working directly with Ms. Girardi to design her full image. Mr. Minden expressed his vision that he and I would work together to create the "blonde bombshell" known as "Erika Jayne."  He explained that he and Ms. Girardi believed that there was no need for a stylist for her performances any longer since he could handle accessories and day to day clothing, and that Erika's stage character "Erika Jayne" was only to wear custom one-of-a-kind designs from here on out whenever she was performing.

**C.    Ms. Girardi Begins Regularly Commissioning Orders from Marco Marco**

13.    Between 2015 and 2016, there were 132 transactions related to Ms. Girardi's costume orders. For these orders, I either illustrated, designed, assembled and embellished custom garments for Ms. Girardi and/or her performing entourage or made alterations or modifications to existing clothing items for their performances. I am aware that these costumes were worn for various stage performances, music videos, photo shoots, etc. because I have seen the overwhelming amount of content readily available online, and by having seen them featured on RHOBH, in which Ms. Girardi is a reoccurring character. I appeared in three episodes of RHOBH season six, conducting fittings with Ms. Girardi. I have seen her and her dancers wear said costumes at performances of hers I have attended, and because of the many photographs and videos showing them online

and in social media posts. I am very proud of my work and am able to recognize my own designs and work when I see them.

14.     On April 30, 2014, Ms. Girardi arrived at Marco Marco for a fitting for the first set of costumes she directly commissioned from us, alterations on her personal clothing, and two "elastic bondage dresses with mesh." Both Christopher Psaila and I were at this fitting as well as Ms. Girardi and her usual entourage (her assistant Laia Ribatallada and her creative director Mikey Minden). At that fitting I heard Ms. Girardi instruct Ms. Ribatallada to pay for the outfit, and Ms. Ribatallada then handed me the American Express credit card, which I then handed to Christopher Psaila. I saw Christopher attempt to hand Ms. Girardi the paper invoice, in the presence of Mr. Minden and Ms. Ribatallada, and saw her physically wave the invoice away and say that it would not be necessary for her to receive the invoices. She said we were to keep the card on file for any future invoices for costumes and services. I also recall Christopher Psaila asking Ms. Girardi for an email address to send the invoices to and her saying that would not be necessary.

15.     I am aware from working with Christopher Psaila in our business for 20 years now that it is our normal business practice to provide invoices upon receipt of goods and services. This includes when a client is charged the initial deposit when we take the order, a deposit which allows us to begin designing and to buy materials needed to construct the order. A second invoice is provided upon completion of the costume and reflects any remaining costs associated with the order, such as additional materials, time, and labor. We keep these records as business records for all client transactions. I worked with Ms. Girardi and her assistants for about three years between 2014 and 2016 and am unaware of her asking to see an invoice or questioning the price of anything between the start of our business relationship and the fall of 2016.

16.    Over the course of our business relationship, Ms. Girardi communicated her orders in a variety of ways. Often, Ms. Girardi or her staff, Michael Minden and Laia Ribatallada, or her stylist, Dani Michelle, would communicate orders via text message, email, or verbally on the phone or in person to either Christopher or me. It was routine for us to conduct business by text and email as well as verbal forms of communication, on the phone or in person. Our computers were also set up to keep a record of our texts and emails. There was no set method of communicating orders. Sometimes Ms. Girardi or her assistants would contact me, and other times they would speak with Christopher Psaila, who would relay the order to me. In some instances, when Ms. Girardi and Mr. Minden were happy with a garment in a fitting, they would request additional sets of that look in multiple colorways.

17.    Orders would include custom costumes as well as alterations and repairs to Ms. Girardi's personal clothing, alterations and repairs to existing costumes, and custom designs for Ms. Girardi and her dancers. I am personally aware of the orders whether I took them initially or Chris did, because in response to these orders, I would design and illustrate the costumes for her and her team's approval. Once receiving approval, we would draft, pattern, sew, and embellish the costumes as needed and then hold fittings with Ms. Girardi at our Hollywood studio or on location. Ms. Girardi's team consistently asked for alterations to Ms. Girardi's personal clothing, repairs and maintenance on existing costumes, and materials kits for Ms. Girardi's tours.

