BARRETT S. LITT, SBN 45527
Email: blitt@mbllegal.com
DAVID S. McLANE, SBN 124952
Email: dmclane@mbllegal.com
MARILYN E. BEDNARSKI, SBN 105322
Email: mbednarski@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

STANLEY I. GREENBERG, SBN 53649
11845 W. Olympic Blvd., Ste. 1000
Los Angeles, CA 90064
Tel: (424) 248-6600
Fax: (424) 248-6601
Email: Stanmanlaw@aol.com

BRUCE BERNARD BEALKE
(pro hac vice)
(Illinois SBN 6200543)
77 West Wacker Drive, Ste. 45001
Chicago, IL 60601
Tel: (312) 216-7177
Fax: (312) 741-1010
Email: bealkelaw@protonmail.com

*Attorneys for Plaintiff* CHRISTOPHER PSAILA

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PSAILA,<br><br>            Plaintiff,<br><br>    v.<br><br>ERIKA GIRARDI aka ERIKA JAYNE, AMERICAN EXPRESS COMPANY, ROBERT SAVAGE, KENNETH HENDERSON, STEVE SCARINCE, PETER GRIMM, LAIA RIBATALLADA, MICHAEL MINDEN, UNITED STATES of AMERICA, and DOES 1 TO 10, Inclusive,<br><br>            Defendants. | Case no.: 2:23-cv-07120-MWF (SKx)<br><br>Hon. Michael W. Fitzgerald<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT ROBERT SAVAGE'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>Hearing Date: September 23, 2024<br>Time:          10:00 a.m.<br>Ctrm:          5A<br><br>Complaint filed: 8/29/2023 |

## **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................... 1

II.  MOTION TO DISMISS STANDARD ..................................................... 3

III. THE FACTS SUPPORT PLAINTIFF'S *BIVENS* CLAIM AGAINST
     SAVAGE ................................................................................................. 4

     A.   The Facts Alleged Against Savage ................................................. 4

     B.   Girardi's Representation and Promise of Money Was the Thing
          of Value that Induced Savage's Official Act of Authorizing and
          Initiating the Investigation ........................................................... 8

IV.  SAVAGE VIOLATED CLEARLY ESTABLISHED LAW AND PLAINTIFF
     IS NOT HOLDING SAVAGE LIABLE UNDER A RESPONDEAT
     SUPERIOR THEORY ............................................................................ 15

     A.   Savage Violated Clearly Established Law ..................................... 15

     B.   Plaintiff Is Not Holding Plaintiff Responsible Under a Respondeat Theory
          of Liability ..................................................................................... 16

V.   THIS COURT SHOULD ALLOW THE *BIVENS* CASE TO PROCEED ......... 16

VI.  CONCLUSION ...................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arpin v. Santa Clara Valley Transp. Agency,*
   261 F.3d 912 (2001)...................................................................................12, 15

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)...........................................................................................2

*Awabdy v. City of Adelanto,*
   368 F.3d 1062 (2004)..........................................................................................4

*Bell Atlantic Co. v. Twombly,*
   550 U.S. 544 (2007)...........................................................................................2

*Bennett v. Brnovich,*
   2024 WL 2930976 (9th Cir.) .........................................................................12

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
   403 U.S. 388 (1971).................................................................................17, 19

*Blankenhorn v. City of Orange,*
   485 F.3d 463 (9th Cir. 2007) .........................................................................13

*Brady v. Maryland,*
   373 U.S. 83 (1963).............................................................................................4

*Caltex Plastics, Inc. v. Lockheed Martin Corporation,*
   824 F.3d 1156 (9th Cir. 2016) .........................................................................2

*Carlson v. Green,*
  446 U.S. 14 (1980)...............................................................................19, 21, 22

*Chism v. Washington State,*
   661 F.3d 380 (9th Cir. 2011) .........................................................................12

*Danhoe v. Arpaio,*
   986 F. Supp 2d 1091 (D.C. Az. 2013) .........................................................13

*Davis v. Passman.,*
   442 U.S. 228 (1979).................................................................................17, 18

*Devereaux v. Abbey,*
   263 F.3d 1070 (9th Cir. 2001) .........................................................................4

*District of Columbia v. Wesby,*
   583 U.S. 48 (2018)...........................................................................................3

*Ebner v. Fresh, Inc.*,
  838 F.3d 958 (9th Cir. 2016) ................................................................2

*Egbert v. Boule*,
  596 U.S. 482 (2022).......................................................16, 17, 18, 19

*Envtl. Ctr. Mendocino*,
  192 F.3d 1283 (9th Cir. 1999) ..........................................................12

*Franks v. Delaware*,
  438 U.S. 154 (1978).....................................................................3, 15

*Frudden v. Pilling*,
  877 F.3d 821 (9th Cir. 2017) ..............................................................3

*Gasho v. United States*,
  39 F.3d 1420 (9th Cir. 1994) ............................................................13

*Groh v. Ramirez*,
  540 U.S. 551 (2004).........................................................................17

*Hartman v. Moore*,
  547 U.S. 250 (2006)...................................................................16, 17

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020)........................................................................18

*Kisela v. Hughes*,
  138 S. Ct. 1148 (2018)........................................................................3

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ............................................................2

*Kramer v. Cullinan*,
  878 F.3d 1156 (9th Cir. 2018) ............................................................3

*Kyles v. Whitley*,
  514 U.S. 419 (1995).......................................................................4, 6

*Lanuza v. Love*,
  899 F.3d 1019 (9th Cir. 2018) ..........................................................19

*Lujon v. Nat. Wildlife Federation*,
  497 U.S. 871 (1990)..........................................................................22

*Manning v. Miller*,
  355 F.3d 1028 (7th Cir. 2004) ............................................................5

*Mazzetti v. Bellino*,
  57 F.Supp. 3d 1262 (E.D. Ca. 2014)................................................18