18.    Consistent with our business practices, when Ms. Girardi placed an order, she was billed an initial deposit that primarily covered materials and other costs to begin designing the order. Once the order was complete, Ms. Girardi was billed the remaining cost of the outfit, which included any additional resources needed and for time and labor. Due to the nature of the industry and the chaotic

ordering pattern with which Ms. Girardi and her team operated, Change Orders would often occur. The change orders requested by Ms. Girardi and her team would modify the scope of work or adjust the amount of time needed to complete the work, or both. These changes, in turn, usually increased the price.

19.    I remember several times when I was working on a design for Ms. Girardi and after a picture of our progress would be sent to Ms. Ribatallada or Mr. Minden, one of them would tell me to make it look "rich" or 'richer." I was aware from talking to her team, and from my observations of Ms. Girardi's persona on stage and on the RHOBH, that was her persona to be expensive, and rich. To make it look "rich," we added significantly more Swarovski crystals than originally planned, which raised the price of the garment significantly. To me, it seemed that Ms. Girardi didn't care how much it cost to look "rich," since she never questioned anyone about the price or the estimated cost of her team's vision.

20.    To my knowledge we provided all of the goods and services that she ordered from Marco Marco and acted with full authorization by her and her assistants to do so.

21.    I as well as my business partner Christopher Psaila, tracked and coordinated all orders, fittings, and deadlines, and communicated all logistics for goods and services produced for Ms. Girardi, through one or more of her assistants including Laia Ribatallada and Mikey Minden, and on occasion, stylist Dani Michelle via text message, email, and proof of delivery text messages. There was never a time that Marco Marco did not provide timely costumes and services Ms. Girardi requested, and neither Ms. Girardi nor her assistants complained that they did not receive the goods and services transacted for.

22.    Ms. Girardi, Ms. Ribatallada, and Mr. Minden regularly participated in initiating the 2015 and 2016 transactions with me, Christopher, and our employees. This is documented by text messages, emails, and sketches of the

costumes sent to their emails and to their devices, and in phone calls and meetings, and in coordinating pickups and deliveries of the costumes,

23.    Marco Marco provided Ms. Girardi with extraordinary custom services not just in designing stunning costumes, but doing so on very short notice, with last minute changes. For example, Ms. Girardi's team would sometimes ask us to remove all of the crystals on a costume and replace them with a different shade of crystal, which could easily cost $3,000-$4,000 in materials and 2-5 days of labor from my embellishment team and my illustrator. I recall this happening at least twice, once on the phone and once in person. On numerous occasions Christopher or I traveled out of Los Angeles to wherever Ms. Girardi was performing to conduct fittings and modify costumes. On approximately six such occasions in 2015 & 2016 I traveled to the venues for Ms. Girardi's shows for these purposes.

**D.    Ms. Girardi Begins Questioning Pricing in Late 2016**

24.    Until September 2016, neither Ms. Girardi nor her assistants complained about any charges applied to Ms. Girardi's American Express card, nor did they complain about the cost of any particular order. Her team communicated the opposite to us, that the outfits needed to be "spectacular and over the top" with premium crystals, such as the time Ms. Ribatallada told me to make an outfit look "richer."

25.    I was surprised to hear from my business partner Christopher Psaila that Mr. Minden was questioning the cost charged to her card for two Swarovski crystal embellished leotards. I designed those leotards and worked with Mr. Minden on those designs and prior crystal embellished leotards. He had insisted that she wanted those crystals even though I had explained they were expensive embellishments, not just in the cost of purchasing the crystals but the meticulous placing of each individual stone by hand on each of her leotards. Mr. Minden had

not raised any issue regarding cost with me. Quite the opposite, he had communicated to me on several occasions that her outfits needed to look one of a kind, rich and expensive, and that Ms. Girardi was insistent on more and more crystals on her costumes.