*Napue v. People of State of,*
   360 U.S. 264 (1959) ........................................................................4

*Pettibone v. Russell,*
   59 F.4th 449 (9th Cir. 2023) ......................................................20

*Pyle v. State of Kansas,*
   317 U.S. 213 (1942) ........................................................................4

*Siegert v. Gilley,*
   500 U.S. 226 (1991) ........................................................................3

*Smiddy v. Varney,*
   665 F.2d 261 (9th Cir. 1981) ....................................................13

*Todd v. Hicks,*
   2023 WL 2375235 ........................................................................14

*Tsao v. Desert Palace, Inc.,*
   698 F.3d 1128 (9th Cir. 2012) ....................................................8

*Turner v. U.S.,*
   582 U.S. 313 (2017) ........................................................................4

*U.S. v. Zuno-Arce,*
   44 F.3d 1420 (9th Cir. 1995) ..................................................4, 6

*White v. Pauly,*
   580 U.S. 73 (2017) ..........................................................................3

*Ziglar v. Abbasi,*
   582 U.S. 120 (2017) ................................................................16, 18

**Statutes**

5 U.S.C. § 702 ....................................................................................22
5 U.S.C. § 704 ....................................................................................22
18 U.S.C. § 3056 ................................................................................20
28 U.S.C. § 540c(b) ..........................................................................20
42 U.S.C. § 1983 ........................................................................16, 18

**Rules**

F.R.C.P. 8(a)(2) ..................................................................................2

## I.   INTRODUCTION

The Court dismissed the complaint against Defendants Savage, Henderson and Scarince on the Bivens claim but gave the opportunity to amend the complaint. (Court Ruling on MTD, Dkt. 106, p. 13.) [1]

This opposition brief argues how the circumstantial facts set forth in the First Amended Complaint ("FAC"), request for judicial notice "RJN" and Exhibits 9-15 reference therein, support that Savage's personal conduct *vis a vis* this investigation was corrupt and not simply an act of authorization by someone who "played no role" as Savage claims. These circumstantial facts support that there was a *quid pro quo* between Tom Girardi and Savage, in exchange for Tom Girardi agreeing to represent Savage and his wife in the *Volkswagen* case and promise to get $100,000 in the *Volkswagen* litigation, that Savage agreed to commence the Secret Service investigation into Plaintiff. Savage's argument that the $7,500 payment cannot be a bribe misses the point and ignores important facts. First, the Girardi offer/promise to Savage was his representation and promise to get $100,000 not $7,500 and second, Girardi's statement to the judge did not "expose" the nature of the payment, as Girardi

---

[1]    The Court further ruled that the Bivens claim, *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("Bivens"), was made in a "new context", and that there are "alternate remedies" that "precludes" a Bivens claim against Savage. (Id. at 11, 12).  The Court ruled that Savage is protected by qualified immunity because there is no "respondeat superior" liability against Savage. (Court Ruling on MTD, Dkt. 106, p. 12-13. Indeed, the ruling to dismiss the claim against Savage was solely based on the grounds that as a legal matter, this case presented a new Bivens context, and that Bivens should not be extended to Savage because of rank as a "senior officer in charge" of the Los Angeles Secret Service office, and  that providing a Bivens remedy would provide a "greater risk of intruding on the investigatory  . . . function of the executive branch." *Id*.

failed to tell the judge that Savage had initiated a federal criminal investigation of his wife's claim that Plaintiff had stolen $800,000 from her. [2]

Plaintiff's FAC added the additional supervisorial Bivens claim against Defendants Savage and Scarince as without their integral participation and failures to train and supervise agent Henderson on the case, there would not have been a violation of Plaintiff's constitutional rights. Savage mischaracterizes Plaintiff's claim against Savage as being premised on a respondeat superior theory. It is not. The facts support he was personally involved with the corrupt purpose of benefitting himself: using his position as the head of the LA office to accept the investigation and assign it for investigation to subordinate agents; directing his subordinates to investigate Plaintiff; and, omitting telling his office or the prosecutor of his transactional relationship with Tom Girardi.

Contrary to Savage's argument, his conflict of interest in initiating and overseeing the investigation was *Brady* material. Had the extent of that conflict been made known to his office or the prosecutor, it is likely the case would never have been accepted. As such, he violated his duty as a supervisor to ensure that Plaintiff would not be prosecuted based on concealed and fabricated evidence.

In addition, this brief addresses that Savage is not entitled to qualified immunity as the case law supports that the malicious prosecution of Plaintiff in 2016-2017 violated clearly established rights.

---

[2] Counsel for defendant also threatens Rule 11 sanctions claiming the Complaint is frivolous. (Savage Motion to Dismiss, ("MTD"), First Amended Complaint, ("FAC"), p. 2. The parties disagree on the facts and the conclusions to draw from the facts, that is why the case should not be dismissed, and Plaintiff should be allowed to move forward to discovery. Our disagreement does not make the FAC frivolous. If the Bivens action is dismissed against Savage, there will be no mechanism to hold him accountable for his actions since he is no longer with the Secret Service.

Finally, with respect to the Bivens remedy, Plaintiff's position is Biven's appropriately gives him a remedy both because these circumstances do not present a new context, rather involve ordinary law enforcement investigation that deprived the Plaintiff of his civil rights analogous to the violation in *Bivens,* and because no special factors exist that warrant not extending the *Bivens* remedy here.

## II.   MOTION TO DISMISS STANDARD

To state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." F.R.C.P. 8(a)(2). To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A complaint may be dismissed for failure to state a claim only when (1) it fails to state a cognizable legal theory or (2) fails to allege sufficient factual support for its legal theories. *Caltex Plastics, Inc. v. Lockheed Martin Corporation*, 824 F.3d 1156, 1159 (9th Cir. 2016). Additionally, when reviewing a motion to dismiss, the court accepts as true all factual allegations as true and construes the pleadings in the light most favorable to the nonmoving party. *See id.* at 679; *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Plaintiff agrees with the Court's statement in its order granting the motion to dismiss that, "Determining whether a complaint states a plausible claim for relief is 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.,* 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal,* 556 U.S. at 679).