26.    I am familiar with my creations and verify that they are the costumes I made for her corresponding to transaction 131 on September 15, 2016. They were performance duplicates of the leotards detailed in transaction 123 which I had previously designed for her. I personally observed her wearing these custom pink and blue crystal leotards on  the broadcast of RHOBH Season 7, Episode 7, titled "It's Expensive to Be Me" when Ms. Girardi performed in Mykonos, Greece. I also personally observed her presenting those costumes, piece by piece on a Bravo.com digital feature titled "Erika Jayne Shows Off Her New Costume." I was present when this video was filmed on location at the Marco Marco Studio on August 10, 2016, and saw it online after it aired in September, 2016.

27.    In late November 2016, Mr. Minden began discussions by text message with me asking for new design illustrations for a Black bodysuit Ms. Girardi requested. I have reviewed a text message I sent at 11:00 a.m. on November 30, 2016, to Mr. Minden with the illustrations I created for that bodysuit. Mr. Minden responded by saying he was sending them to Ms. Girardi. I recall that later that day, I spoke with Mr. Minden on the phone and he told me that Ms. Girardi approved the illustrations. I communicated that to Christopher so that he could prepare the order, and bill her for the deposit to begin the construction of the Black Crystal bodysuit. The materials alone for a costume like that with such a large amount of high end crystal, and the $50 per yard, discontinued power fishnet Ms. Girardi insisted on using, would cost about $3,000.

28.    She and her assistants asked for it to be ready by December 5, 2016 for pickup, a fast turnaround. My staff and I moved quickly to create this garment.

On December 1, 2016, I sent Mr. Minden a text with an image of the bodysuit displayed on a dress form so Mr. Minden could approve the shape of the garment. He responded saying he was going to show Ms. Girardi. Shortly after that text, he called me to tell me that Ms. Girardi approved of the shape of the bodysuit.

29.    Chris told me that he was going to have a meeting with Ms. Girardi to discuss invoicing and billing. I did not attend because I knew we had provided all of the goods and services ordered and had authorization to bill such goods and services to her AmEx card from the start, so I didn't think much of the meeting. I also knew that any questions about pricing would be easily cleared up because our prices had never been an issue for them and because she and her assistants knew the demands they had made for "rich," one of a kind, original designs on very short notice as well as clothing and alterations for her dancers.

30.    I was shocked when the Secret Service served a search warrant the following month and took our business records, computers, and devices. I knew we had done nothing wrong. Ms. Girardi and her assistants including Mikey had not complained to me about pricing or billing and we had been friends for many years and provided extraordinary services to them. I also knew that no one at American Express or at the Secret Service had ever talked to me or to Christopher about our commercial business relationship with Erika Girardi.

31.    I have reviewed and am familiar with Psaila Decl. Ex. 1, a multipage chart describing our business records and other evidence related to each of the 132 transactions Ms. Girardi engaged in directly with Marco Marco between 2015 and 2016. Exhibit A accurately summarizes evidence related to these 132 transactions. Every transaction and billing was authorized by her to be charged to her AmEx card and all of the goods and services transacted for were provided.

32.    I have thoroughly reviewed Exhibit 1A (the chart of seven transactions that occurred in 2015-2016), and Exhibit 1B (the chart of all 132

transactions between our company and Ms. Girardi in 2015–2016.  It is my opinion that those two charts accurately summarize our business records (emails, text messaging, order forms, invoices) documenting the referenced transactions in each chart. In addition they accurately summarize the posts, photographs, and video evidence that is referenced therein and which I have watched and /or reviewed myself.

I declare under penalty of perjury that the foregoing is true and correct. Executed this November 19, 2023, at Hollywood, California.

_____
Marco Morante