Common sense application of the facts and reasonable inferences from those facts support the conclusion that Plaintiff has stated a viable *Bivens* claim against Savage.

**III.   THE FACTS SUPPORT PLAINTIFF'S *BIVENS* CLAIM AGAINST SAVAGE**

### A.   The Facts Alleged Against Savage

Plaintiff incorporates by reference the Statement of Facts set forth in his Opposition to Defendant Savage's Motion to Dismiss the original complaint, (Dkt. 81),[3] for purposes of avoiding repetition, brevity and to ensure Plaintiff does not exceed the word count limitation in the local rules.  Instead, Plaintiff will address the facts alleged against Savage that support the conclusion that there was a bribe, quid pro quo or illegal gratuity, and additional facts that establish Savage's personal involvement in the Secret Service investigation and prosecution of Plaintiff.  It is not the number of acts, but the quality of those acts, which demonstrates Savage's singular responsibility for the malicious prosecution of Plaintiff.

> ➢ FAC¶ 43 alleges that Savage had a history of fake presidential advance trips where he would use his Secret Service credential to obtain free rooms, food, drinks and golf for him and other agents that resulted in his involuntary separation from the Secret Service.  This was *Brady* evidence that Savage needed to disclose to Scarince and Henderson so it could be

---

[3]     Plaintiff also incorporates the law on *Bivens* and whether this case presents a new context, and whether if so, *Bivens* should be extended to this context since it involves ordinary law enforcement activities that are not novel, whether the special factors in this case support denying *Bivens* relief, and whether the other remedies such as the Federal Tort Claims Act provides a sufficient level of deterrence, which it does not. The *Bivens* issue has been presented thoroughly in the opposition to Scarince and Henderson's motion to dismiss the original complaint, Dkt. 78, pp. 13-21, opposition to Savage's motion to dismiss the original complaint, Dkt. 81, pp. 15-22, and opposition to Scarince and Henderson's motion to dismiss the FAC, Dkt. 115, pp. 16-22. There is no case on point rejecting a *Bivens* remedy based on the facts of this case, and the Court will have to make its decision on whether *Bivens* supports a remedy in this case.

disclosed to the defense since he initiated the investigation against Plaintiff.  It also affects Savage's credibility in opposing this motion.

➢ FAC¶ 44 alleges that Tom Girardi and Savage knew each other for at least 10 years prior to 2016, two of Savage's wife's relatives interned at Girardi Keese in the 90's, and that Savage and Tom Girardi socialized regularly and was a regular attendee at Girardi's Super Bowl parties.

➢ FAC¶ 45 alleges that Erika Girardi contacted Savage to assist with what she claimed were fraudulent Marco Marco charges on her AMEX credit card.

➢ At the same time Tom Girardi agreed to represent Savage in the Volkswagen litigation. FAC¶ 49.  Exhibit 9 attached to McLane decl.[4] is the Volkswagen docket which first mentions an appearance by Tom Girardi on November 22, 2016.  (Ex. 9, Dkt. 77)  Thus, the quid pro quo was already in the works dating back to November 22, 2016.  Girardi's representation of Savage in the Volkswagen litigation is a thing of value under the bribery statutes. On December 1, 2016, Girardi filed a document with the court, Clarification of Joint Status Report, along with Robert Savage's declaration alleging that the Capstone Law APC had misled him about a previous settlement of the Volkswagen litigation, (McLane decl., Exhibit 10, Dkts. 78 and 78-1, Volkswagen litigation). On that same day, Capstone Law APC filed a response, disputing Savage's affidavit, and alleging it contained "false allegations."  Exhibit 11, McLane decl., Volkswagen Dkts. 79 and 79-1.  In Savage's declaration he stated it would

---

[4]     Plaintiff seeks Judicial Notice of Exhibits 9-14 which represent events in the Volkswagen litigation (Valencia v. Volkswagen, 4:15-cv-00887-HSG, Northern District of California), in which Savage and his wife were Plaintiffs and represented by Tom Girardi.

take $39,000 to repair his car, so of course he had Girardi step in by November 22, 2016, to get him more money, and Tom Girardi agreed to do it.

➢ Defendant Erika Girardi knew Savage and contacted him in early December 2016, after Girardi had made an appearance in the *Volkswagen* litigation.  She  spoke to Savage about her claims, and Savage set up a meeting with her.  At that meeting on December 7, 2016, authorized the investigation into Plaintiff, and introduced her to Scarince and Henderson who would be handling her case.  (Girardi decl., Dkt. 25-1, ¶¶ 59, 64-65.)  Savage's authorization of the investigation, and assigning Scarince and Savage to investigate the case, was the official act he took in exchange for Girardi to get him $100,000.

➢ As set forth in the FAC, on December 13, 2016, Tom Girardi appeared in court on behalf of Defendants Robert and Michelle Savage in the Volkswagen litigation.  See McLane decl., Exhibit 13, transcript of a telephonic court hearing on December 13, 2016, in the *Volkswagen* litigation. The transcript specifically states that Girardi, and Robert and Michelle Savage were present for the telephonic conference.  Ex. 13 to McLane decl., p. 3:l-25, and p. 4:l-2.

➢ At the December 13, 2016 hearing, six days after Savage introduced Erika Girardi to Scarince and Savage who would handle the Psaila criminal investigation, the court and Girardi discussed Savage's objection to the settlement, and as alleged in the transcript, Ex. 13, Mr. Girardi states, "Okay, your honor.  I'll do this.  I'll withdraw our objection. I will pay these people what they have coming to them . . . So, I personally will pay them $100,000, which is what they are entitled to in this. . .. Ex. 13, p. 10:10-17.

Well, I hope somebody's writing this down . . .. Like we'll withdraw our complaint. Well withdraw the fact that we got defrauded. We'll withdraw all that.  This case is over with as far as we're concerned, and I personally, in light of the fact that the Court thought I intentionally disobeyed an order, which isn't true, and in light of that fact, this is worth it to me, and I will pay then $100,000 they would be entitled to had they been properly represented . . .." Ex. 13, p. 10:20-21; p. 10: 25, p. 11:1-7.  Tom Girardi was frustrated at the hearing, reading the signs he could not get Savage the $100,000 he promised to get him, so he personally promised to get him the $100,000 because he would be dismissing the *Volkswagen* lawsuit by Robert and Michelle Savage.  That promise was already agreed to by Girardi and the reason why Girardi was intervened in the *Volkswagen* case in the first place, to get the Savages more money. The $100,000 did not come out of thin air.

- ➤ FAC¶ 51 alleges that on the very next day, December 14, 2016, two significant events happen, Girardi and Savage agree to dismiss the *Volkswagen* case with prejudice, and Scarince and Henderson arranged with Erika Girardi to surreptitiously record a meeting with Plaintiff. Savage agreed to dismiss the case with prejudice as Girardi had put on the record he would pay Savage the $100,000 he previously promised to get him.

- ➤ As set forth in Savage's motion, Girardi Keese issued a check on December 23, 2016, to Lorenzo (Robert) and Michelle Savage for $7,500. As indicated in the declaration of David McLane, counsel for Savage, on June 26, 2024, in an email supplied a $7,500 check from the Girardi Keese firm made payable to Lorenzo (Robert) and Michelle Savage, dated December 21, 2016, and represented via email that was all the money Mr.

Savage received from Tom Girardi. (McLane decl., ¶ 4) Plaintiff would amend paragraph 59 of the FAC to reflect the same without any information to the contrary at this time.

➢ FAC¶ 135 in the Supervisorial *Bivens* claim alleges that due to Savage's personal relationship with the Girardis, he failed to supervise, along with Scarince, Henderson, which resulted in the malicious prosecution of Plaintiff. FAC¶ 136 alleges that Savage, in initiating and authorizing this investigation allowed for the malicious prosecution of Plaintiff by failing to ensure Henderson and Scarince carried out their duties, including failing to ensure the search warrant did not contain falsehoods, (FAC¶ 60), and that they had probable cause prior to presenting the case to the grand jury, instead Henderson and Scarince presented false facts to the grand jury. (FAC ¶¶ 90-92)

**B. Girardi's Representation and Promise of Money Was the Thing of Value that Induced Savage's Official Act of Authorizing and Initiating the Investigation**

Savage's motion contends that Savage did nothing wrong by initiating and authorizing Scarince and Henderson to investigate and prosecute Plaintiff. A fair inference from the facts above is that Tom and Erika Girardi, had a transactional relationship with Savage, "if you scratch my back I'll scratch yours." The Girardis were in desperate need of cash, they were going bankrupt, and Tom Girardi was funding his and Erika Girardi's lifestyles and Erika Girardi's career by stealing money from clients. They needed money from somewhere, and Erika Girardi went to Tom Girardi and complained about issues with Plaintiff concerning his provision of costumes and services, which according to Erika Girardi's declaration had begun by September 2016. (Erika Girardi decl., ¶ 30).

Savage was dissatisfied with the *Volkswagen* settlement.  He went to Girardi to have him intervene in the litigation so Savage would get more money.  So, Girardi intervened in the *Volkswagen* litigation because he promised to get Savage $100,000.  He commenced to act on Savage's behalf with respect to the *Volkswagen* litigation by at least November 22, 2016. (McLane decl., Exhibit 9, Dkt. 77)  This was prior to December 2016 when Erika Girardi went to Savage for him to reciprocate and commence the criminal investigation against Plaintiff.  She knew Savage, and she went directly to him.  She did not file a report with an intake officer with the Secret Service.  She did not get AMEX to commence an investigation of Marco Marco; she did not go to the Los Angeles Police Department and file a complaint, she went to the person with the biggest stick she and Tom Girardi could find and with whom she had a personal relationship, and most importantly, because of Girardi's representation of Savage in the *Volkswagen* suit and promise to get him more money.  In December 2016, Savage authorized the investigation into Psaila, the official act done in response to the thing of value, Tom Girardi's representation of Savage in the *Volkswagen* litigation and promise to get him $100,000.

On December 7, 2016, Savage meets with Erika Girardi and tells her that Scarince and Savage were assigned to the case, without doing any background work by contacting AMEX and asking about Erika Girardi's account.  Instead of the normal course in white collar or credit card cases where the Secret Service relies on the credit card company's investigation or goes to the merchant and asks for a voluntary interview, because many of these disputes can be cleared up with a meeting and Girardi come up with the unusual step and heavy handed step to conduct an undercover recorded conversation with Plaintiff on Decembre 14, 2016, so they can develop a case against him.

The surveillance occurred the day after Tom Girardi appeared in court on December 13, 2016, and promised to personally pay the Savages $100,000 during the

telephonic judicial appearance which the Savages attended.  Then on the same day, December 14, 2016, Girardi on behalf of the Savages moves to dismiss with prejudice the civil case because Girardi promised to personally pay $100,000 to Savage.  If the agreement was for $7,500, why dismiss the lawsuit since Volkswagen was willing to pay that amount prior to Savage retaining Girardi in the *Volkswagen* litigation.  Tom Girardi, who is going broke at this time, after Savage authorized the criminal investigation which is what the Girardis wanted, either reneges on his promise and only pays Savage $7,500 or was going to pay him more as he had promised at a later time.  We don't know because we don't have discovery.  Savage never discloses his arrangement with Tom Girardi, the promise to pay $100,000 to the government or Scarince or Henderson, the prosecutor in the case, or defense counsel (he had a duty to disclose it through Henderson and Scarince); he never obtained a conflict waiver or took any actions to ensure the Secret Service could proceed with the case, because he initiated the case in return for a thing of value, Girardi's representation in the *Volkswagen* case to get him more money.

These acts, agreeing to receive a bribe from Girardi, and then hiding it from everyone who had a right to know, and the institution and authorization of this investigation, personally involved him in the case.  His actions set in motion the malicious prosecution of Plaintiff.  Despite his entanglement with the Girardis, he did not create a wall between him and the Girardis, or between him and Scarince and Henderson, as they proceeded to investigate and prosecute Plaintiff.  The case should have never been commenced in the first place because any real investigation would have revealed all of Plaintiff's AMEX charges were authorized and legitimate.  It was the quality of his few actions, and as the head of the office in Los Angeles, there was no question that this case would be investigated and prosecuted on the thinnest of proof.  That was borne out by the dismissal in September 2021.

Just prior to the time the investigation was initiated and put into operation by Savage on December 7, 2016, which Plaintiff alleges is no coincidence, Tom Girardi by November 22, 2016, agreed to represent Savage in the *Volkswagen* litigation. Savage initiated the criminal investigation into Plaintiff that eventually led to AMEX reimbursing the Girardis $787,117.88.  As alleged in the FAC, the AMEX reimbursement contributed to the indictment, the criminal investigation led AMEX to reimburse the money to the Girardis without any audit or chargeback by AMEX of Plaintiff, what the Girardis wanted all along.  On December 13, 2016, Tom Girardi put on the record what he previously promised to pay the Savages, $100,000 in his personal funds. Then the very next day, two key events happened.  In reliance on that promise, which is a bribe as discussed below, the Savages dismissed their lawsuit with prejudice, and secondly, on that day the Secret Service and Defendants Scarince and Henderson conducted the undercover recording with Plaintiff.

Savage contends that since the payment was eventually $7,500, the amount that he was supposed to receive from the *Volkswagen* defendants, there was no bribe.  The problem with the analysis is that it is plain wrong.  Nowhere does he address why the offer of $100,000 is not a bribe.  Nowhere does Savage explain why a personal payment from Girardi is not normal:  plaintiff's contingency attorneys are not in the business of paying settlements out of their personal funds to their clients.  The fact of the representation of the Savages and intervening in the *Volkswagen* case and promising to get the Savages $100,000 is the thing of value and the bribe in this case that influenced Savage to authorize the investigation of Plaintiff.  The fact Girardi promised to pay $100,000 out of his personal funds at the time of dire financial circumstances supports the reasonable inference the Girardis did this as part of a transaction with Savage, "we will help you and you will help us."

And if ever the United States Attorney or responsible persons at the Secret Service knew of this financial, personal and legal entanglement of Savage with

Girardi, this case would have been rejected out of hand and never been investigated by the Secret Service or prosecuted by the United States Attorney.

Defendant Savage argues he cannot be held liable because he only authorized and initiated the investigation.  It is not the number of acts committed by Savage that is legally significant, it is the quality of the acts he committed by using his position as head of the Los Angeles Secret Service to authorize the Psaila investigation.  Tom Girardi gave him a thing of value  – his representation and intervention in the *Volkswagen* case and promised to get him $100,000, and in return, Savage committed an official act, authorizing a criminal investigation into Plaintiff.  And all the actions that are alleged that were committed by Scarince and Henderson flow from Savage's actions at the beginning of the case.

The fact he initiated this case is the most important legally significant action in this case.  It is this personal involvement of Savage in accepting and directing the investigation to occur that takes it out of an upper manager with no involvement and no stake in the investigation that makes this case *Bivens* worthy for supervisorial liability for his personal involvement.

It is a question for the jury – and there is evidence that Tom Girardi represented Savage and promised to get him $100,000, and in exchange Savage authorized the investigation.  Was it a bribe or was it just a mere coincidence.  It is as simple as that; and those are powerful facts.  Tom Girardi was going broke, how was he going to pay for it.  By getting Savage to initiate the investigation of Plaintiff that resulted in Tom Girardi being reimbursed $787, 117.88.  A reimbursement that should have never been made since all the costumes and services were provided by Plaintiff to Erika Girardi.  AMEX was going to get its money back too through the criminal prosecution as mandatory restitution.

The criminal statutes of receiving a bribe by a public official and receiving an illegal gratuity support Plaintiff's reasonable assessment of the facts.  Under Ninth

Jury Criminal Instruction 10.3. Receiving a Bribe Public Official, 18 U.S.C §
201(b)(2), the elements are that the defendant is a public official (Savage as an
executive branch employee is a public official 18 U.S.C § 201(a)(1)), the defendant
**agreed to receive or accept something of value**, in return for being influenced in the
performance of an official act, and the defendant acted corruptly, which includes,
"intending to be influenced [in the performance of an official act][to commit or allow a
fraud on the United Staes][to do or to omit to do an act in violation of the defendant's
official duty.  A public official acts "corruptly" when he or she accepts or receives, or
agrees to accept or receive, a thing of value in return for being influence with the intent
that, in exchange for the thing of value, some act would be influenced."  The official
does not have to receive a thing of value, but just agrees to accept it.

Under 18 U.S.C § 201(c)(1)(A), receiving an illegal gratuity, as set forth in
Ninth Circuit Criminal Instruction 10.7, the elements are that the defendant was a
public official, and received or agreed to receive something of value, personally for or
because of an official act to be performed by the defendant.  As set forth in Model
Ninth Circuit Criminal Instruction 10.6, the distinction between bribery and illegal
gratuity is the intent element, bribery requires the intent to be influenced in an official
act, while illegal gratuity only require that the gratuity be accepted because of an
official act.

The **thing of value** was Tom Girardi's representation and promise to get him
$100,000 from *Volkswagen*.  Either alone is a thing of value.  It was of great value to
Savage to have the top personal injury attorney in California to represent him in the
*Volkswagen* litigation.  Savage's **official act** in response was authorizing the
investigation.  He acted corruptly because he disclosed to no one his arrangement with
Girardi.  The proof is contained in the *Volkswagen* docket and the December 13, 2016,
transcript.  Girardi realized he was getting nowhere with the Court in trying to
withdraw from the settlement, so he told the Court he would personally pay $100,000

he already had promised to get Savage in the litigation.  Thus, the elements of both offenses are met in this case.  For bribery, he acted corruptly because he agreed to accept a thing of value, Girardi's representation and promise to get him $100,000, and when Erika Girardi approached him, he was influenced in his decision to investigate Plaintiff. For receiving an illegal gratuity by a public official, Savage was influenced by Girardi representing him for free in his civil case, and Girardi offering to pay him $100,000.

Savage disputes the conclusions to be drawn from the personal, financial and legal relationship between Tom and Erika Girardi and Savage; Savage sees this as the ordinary payments of legal fees.  But that is why we have trials: to discern who is right, and the facts support Plaintiff's conclusions.  See also *Danhoe v. Arpaio* 986 F. Supp 2d 1091 (D.C. Az. 2013)  (in holding a criminal defendant may maintain a § 1983 claim not only against prosecutors, but police officers and investigators who wrongfully caused plaintiff's prosecution, if the evidence is "conflicting, so that on one conclusion as to the facts drawn therefrom probable cause exists, while from another it does not, it is then for the jury to determine the true state of facts.)"

The acts and omissions of Savage are the essential acts as to why this case was pursued in the first place.  His authorization was the one essential act that set in motion the chain of events that resulted in the malicious prosecution by all three Secret Service defendants of Girardi.  Under an aiding and abetting theory, he did not need to participate in all actions that Scarince or Savage conducted, or know every single act, but he set in motion a chain of events for which he was responsible for because he was personally involved in the one essential decision that tainted the criminal investigation. Without his actions, Plaintiff never would have been prosecuted because as set forth in the Anti-SLAPP briefing, and the previous oppositions to the motions to dismiss, there was no probable cause to prosecute Plaintiff.

Pursuant to California and federal law, Savage meets the elements for malicious prosecution.  In California, Plaintiff must establish (1) the prosecution was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice. *Zucchet v. Galardi*, 229 Cal.App.4th 1466, 1481 (2014).  To prove malice the Plaintiff must prove ill will or some improper motive.  *Daniels v. Robbins,* 182 Cal. App. 4th 204, 224 (2010). In *Mazetti v.* Bellino, 57 F.Supp.3d 1262 (2014), citing *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004), to maintain a § 1983 malicious prosecution the plaintiff must show that the defendants prosecuted with malice and without probable cause, and did it for the purpose of denying her a specific constitutional right.

The Court has already determined in the Anti-SLAPP opinion that the elements for a malicious prosecution have been met against the Girardi defendants, and it has been met here since the investigation and prosecution terminated in Plaintiff's favor, was brought or continue to be brought when there was no probable cause and was done with malice because it was done for the personal benefit of the Girardis and Savage.

## IV.   SAVAGE VIOLATED CLEARLY ESTABLISHED LAW AND PLAINTIFF IS NOT HOLDING SAVAGE LIABLE UNDER A RESPONDEAT SUPERIOR THEORY

### A.   Savage Violated Clearly Established Law

Here, the Complaint identifies constitutional rights violated, using fabricated evidence to maliciously prosecute Plaintiff during the entire investigation, the presentation to obtain the search warrant, (*Franks v. Delaware*, 438 U.S. 154 (1978) (recognizing that the Fourth Amendment may be violated if a search warrant affidavit's probable cause is based on a false statement made knowingly or with reckless disregard for the truth); violated Plaintiff's Fifth Amendment clearly established due process rights in 2016-17 by continuing to prosecute him in reckless

disregard of his innocence; *See* 9th Cir. Model Civil Jury Instruc., 9.33 (Deliberate Fabrication of Evidence). *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) *see also Napue v. People of State of Il.*, 360 U.S. 264 (1959); *Pyle v. State of Kansas*, 317 U.S. 213 (1942); malicious prosecution of Plaintiff in 2016-17 violated clearly established rights; *see, e.g.*, *Awabdy v. City of Adelanto,* 368 F.3d 1062 (2004); and a Brady violation, *Brady v. Maryland*, 373 U.S. 83 (1963). *See also* Opp. to Scarince and Henderson motion to dismiss. (Dkt. 115, pp. 3-5)

**B.      Plaintiff Is Not Holding Plaintiff Responsible Under a Respondeat Theory of Liability**

Plaintiff agrees with both Savage and the Court that Plaintiff cannot sue a government official under a respondeat superior theory of liability but must allege that through the official's own individual actions has violated the constitution.  *See* Court's ruling on motions to dismiss the original complaint, Dkt. 106, pp. 12-13, citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).   The Court went onto say that under a respondeat superior theory, Savage cannot be found to violate clearly established law.  Court's Order on Motion to Dismiss Original Complaint, p. 13.

However, Plaintiff desires to make clear that Savage is being sued for his own personal conduct in initiating and prosecuting Plaintiff, and his supervisory conduct in authorizing the investigation of Plaintiff, that never would have happened without the personal, financial and legal entanglements between Savage and Girardi, his conduct in receiving a bribe or gratuity, for clearly the quid pro quo between Girardi and him, and failure in not disclosing this relationship and his actions that would have ended the investigation into Plaintiff.

**V.      THIS COURT SHOULD ALLOW THE *BIVENS* CASE TO PROCEED**

Plaintiff has argued in his opposition to Defendants Scarince and Savage motion to dismiss the original complaint, Dkt. 78, pp. 13-21, the opposition to Defendant Savage's motion to dismiss the original complaint, Dkt. 81, pp. 15-22, and

the opposition to Defendants Scarince and Savage motion to dismiss the FAC, Dkt. 115, pp, 16-22, and incorporates those arguments by reference. Plaintiff will not address whether the case arises in a context already covered by *Bivens* and incorporates by reference those arguments.

But whether to allow *Bivens* in this case, no "special factors" counsel against allowing the *Bivens* remedy.  This is a unique case, and the facts alleged against Savage are so compelling that they justify applying *Bivens* in this context.

On the one hand, the crimes that were investigated are ordinary, and thus do not take it out of the *Bivens* context.  This type of prosecution, as the Court said at the hearing on the Motion to Dismiss, "But the Secret Service investigates credit card fraud all the time.  You know, it's not like it's the NASA Inspector General, or something." McLane decl., Exhibit 15, April 8, 2024, Hearing on Motion to Dismiss transcript, p. 12:5-7.

The prosecution is an ordinary prosecution and allowing a *Bivens* remedy against Savage and Scarince, who are no longer with the Secret Service, does not intrude in any way on the executive branch. It is hard to fathom additionally why if Plaintiff proceeds on an FTCA claim and takes discovery and depositions from the three individual Secret Service agents, and discovery on its claims from the government, that dismissing the *Bivens* claims provides these defendants any relief or is any less burdensome.  What it does do is deprive Plaintiff of a jury and punitive damages, so the relief in dismissing *Bivens* is more a financial consideration rather than a burden on the government that has to defend the FTCA action anyway.

However, the manner in which this case was authorized and investigated, and the issues presented are so extraordinary this case does not open the doors to a stampede of civil rights plaintiffs.  The Court can see for itself that this case is unique and stands on its own.  It also does not intrude on the executive branch because this case is sui generis, it is one of a kind, and there are not many cases with the unique

facts here, so allowing *Bivens* remedy is not going to cause a rush of lawsuits against federal agents.

Moreover, both the Court in its order on the Motion to Dismiss, and Savage cite the fact that Savage was the head of the Los Angeles Secret Service at the time who supervised hundreds of agents. The Court indicated that Defendant Savage whose duty was to supervise the third largest Secret Service office was under a different "legal mandate." Court Order on MTD original complaint, Dkt. 106, p. 11.

If, in fact, all that Savage did was supervise from afar with many intermediaries in between in this case and was only being sued as the head of the office and without any proof of involvement, Plaintiff would agree that special factors would dictate not allowing a *Bivens* remedy.  However, such is not the case here, because rather than Plaintiff intruding on Savage, Savage interjected himself into the investigation of Plaintiff.  Here, the allegations prove that Erika Girardi did not file a complaint with an intake officer, she went directly to Savage who then authorized the investigation, which Plaintiff has alleged was for an improper purpose as a result of receiving a bribe or gratuity, and was done as a result of the legal, business and financial  relationship between Savage and the Girardis that was not disclosed in the case to the prosecutor or the defendants.  He was not acting as a supervisor dispassionately analyzing whether to authorize an investigation, he was authorizing the investigation for the benefit of his friends and himself.  His actions and omissions were the moving force in this case, and he was personally involved.  He was not a high up administrator who did nothing on the case; he was the reason the case was pursued.

Even if this Court concludes that Plaintiff's *Bivens* claims arise in a new context, there are no special factors "indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and befits of allowing a damages action to proceed. *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (internal citation omitted) (quoting *Ziglar v. Abassi*, 582 U.S. 120, 136-39(2017))" cited in Court's MTD order, p. 6, Dkt.

106.  The judiciary is well-suited to consider Plaintiff's functional equivalent of ordinary law enforcement § 1983 claims.

There are no special factors not allowing Plaintiff to hold the Secret Service defendants personally responsible for their conduct:  it does not concern the border, where the Court has not extended *Bivens*.  *See Egbert*, 596 U.S. 482, 494 (2022); *Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020). In both cases, the Court hesitated to extend a *Bivens* cause of action to those federal defendants because it ran the "risk of undermining border security," and that "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Egbert*, 596 U.S. at 494); and it does not involve terrorism, *Ziglar v. Abassi, Id.,* (high level executive branch officials alleged to violate rights of suspected terrorists).  The border, and national security counsel against extending *Bivens* where in those areas the judiciary is not as equipped to weigh the pros and cons of remedies for constitutional violations.

Even in the immigration context, where a government immigration attorney fabricated evidence in a deportation proceeding, the Court held that the plaintiff could proceed under *Bivens.  Lanuza v. Love,* 899 F.3d 1019 (9th Cir. 2018).  The conduct in that case was so outrageous, as it is here, the Court allowed a *Bivens* claim.

Further, this case does not involve a new category of defendants. *Bivens* recognized a cause of action against federal *agents* of the Federal Bureau of Narcotics who entered the plaintiff's apartment and arrested him for alleged narcotics violations. *Bivens*, 403 U.S. at 389. Similarly, the plaintiff in *Carlson v. Green*[5] brought a *Bivens* action against federal prison officials. 446 U.S. 14, 17 (1980). Despite belonging to different agencies, the Court recognized a *Bivens* cause of action against the individual federal agents in both cases.

---

[5] *Carlson* recognized a *Bivens* cause of action for the petitioner's Eighth Amendment violations. 446 U.S. 14, 19 (1980).

Savage's attempt to point to "alternative" remedial schemes counseling against recognition of a new Bivens context misunderstands the ultimate consideration of this factor. "Bivens is concerned solely with deterring the unconstitutional acts of individual officers." *Egbert*, 596 U.S. at 498 (emphasis added, internal quotations omitted). "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." Id. (emphasis added). Thus, the sole concern is not the mere existence of an alternative remedial scheme but rather an alternative remedial scheme that provides an "adequate level of deterrence" against individual officers.

Here, all the reporting mechanisms provide inadequate levels of deterrence.  The Court in its MTD order, Dkt. 106, p.8, cites to *Pettibone v. Russell,* 59 F.4th 449, 455 (9th Cir. 2023), for the proposition that "reporting misconduct to the Inspector General precludes a *Bivens* action in cases such as this one."  *Pettibone* is distinguishable and was concerned with the judiciary intruding into a high-level regional official carrying out an executive order. *Id.,* 59 F.4th 449, 455.  In *Pettibone*, the court concluded that the plaintiff's claims arose in a new *Bivens* context because, among other things, providing for a *Bivens* remedy would be a disruptive intrusion by the Judiciary into the Executive branch because the defendant was carrying out an executive order. *Id*., 59 F.4th 449, 455 (9th Cir. 20203). Here, no such intrusion would occur if this Court permitted a *Bivens* remedy. The Secret Service investigates financial crimes via a statutory mandate, similarly to other investigatory agencies. *Compare* 18 U.S.C. § 3056 (Powers, authorities, and duties of the United States Secret Service); *with* 28 U.S.C. § 540c(b) (describing the duties and authority of FBI agents). Thus, there is no difference in legal mandate between the Secret Service and other federal investigatory agencies operating under a statutory mandate.

Second, this case is distinguishable because unlike *Pettibone,* Plaintiff here has demonstrated the reporting mechanisms provide inadequate deterrence.  For example, while the OIG website provides a forum for reporting alleged misconduct, the statistics published on the OIG's website regarding the results of reported conduct cast doubt on whether the hotline provides a meaningful level of deterrence. In Fiscal Year 2022, the OIG received 42,943 hotline complaints. Office of Inspector General, *About Us*, www.oig.dhs.gov/about (last visited Feb. 13, 2024). Of those complaints, only 257 recommendations were issued, 95 investigations were referred to prosecution, and only 28 personnel actions were taken. *Id.* In other words, less than 1% of the complaints received resulted in action by the OIG. Thus, it would be unreasonable to conclude that action taken by the OIG's office provides an "adequate level of deterrence" of constitutional violations.

Similarly, while the Department of Homeland Security's Office for Civil Rights and Civil Liberties ("Office" or "the Office") allows aggrieved individuals to make a complaint, the Office's annual statistics raise doubt in the effectiveness of deterring constitutional violations. Of the 747 complaints closed in fiscal year 2022, only 5% of these complaints were closed with a recommendation to a DHS office. Department of Homeland Security, Fiscal Year 2022 Annual Report to Congress (last visited Feb. 13, 2024) https://www.dhs.gov/sites/default/files/2023-12/23_1117_crcl_fy22-annual-report-508.pdf. Additionally, the complaints result in "recommendations" implying that even if an investigation concludes a civil rights violation may have occurred, the relevant department is not bound to abide by the Office's conclusions. *See id.* at 38. Thus, making a complaint to the Office does not create an adequate level of deterrence against future constitutional violations. Finally, while the Secret Service has an independent avenue for reporting employee misconduct, it is even less clear whether this provides an effective means of deterring future constitutional violations since information regarding these reports is unavailable. Moreover, Savage and Scarince are

no longer Secret Service employees, so no internal investigation could be mounted. Thus, none of the three identified "alternative" reporting measures provide an "adequate level of deterrence" of future constitutional violations.

Defendant's two alternative statutory remedies are equally insufficient to address Plaintiff's constitutional violations because they are aimed at preventing adverse action by the Government and its agencies, rather than individual misconduct. First, the Supreme Court has held that the FTCA is "not a sufficient protector of [a] citizens' constitutional rights" and could not be viewed as an exclusive alternative remedy to *Bivens* "without a clear constitutional mandate." *Carlson*, 446 U.S. at 23. The Court recognized that a *Bivens* claim against an individual officer is a more effective deterrent than the FTCA remedy against the United States and would ensure more uniform rules would govern a plaintiff's constitutional claims. *Id.* at 21-23. Second, the lack of punitive damages in FTCA suits rendered it a "much less effective" remedy than *Bivens*. *Id.* at 22. Finally, the Court noted that a plaintiff's inability to opt for a jury trial in an FTCA action, which is available in a *Bivens* suit, rendered *Bivens* a more effective remedy. *Id.* Thus, the FTCA claim is not an adequate alternative remedy to Plaintiff's *Bivens* claim.

Likewise, Defendant's assertion that the Administrative Procedure Act ("APA") provides an effective avenue for Plaintiff to redress his constitutional claims is inapposite since the APA is not concerned with individual action. The APA grants judicial review for a person suffering a legal wrong because of "agency action." 5 U.S.C. § 702. "[T]the 'agency action' in question must be 'final agency action.'" *Lujon v. Nat. Wildlife Federation*, 497 U.S. 871, 883 (1990) (quoting 5 U.S.C. § 704). Because Plaintiff's claims are against individual officers within the Secret Service, which by definition cannot be viewed as final agency action, the APA is wholly inapplicable and cannot address Plaintiff's constitutional violations.

Accordingly, Defendant has failed to identify any special factors counseling against recognition of a new *Bivens* context.

## VI.   CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss should be denied.

Dated: August 5, 2024                McLANE, BEDNARSKI & LITT, LLP


By: */s/ David S. McLane*
      Barrett S. Litt
      Marilyn E. Bednarski
      David S. McLane*
      Attorneys for Plaintiff Christopher Psaila


## L.R. 11-6.2 – CERTIFICATE OF COMPLIANCE*

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 6,859 words, which complies with the word limit of L.R. 11-6.1.